IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.,

1411 Sand Island Parkway
Honolulu, HI,

        Plaintiff,

    v.

DEPARTMENT OF TRANSPORTATION

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590, and

MARITIME ADMINISTRATION,

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590,

        Defendants.

Civil Action No. 18-2751

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Matson Navigation Company, Inc. ("Matson" or "Plaintiff"), for its complaint against the Department of Transportation and the Maritime Administration ("MARAD") (collectively "Defendants"), by and through its attorneys, alleges as follows:

### INTRODUCTION

1.    This action arises from MARAD's approval of two vessel replacement requests under the Maritime Security Program (the "MSP"), which MARAD, an agency within the Department of Transportation, administers pursuant to the Maritime Security Act of 2003, as amended. The MSP provides financial assistance to certain U.S.-flag vessels operating in foreign commerce, in part to compensate for the higher costs of building, maintaining, and operating U.S.-flag vessels, as well as to advance national security by ensuring that the United States maintains a

viable U.S.-flag presence in international commercial shipping.  *See* 46 U.S.C. § 53102(a); 139 Cong. Rec. H8832 (Nov. 4, 1993) (discussing a predecessor program to the MSP).

2.      Not all vessels operating in international shipping are eligible for MSP subsidies. Among other limitations, to protect U.S.-flag vessels operating in domestic trade from unfair competition from subsidized vessels, MSP vessels "shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," and "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1); *see also* 46 C.F.R. §§ 296.2, 296.11.

3.      MSP subsidies are awarded to identified vessels pursuant to written agreements.  A vessel under an existing agreement may be replaced with a different subsidized vessel only with the approval of the Secretary of Transportation and the Secretary of Defense or their delegees.  *See* 46 U.S.C. § 53105(f).  A replacement vessel must meet then-current eligibility requirements.

4.      This case involves two MARAD decisions (the "APL Decisions") approving the replacement of two vessels receiving subsidies under MSP Agreement Numbers MA/MSP-54 and MA/MSP-57 with two vessels, renamed the APL GUAM and APL SAIPAN, operated by APL Lines, Inc., APL Marine Services, Ltd., and APL Maritime, Ltd (together, "APL").

5.      Whereas the vessels originally subsidized under these agreements operated in the Middle East, the replacement vessels are used by APL to carry cargo originating on the west coast of the United States to Guam and Saipan, both of which are U.S. territories.  They directly compete with Matson's unsubsidized vessels that operate in these domestic trade routes.

6.      The APL vessels are ineligible for MSP subsidies because they do not operate exclusively either in foreign trade or in mixed foreign trade and domestic trade permitted under a registry endorsement issued pursuant to 46 U.S.C. § 12111.  Specifically, trade with Saipan is

neither foreign trade nor domestic trade permitted under a registry endorsement. Accordingly, the APL vessels do not meet the statutory and/or regulatory eligibility requirements.

7.     Matson seeks judicial review of MARAD's APL Decisions on the grounds that MARAD's APL Decisions were arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"), and were otherwise contrary to law or unsupported by substantial evidence in the administrative record. *See* 5 U.S.C. § 706.

8.     For the reasons summarized above and explained more fully below, Matson respectfully requests that this Court hold unlawful, vacate, terminate, and set aside MARAD's APL Decisions.

9.     Matson further requests that this Court enjoin MARAD from approving the APL GUAM and APL SAIPAN as "replacement" vessels under the MSP Operating Agreements at issue here.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This Court is authorized to issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

11.     Matson previously challenged the APL Decisions in the United States Court of Appeals for the D.C. Circuit, but that court held that the action must be brought in the district court in the first instance. *See Matson Navigation Co. v. U.S. Dep't of Transp.*, 895 F.3d 799 (D.C. Cir. 2018).

12.    The APL Decisions are "final" for purposes of the APA, 5 U.S.C. § 701 et seq. This action is timely because it is brought within six years after the APL Decisions were made. *See* 28 U.S.C. § 2401(a).

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because Defendants are agencies of the United States, they reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

14.    Matson was not required to exhaust its administrative remedies before filing suit. MARAD's implementing regulations require, and authorize, administrative appeals only by MSP "Contractors," and MARAD ruled in this proceeding that Matson is not a Contractor entitled, or required, to invoke the administrative appeal process. Similarly, Matson cannot have waived or forfeited any allegation or argument by not previously presenting it to the agency, because there was and is no process by which such presentation could have been made.

## PARTIES

15.    Plaintiff Matson provides ocean freight carrier services from the U.S. west coast to Alaska, Asia, Hawaii, Guam, the Northern Mariana Islands (which include Saipan), and other ports of call in the Pacific Ocean. Matson has been providing ocean freight carrier services in the Pacific region since 1882. Matson is a Hawaii corporation that maintains its headquarters in Honolulu, Hawaii. Matson is a wholly-owned subsidiary of Matson, Inc., a publicly traded Hawaii corporation.

16.    Defendant Department of Transportation is an executive agency of the United States government, headed by the Secretary of Transportation. The Secretary of Transportation is authorized by statute to establish the MSP, award operating agreements, make payments under the MSP, and prescribe rules in order to implement the MSP. 46 U.S.C. §§ 53101–53111.

17.     Defendant MARAD is an administrative agency within the Department of Transportation, led by the Maritime Administrator. The Secretary of Transportation has delegated the administration of the MSP to the Maritime Administrator. 49 C.F.R. § 1.93(a). As a result, MARAD has the responsibility to prescribe regulations, determine vessels' eligibility for the MSP, award operating agreements under the MSP, and approve replacement vessels.

18.     Non-party APL Lines, Inc. is a shipping company organized in Delaware. APL Lines, Inc. is owned, through a series of subsidiaries, by the French corporation CMA CGM S.A. APL Lines, Inc., APL Marine Service, Ltd., and APL Maritime, Ltd. serve several of the same routes and its vessels call at many of the same ports as Matson's. Matson and APL are direct competitors in the provision of ocean freight services to Guam and Saipan.

## STATUTORY AND REGULATORY BACKGROUND

### I.     Congress Promotes U.S. Shipping in Domestic Trade Routes

19.     "From the earliest days of the Republic, Congress has been concerned with stimulating and protecting the growth of an American-built and controlled coastwise Merchant Marine," and has enacted legislation granting preferential treatment to U.S.-built and U.S.-flagged vessels. *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964) (citing An Act Imposing Duties on Tonnage, 1 Stat. 27–28 (1789)). Among other things, the federal government has long promoted the domestic shipping industry by limiting access to trade routes between points within the United States to domestic carriers.

20.     Congress strengthened these long-standing protections for the domestic shipping industry in 1920 by passing the Jones Act. *See* Merchant Marine Act of 1920, Pub. L. No. 66-261, § 27 (1920).

21.     Now codified at 46 U.S.C. § 55101 et seq., the Jones Act provides that "a vessel may not provide any part of the transportation of merchandise . . . between points in the United

States to which the coastwise laws apply, either directly or via a foreign port," unless the vessel was built in the U.S. and is owned by a U.S. citizen, or else an exception applies. 46 U.S.C. § 55102(b); *see also* 46 U.S.C. § 12112.

22.     Because the Jones Act does not authorize direct subsidies to domestic carriers, it allows the federal government to promote the domestic shipping industry "without direct cost to the taxpayers." *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 912 (D.C. Cir. 1982).

23.     Violating the Jones Act is no small matter; penalties include the seizure and forfeiture of merchandise from the vessel. 46 U.S.C. § 55102(c).

24.     The Jones Act applies to commerce between points in the United States to which the "coastwise," or domestic shipping, laws apply. 46 U.S.C. § 55102(b).

25.     "[T]he coastwise laws apply to the United States, including the island territories and possessions of the United States," with limited exceptions for American Samoa, the Northern Mariana Islands, and the Virgin Islands. 46 U.S.C. § 55101.

26.     Trade between any point in the United States or its territories and Guam is domestic.

27.     Trade between any point in the United States or its territories and Saipan is domestic.

28.     Federal contractors operating between points in the United States (including Guam) and the Northern Mariana Islands (including Saipan) are engaged in the coastwise trade.

29.     Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("the Northern Mariana Islands Covenant") provides that "[t]he laws of the United States regarding coastal shipments . . . will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note (Northern Mariana Islands Covenant § 502(b)); *see also*

46 U.S.C. § 55101(b)(2); Customs Service Ruling HQ 109583 (July 7, 1988) (discussing service between Guam and Saipan, and noting that "the coastwise laws of the U.S. are applicable in the Northern Mariana Islands only to the activities of the U.S. Government and its contractors").

30.     A carrier cannot evade the requirements of the coastwise laws, including the Jones Act, by interrupting a voyage between points in the United States with a stop or a transshipment (*i.e.*, a change of vessels) at a foreign port. Indeed, the Jones Act specifically covers shipping between points in the United States "either directly or *via a foreign port*." 46 U.S.C. § 55102(b) (emphasis added). "Congress, seeing how easily the protection to American shipping would be vitiated by a simple transshipment of the same cargo, inserted the words 'either directly or via a foreign port' to prohibit such simple transshipment." *Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

31.     The U.S. Customs and Border Protection ("CBP") was the nation's first comprehensive border security agency, charged with maintaining the integrity of the nation's boundaries and ports of entry.

32.     A CBP regulation provides that "[a] coastwise transportation of merchandise takes place, within the meaning of the coastwise laws, when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is unladen at another coastwise point, regardless of the origin or ultimate destination of the merchandise." 19 C.F.R. § 4.80b(a).

33.     The CBP has repeatedly explained that "an 'honest intention to bring the goods [transported] into the common stock of the [intermediate foreign] country' is required to break the continuity of transportation between coastwise points via a foreign point." *E.g.*, CBP Ruling HQ 219709 (Aug. 9, 2012); CBP Ruling HQ H114310 (July 13, 2010). As the Supreme Court long ago recognized, "even the landing of goods and payment of duties does not interrupt the continuity

of the voyage of the cargo, unless there be an honest intention to bring them into the common stock of the country." *The Bermuda*, 70 U.S. 514, 554 (1865).

34.     To illustrate, goods originating in Long Beach, California; transported by one vessel to Busan, South Korea; and from there transported by a second vessel to Guam or Saipan constitute a domestic shipment because they originated and terminated at ports in the United States or its territories.

## II.     The Maritime Security Program Promotes U.S. Shipping in Foreign Commerce

35.     The Jones Act protects *domestic* shipping.   "In U.S. foreign commerce, however, such protective legislation is not possible," because the foreign countries with which the United States trades have equal rights to allow their own flagged vessels to carry cargo in such trade. *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912.

36.     In order to promote U.S. shipping in foreign commerce and protect U.S.-flagged carriers from the lower construction and labor costs generally enjoyed by foreign carriers, Congress has long authorized subsidies to U.S.-flagged carriers operating in foreign commerce.

37.     For example, in the Merchant Marine Act of 1936, Congress enacted the Construction-Differential Subsidy program ("CDS") and the Operating-Differential Subsidy program ("ODS"). Merchant Marine Act of 1936, 49 Stat. 1985, §§ 501–610 (1936). For decades, the CDS and ODS programs offset the higher costs of constructing vessels in the United States and employing U.S.-citizen mariners by providing direct subsidies to qualifying carriers that operate in foreign trade.

38.     At the same time, Congress has long prevented subsidized carriers or vessels from engaging in domestic trade, as "[i]t would be grossly unfair to allow U.S. vessels that have received a subsidy . . . to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards." *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912; *see also* 139 Cong. Rec. H8760

(Nov. 3, 1993) ("Among [the CDS] restrictions is a requirement that subsidized vessels operate exclusively in foreign trade. This restriction is intended to protect both the operators of unsubsidized vessels in the protected domestic trades and our domestic shipyards that have exclusive right to supply vessels for domestic trades."); *Sea-Land Serv., Inc. v. Dole*, 596 F. Supp. 1143, 1146 (D.D.C. 1984) (describing "the clear statutory intent" of a previous subsidy program "to protect unsubsidized lines such as plaintiffs here from competition by subsidized lines such as APL on domestic cargo routes").

39.     Limitations on domestic trade for subsidized vessels cannot be evaded by transshipment at a foreign port.

40.     Congress currently subsidizes U.S. carriers engaged in foreign commerce through the MSP. *See* 46 U.S.C. § 53101 et seq.

41.     Congress created the MSP in the Maritime Security Act of 1996, in order to "meet national defense and other security requirements and maintain a United States presence in *international* commercial shipping." Pub. L. No. 104-239, § 2 (1996) (now codified at 46 U.S.C. § 53102(a)) (emphasis added).

42.     In creating the MSP, Congress enacted strict eligibility limitations. In order to participate in the MSP, a vessel must, among other things, "provid[e] transportation in foreign commerce"; be "suitable for use . . . for national defense or military purposes"; and be "commercially viable." 46 U.S.C. § 53102(b)(2), (4).

43.     "Foreign commerce" is defined in the statute as:

(A) commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country; and

(B) commerce or trade between foreign countries.

46 U.S.C. § 53101(4).

44.     The regulations regarding eligibility for inclusion in the MSP similarly require that a vessel must be "operated or, in the case of a vessel to be purchased or construed, will be operated to provide transportation in the foreign commerce." 46 C.F.R. § 296.11(a)(2).

45.     The regulations define "foreign commerce" as follows:

> Foreign commerce means a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. § 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

46.     A registry endorsement under 46 U.S.C. § 12111 permits a vessel to engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef, even if that vessel would not otherwise be eligible to operate in coastwise trade. A vessel may not obtain a registry endorsement to call Saipan.

47.     Carriers participate in the MSP by entering into "operating agreements" with MARAD for specifically identified vessels. 46 U.S.C. § 53102(a); 46 C.F.R. §§ 296.1, 296.12.

48.     Here too Congress set strict eligibility requirements for MSP operating agreements, requiring that the subsidized vessels "shall be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement," and that the vessels "shall not otherwise be operated in the coastwise trade." 46 U.S.C. § 53105(a).

49.     Vessels are thus not eligible for an MSP operating agreement if they are not operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement, or are otherwise operated in the coastwise trade.

50.     The Maritime Security Act also includes requirements for replacing vessels in the subsidy program. A replacement vessel must be "eligible to be included" in the MSP, and the

replacement must be approved by the Secretary of Transportation, in conjunction with the Secretary of Defense. 46 U.S.C. § 53105(f).

51.     The National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 (2017), among other things, amended 46 U.S.C. § 53105 to include an additional paragraph regarding the eligibility of vessels to participate in the MSP:

> (2)     in the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port . . . .

Pub. L. No. 115-91, § 3503, 131 Stat. 1283, 1911 (2017) (codified at 46 U.S.C. § 53105(a)(2) (2017)).

## FACTUAL ALLEGATIONS

### I.     APL Receives MSP Subsidies for Ships Operating in Domestic Trade

52.     In January 2005, APL was awarded MSP Operating Agreement Nos. MA/MSP-49 to -57, allowing nine vessels to operate under the MSP. *See* Ex. 1.[*]

53.     On December 4, 2014, APL applied to MARAD for a determination that it could replace two vessels under its MSP Operating Agreements with unspecified, smaller vessels. Ex. 2. Whereas the existing vessels operated in the Middle East, the proposed replacement vessels would operate in the Pacific Ocean. *Id.* at 3–4.

54.     In its initial application, APL indicated that it would operate at least one of the replacement vessels in service to Guam—a service APL had not offered for nearly two decades. Ex. 2, at 5–6.

---

[*]     All exhibits to the complaint are from the administrative record provided by MARAD to Matson. Portions of the administrative record have been provided to Matson only in redacted form, and certain attachments to documents in the administrative record have not been provided to Matson at all.

55.     APL emphasized that it would carry cargo originating in the mainland United States to Guam, but did not make any representations about transportation of cargo originating in the United States or its territories to Saipan (a U.S. territory in the Mariana Islands), or transportation of cargo originating in Saipan to other parts of the United States. Ex. 2.

56.     Specifically, APL noted that "the only vessel operator [currently] providing a regular container service between the U.S. mainland and Guam is Matson," and that, "[a]t this time, there is effectively a single carrier providing service to Guam from the U.S. mainland. The free market is never well served by a monopoly . . . ." Ex. 2, at 5–6.

57.     APL argued that although the carriage of cargo between the continental United States and Guam constitutes domestic trade, this did not make it ineligible for MSP subsidies because "MSP vessels may be operated in mixed foreign commerce and domestic trade allowed under a registry endorsement," and Guam is among the ports authorized to be called under a registry endorsement. Ex. 2, at 5.

58.     Again, APL did not make any representations about transportation of cargo originating in the United States to Saipan, or transportation of cargo originating in Saipan to other parts of the United States. Ex. 2.

59.     Unlike Guam, Saipan is not among the ports that may be called under a registry endorsement.

60.     MARAD approved APL's application in principle in January 2015. Ex. 3, at 1–2. However, APL did not begin providing service to Guam (or Saipan) at that time.

A.      **MARAD Approves the APL GUAM for the MSP**

61.     On August 27, 2015, APL represented to MARAD that it had located a suitable and qualified replacement for one of its existing MSP vessels. APL proposed to substitute in a vessel

then known as the NEW DYNAMIC and requested a determination that the NEW DYNAMIC was eligible under MSP and was an acceptable replacement vessel for one of APL's existing MSP vessels. Ex. 4.

62.     APL indicated that the replacement vessel would carry cargo to and from Guam, but made no representations about, or reference to, the vessel's anticipated transportation of cargo to or from Saipan.

63.     On August 31, 2015, non-party R&D Investments requested a determination from MARAD that the NEW DYNAMIC would be eligible for the MSP. Ex. 5. R&D Investments stated that it was the owner or intended to become the owner of the NEW DYNAMIC. R&D Investments made no representations about the vessel's carriage of goods to or from Saipan.

64.     On September 11, 2015, MARAD determined that the NEW DYNAMIC was eligible for the MSP. Ex. 6.

65.     Aside from noting that it had "determined that the Vessel meets the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11," MARAD offered no examination of the requirements for eligibility, including whether the vessel would be engaged in foreign commerce within the meaning of the statute and the regulations. Ex. 6, at 1.

66.     On September 16, 2015, APL requested formal approval to replace one of its MSP vessels (the APL CYPRINE) with the NEW DYNAMIC, which would be renamed the APL GUAM. Ex. 7.

67.     APL represented that the APL GUAM would operate under MSP Operating Agreement No. MA/MSP-54. Ex. 7.

68.     On October 12, 2015, before MARAD had acted on APL's formal application, APL issued a press release announcing its new service to Guam and Saipan, called the "Guam Saipan

Express" or "GSX."   Ex. 8.   APL advertised that the service would give "Saipan shippers an alternative for shipping from the U.S. mainland."   *Id.*

69.     Around the same time, Eric Mensing, the President of APL Marine Services, Ltd. and APL Maritime, Ltd., told a newspaper, The Guam Daily Post, that the addition of the Guam Saipan Express would let "Saipan shippers 'tap into APL's global service network for freight to and from many parts of the world.'"   Ex. 9, at 3.

70.     Mr. Mensing made clear in emails to MARAD that APL's entrance into the Guam/Saipan trade was "a commercial decision, but ONLY made possible with the help of Marad and the US Department of Defense who supported us all along the way."   Ex. 9, at 2.

71.     Although not disclosed by APL in its applications to MARAD, the APL GUAM was intended to carry cargo originating from the United States west coast, operating in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands.   Ex. 10, at 2.

72.     On October 15, 2015, an internal memorandum was circulated within MARAD recommending that MARAD approve APL's request to substitute the APL GUAM for the APL CYPRINE.   Ex. 11.

73.     With respect to the statutory requirement that an MSP vessel operate in foreign commerce, the memorandum stated:

> Section 53102(b)(2) of Chapter 531 requires that an eligible vessel must be operated in providing transportation in foreign commerce.   As previously mentioned, Maritime will demise charter the Replacement Vessel and time charter the vessel to APL Lines.   The NEW DYNAMIC (tbn APL GUAM) will operate in APL Lines' established world-wide services.   Accordingly, it has been determined that the Replacement Vessel will be operated in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

Ex. 11, at 8–9.

74.    With respect to the regulatory eligibility requirements, the memorandum stated: "Section 296.11(a) implements 46 U.S.C. § 53102(b).  The requirements and qualifications of section 53102(b) have previously been discussed and have been determined to be satisfied. Accordingly, it can be determined that the requirements of section 296.11(a) have been satisfied." Ex. 11, at 11.

75.    The memorandum recommended that MARAD:

(P)    Find that the Replacement Vessel will be time chartered to American President Lines, Ltd. (APL Lines), a Delaware corporation and United States documentation citizen, for operation in its established world-wide services.

(Q)    In view of (P) above, find that the Replacement [V]essel will provide transportation in foreign commerce pursuant to the requirement of 46 U.S.C. § 53102(b)(2).

Ex. 11, at Recommendations  4.

76.    The memorandum included no discussion about the APL GUAM's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.  In fact, the memorandum did not address Saipan at all.

77.    MARAD adopted those recommendations, and on October 22, 2015, issued a letter to APL approving the substitution of the APL GUAM in place of the APL CYPRINE.  Ex. 12.

78.    In approving APL's request, MARAD made the following determinations regarding the APL GUAM's compliance with the statutory eligibility requirements:

(P)    Found that the Replacement Vessel will be time chartered to American President Lines, Ltd. (APL Lines), a Delaware corporation and United States documentation citizen, for operation in its established world-wide services.

(Q)    In view of (P) above, found that the Replacement [V]essel will provide transportation in foreign commerce pursuant to the requirement of 46 U.S.C. § 53102(b)(2).

Ex. 12, at 3.

79.     In approving APL's request, MARAD made the following determination regarding the APL GUAM's compliance with the regulatory eligibility requirements:

> (Z)     Noted that: (1) that Section 296.11(a) implements 46 U.S.C. § 53102(b); (2) found the requirements and qualifications of Section 53102(b) have previously been discussed and have been determined to be satisfied; and (3) found that the requirements of section 296.11(a) have been satisfied and that approval by the Secretary in conjunction with SecDef has already been discussed and determined to have been satisfied.

Ex. 12, at 4.

80.     The letter included no discussion about the APL GUAM's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States. In fact, the letter did not address Saipan at all.

81.     The October 22, 2015 letter awarding MSP subsidies to the APL GUAM constitutes the first of the two APL Decisions challenged in this action.

82.     Although APL explicitly intended for the APL GUAM to operate in competition with Matson's unsubsidized service to Guam and Saipan, Matson was not given formal notice of APL's application to substitute the APL GUAM for the APL CYPRINE, nor was it given an opportunity to participate in the administrative proceeding approving the subsidy award.

**B.     MARAD Approves the APL SAIPAN for the MSP**

83.     On August 24, 2016, APL sought approval in principle to replace a second of its MSP vessels with another vessel to be operated "alongside the APL GUAM in APL's existing US-flag service of Guam and Saipan via Korea." Ex. 13, at 1.

84.     APL represented to MARAD:

(iii)     In implementation of the authority granted in your January 20, 2015 letter, and the Administration[']s subsequent determination that the APL GUAM meets the MSP eligibility requirements, effective December 2015, APL initiated its

planned feeder service to Guam and Saipan with that vessel, replacing a second of the S12s (the APL Cyprine) under Operating Agreement No. MS/MSP 54.

Ex. 13, at 3.

85.     On October 11, 2016, APL supplemented its August 24, 2016 application, representing that it had identified a vessel, the ELISA ELMAS, suitable for substitution in place of an existing MSP vessel. Ex. 14.

86.     APL represented that the ELISA ELMAS was "ideally suited to the APL Guam/Saipan service." Ex. 14, at 1.  APL contended that there was "no question that the vessel [met] the eligibility standards of 46 U.S.C. [§] 53102(b)," because, among other things, it would "be operated in foreign commerce." *Id.* at 2.

87.     APL represented that the ELISA ELMAS would operate under MSP Operating Agreement No. MA/MSP-57.  Ex. 14.

88.     On November 9, 2016, MARAD responded to APL's August 24, 2016 application and approved the substitution in principle, provided the substituted vessel met all MSP eligibility requirements.  Ex. 15.  MARAD did not address whether the substituted vessel would operate in foreign commerce.

89.     On November 15, 2016, MARAD responded to APL's October 11, 2016 application and determined that the ELISA ELMAS met the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11.  Ex. 16.  MARAD did not otherwise discuss the issue of whether the ELISA ELMAS would operate in foreign commerce.

90.     On December 9, 2016, an internal memorandum was circulated within MARAD recommending that MARAD formally approve APL's request to substitute the ELISA ELMAS, to be renamed the APL SAIPAN, in place of the APL AGATE.  Ex. 17.

91.    With respect to the statutory requirement that an MSP vessel operate in foreign commerce, the memorandum stated:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code. Under 46 U.S.C. § 12111(b), a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef. APL will time charter the Replacement Vessel from APLMS for operation in its established worldwide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement. Accordingly, it has been determined that the Replacement Vessel will provide transportation in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

Ex. 17, at 4.

92.    With respect to the regulatory eligibility requirements, the memorandum stated: "46 C.F.R. § 296.11(a) implements 46 U.S.C. § 53102(b). The requirements and qualifications of Section 53102(b) have previously been discussed and have been determined to be satisfied." Ex. 17, at 7.

93.    The memorandum recommended that MARAD:

> (C)    Note that APLMS will time charter the Replacement Vessel to American President Line, Ltd. (APL), a Delaware corporation and U.S. documentation citizen, for operation in APL's established world-wide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement.

> (D)    In view of (C) above, find that the Replacement Vessel will provide transportation in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).

Ex. 17, at 12–13.

94.    The memorandum included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation

of cargo originating in Saipan to other parts of the United States. In fact, with the exception of the vessel's name, the memorandum did not address Saipan at all.

95.     MARAD adopted those recommendations, and on December 20, 2016, issued a letter to APL approving the substitution of the APL SAIPAN in place of the APL AGATE. Ex. 18.

96.     In approving APL's request, MARAD made the following determinations regarding the APL SAIPAN's compliance with the statutory eligibility requirements:

(C)     Noted that APLMS will time charter the Replacement Vessel to American President Line, Ltd. (APL), a Delaware corporation and U.S. documentation citizen, for operation, in APL's established world-wide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement:

(D)     In view of (C) above, found that the Replacement Vessel will provide transportation in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).

Ex. 18, at 1–2.

97.     In approving APL's request, MARAD made the following determination regarding the APL SAIPAN's compliance with the regulatory eligibility requirement:

(K)     Noted that (1) Section 296.11(a) implements 46 U.S.C. § 53102(b); (2) found the requirements and qualifications of Section 53102(b) have been determined to be satisfied; and (3) found that the requirements of Section 296.11(a) have been satisfied and that approval by the Secretary in conjunction with SecDef has been determined to have been satisfied.

Ex. 18, at 2.

98.     The letter included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States. In fact, with the exception of the vessel's name, the letter contained no discussion of Saipan at all.

99.     The December 20, 2016 letter awarding MSP subsidies to the APL SAIPAN constitutes the second of the two APL Decisions challenged in this action.

100.     The APL SAIPAN in fact carries cargo originating from the United States west coast, and operates in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands. Ex. 10, at 2.

101.     When APL announced the addition of the APL SAIPAN to its service to Guam, APL's General Manager for Guam and Micronesia, John Selleck, explained that "[t]he more frequent GSX service will speed up essential cargo shipments from the U.S. mainland to the islands." Ex. 19.

102.     APL advertised its expanded GSX service in a brochure highlighting the "[w]eekly Priority I U.S. flag service departures from the U.S. West Coast ports to Guam." Ex. 10, at 2.

103.     Although neither MARAD nor APL formally notified Matson of the application to approve the APL SAIPAN as a subsidized replacement vessel, Matson wrote to MARAD on December 12 and 15, 2016, setting forth certain reasons why APL's vessels providing service to Guam and Saipan should not be included in the MSP. Exs. 20–21. MARAD did not acknowledge or address Matson's objections in its letter approving the APL SAIPAN for inclusion in the MSP.

**C.     Previous Litigation Regarding Eligibility**

104.     Following MARAD's formal approval of the APL SAIPAN, Matson attempted to challenge both APL Decisions by administrative appeal on February 17, 2017. *See* Ex. 22; *see also* 46 C.F.R. § 296.50. Matson filed an amended appeal on March 17, 2017. *See* Ex. 23.

105.     On April 7, 2017, MARAD rejected the administrative appeal on the ground that Matson lacked standing under 46 C.F.R. § 296.50(a) because it is not a "Contractor" within the meaning of the operative regulations. Ex. 24, at 1.

106.    Although MARAD concluded that Matson lacked standing, it nonetheless discussed the merits of the administrative appeal as well.

107.    MARAD found that the "relevant language in the [Maritime Security Act] could not be clearer regarding APL's ability to operate in the Guam trade," and cited 46 U.S.C. § 53105(a)(1)(A) in support, saying that because domestic trade with Guam under a registry endorsement "as provided in section 53105(a)(1)(A)" is permitted in the MSP, the replacement vessels were eligible to participate in the MSP. Ex. 24, at 1–2.

108.    MARAD also dismissed Matson's argument that the replacement vessels' transport of cargo originating in and destined for the United States made them ineligible for the MSP. Ex. 24, at 2.

109.    MARAD did not discuss or acknowledge the replacement vessels' transport of cargo to and from Saipan.

110.    Matson petitioned for review of MARAD's appeal determination in the United States Court of Appeals for the D.C. Circuit. APL intervened. Both MARAD and APL argued that the Court of Appeals lacked jurisdiction to hear Matson's appeal and that the case should be brought instead in district court. After briefing, argument, and supplemental briefing, the Court of Appeals dismissed the appeal for lack of jurisdiction, ruling that Matson's challenges to the APL Decisions must be brought initially in the district court. *See* Ex. 25.

## II.    Harm to Matson

111.    Matson has suffered and will continue to suffer economic injury as a result of Defendants' actions in approving MSP subsidies to the two APL vessels in the APL Decisions.

112.    Matson and APL are competitors in the Guam and Saipan trades. Specifically, both Matson and APL operate vessels that transport cargo from the United States and its territories to Guam and Saipan, and from Guam and Saipan to other parts of the United States.

21

113.     Currently, Matson operates no vessels that receive MSP subsidies, including vessels that provide ocean freight services between other parts of the United States and its island territories of Guam and Saipan.

114.     As a result of the APL Decisions and the MSP subsidies resulting therefrom, APL is able to offer significantly lower prices than Matson for shipping cargo on the same routes, driving carriage from Matson to APL and altering the competitive balance in this domestic market.

115.     Between the fall of 2016 and the fall of 2017, the same timeframe in which the APL SAIPAN was approved for inclusion in the MSP, the volume of containers Matson carried in the "Guam Service" declined by 23%. *See* Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 8 (Nov.                                    2,                                    2017), https://www.sec.gov/Archives/edgar/data/3453/000155837017008005/0001558370-17-008005-index.htm. As indicated in Matson's July 8-K filings, that volume has further declined since. *See* Matson, Inc. form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 7 (July 31, 2018), https://www.sec.gov/Archives/edgar/data/3453/000155837018005979/0001558370-18-005979-index.htm.

116.     For financial reporting purposes, Matson combines the freight volumes for cargo shipped to or from Guam and Saipan into a single category—the "Guam Service" reported above. Revenue from cargo shipped to or from Guam and Saipan is similarly combined for financial reporting purposes. Therefore the decreased carriage reported by Matson includes both Guam and Saipan.

117.     The CEO of Matson recently described the competition with APL for market share in the Guam and Saipan region as an "axe fight." *See* Ex. 26.

118.    MARAD's decisions have caused and will cause Matson to lose sales, lower prices, and/or expend more of its own resources to obtain business in the Guam and Saipan trades. Since the APL vessels began to operate with MSP subsidies, Matson's unsubsidized vessels have lost carriage as measured in both volume of containers and revenue.

119.    Matson supports full and fair competition in all of its trade lines, but so long as APL vessels are receiving federal subsidies for which they do not qualify, Matson is not competing on a level playing field and will continue to incur injury.

120.    Congress did not and does not intend for vessels operating in the domestic trades, including the transportation of freight to and from Pacific island territories, to receive MSP subsidies.

**COUNT I**
**(Administrative Procedure Act – Arbitrary and Capricious Action)**

121.    Matson incorporates the preceding paragraphs as if fully set forth herein.

122.    MARAD's approval of the two APL vessel replacement requests was inconsistent with the statutory and regulatory definition of "foreign commerce."

123.    The APL vessels are ineligible for MSP subsidies because they do not operate in foreign commerce as defined in the statute and implementing regulations.

124.    In order to be eligible for the MSP, a vessel must "provid[e] transportation in foreign commerce." 46 U.S.C. § 53102(b)(2).

125.    46 U.S.C. § 53105(a)(1)(A) further provides that a vessel operating pursuant to the MSP "shall be operated *exclusively* in the foreign commerce or . . . , in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," and "shall not otherwise be operated in the coastwise trade." 46 U.S.C. § 53105(a)(1) (emphasis added).

23

126.   "Foreign commerce" is defined as "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country," and "commerce or trade between foreign countries."  46 U.S.C. § 53101(4).

127.   46 C.F.R. § 296.11(a)(2) similarly provides that a "vessel is eligible to be included in an MSP Operating Agreement if . . . [t]he vessel is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."

128.   "Foreign commerce" is defined as:

> a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

129.   MARAD found that the APL GUAM would be engaged in foreign commerce simply because it would "operat[e] in [APL Lines'] established world-wide services." Ex. 12, at 3.

130.   Similarly, MARAD stated that the APL SAIPAN would be engaged in foreign commerce simply because it would "operate in [APL's] established worldwide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the [vessel's] registry endorsement." Ex. 18, at 1–2.

131.   In neither case did MARAD consider whether the vessel's transportation of cargo originating in the United States or its territories to Saipan, or from Saipan to other parts of the United States, rendered the vessel ineligible for the MSP.

132.    The APL GUAM and APL SAIPAN are engaged in domestic trade or coastwise trade because they carry cargo that both originated in and is destined for the United States. *See* 46 C.F.R. § 296.2; 19 C.F.R. § 4.80b(a).

133.    APL has publicly stated that both the APL GUAM and APL SAIPAN carry cargo originating from the United States west coast, and operates in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan. Ex. 10, at 2.

134.    APL has advertised that the APL GUAM will give "Guam and Saipan shippers an alternative for shipping from the U.S. mainland." Ex. 8.

135.    APL advertises that the APL GUAM and APL SAIPAN provide "[w]eekly Priority I U.S. flag service departures *from the U.S. West Coast ports* to Guam and Saipan." Ex. 10, at 2 (emphasis added).

136.    APL represented to MARAD that the APL SAIPAN would be operated "alongside the APL GUAM in APL's existing US-flag service of Guam and Saipan via Korea." Ex. 13.

137.    APL represented to MARAD that the APL GUAM operates in a route "to Guam and Saipan." Ex. 13, at 3.

138.    APL represented to MARAD that the APL GUAM's and APL SAIPAN's "deployment provides a link for the US military from Guam and Saipan back to the US mainland that does not transit China which for a significant number of types of DoD cargo is prohibited." Ex. 27, at 3.

139.    Saipan is part of the United States as defined at 46 U.S.C. § 53101(10). Vessels that transport cargo originating in the continental United States to Saipan, or transport cargo originating in Saipan to the continental United States, are therefore not engaged in foreign

commerce within the meaning of 46 U.S.C. §§ 53101, 53102, and 53105, and 46 C.F.R. §§ 296.2 and 296.11.

140.    Saipan is not a territory for which a registry endorsement may be issued pursuant to 46 U.S.C. § 12111.  Vessels that transport cargo originating in the continental United States to Saipan, or transport cargo originating in Saipan to the continental United States, are therefore not engaged in domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111 within the meaning of 46 U.S.C. §§ 53101, 53102, and 53105, and 46 C.F.R. §§ 296.2 and 296.11

141.    Because the APL GUAM and APL SAIPAN are engaged in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, they do not operate "exclusively in the foreign commerce, or . . . , in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," as required by 46 U.S.C. § 53105(1)(A).  They are thus ineligible for inclusion in the MSP.

142.    Because the APL GUAM and APL SAIPAN are engaged in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, they do not operate "exclusively in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111," as required by 46 C.F.R. §§ 296.2, 296.11.  They are thus ineligible for inclusion in the MSP.

143.    Furthermore, because APL is a contractor of the United States government, its transport of cargo originating in the continental United States to Saipan, and cargo originating in Saipan to the continental United States, is coastwise trade.  *See* 46 U.S.C. § 55101; 48 U.S.C. § 1801 note (Northern Mariana Islands Covenant § 502(b)).

144.    The APL GUAM and APL SAIPAN are "otherwise . . . operated in the coastwise trade." 46 U.S.C. § 53105(a)(1)(B).  They are thus ineligible for inclusion in the MSP.

145.     Because the APL GUAM and APL SAIPAN call Saipan, and carry goods between Saipan and other ports in the United States and its territories, both vessels were ineligible to receive MSP subsidies at the time the APL Decisions were made and have remained ineligible since the dates of the respective APL Decisions.

146.     MARAD has had actual notice that the APL vessels would provide service to Saipan, and thus of their ineligibility to receive MSP subsidies, since no later than October of 2015, before either of the APL Decisions was issued.

147.     Yet, apart from the vessel's name, the word "Saipan" appears only once in the MARAD documents in the administrative record provided to Matson, in the letter disposing of Matson's administrative appeal: "The vessels operate on a rotation between Yokohama, Japan, Guam, Saipan, and Busan, South Korea." Ex. 24, at 3. MARAD is thus well aware that both APL vessels call Saipan, yet continues to authorize subsidies to them. That is precisely the kind of unlawful government action that the APA authorizes courts to review and redress.

148.     As a result, the APL Decisions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

## COUNT II
### (Administrative Procedure Act – Arbitrary and Capricious Action)

149.     Matson incorporates the preceding paragraphs as if fully set forth herein.

150.     MARAD regulations require a *pro rata* reduction in MSP payments "for each day less than 320 in a fiscal year that [a vessel] . . . [i]s not operated exclusively in the foreign commerce . . . [or i]s operated in the coastwise trade." 46 C.F.R. § 296.41(b).

151.    The APL GUAM and APL SAIPAN are not operated exclusively in foreign commerce insofar as they transport cargo originating in any part of the United States to Guam or Saipan, and *vice versa*, and are therefore engaged in domestic trade.

152.    MARAD is therefore required to make a *pro rata* reduction in MSP subsidies for days the APL GUAM and the APL SAIPAN carry cargo destined to or from Guam or Saipan.

153.    On information and belief, however, MARAD pays APL 100% of APL's available MSP subsidies for the APL GUAM and the APL SAIPAN.

154.    As a result, MARAD's MSP payments to APL for the APL GUAM and the APL SAIPAN are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Matson prays that this Court:

1.    Declare MARAD's approval of APL's vessel replacement requests unlawful.

2.    Vacate and set aside MARAD's approval of APL's vessel replacement requests.

3.    Enjoin MARAD from making any further subsidy payments to APL with respect to the APL GUAM and/or APL SAIPAN, or, in the alternative, reduce the MSP subsidies pro rata.

4.    Enjoin MARAD from approving the APL GUAM and/or APL SAIPAN under the MSP.

5.    Award Matson its costs and reasonable attorney's fees as appropriate.

6.    Grant such further relief as this Court deems proper.

Respectfully submitted,

Dated:   November 27, 2018

s/ *Mark A. Perry*
Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice pending*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*