IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.,

Plaintiff,

v.

DEPARTMENT OF TRANSPORTATION,

and

MARITIME ADMINISTRATION,

Defendants.

Civil Action No. 18-2751

ORAL ARGUMENT REQUESTED

## <u>MATSON NAVIGATION COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Matson Navigation Company, Inc., by its undersigned counsel, respectfully moves for summary judgment on all claims in this action pursuant to Rule 56 of the Federal Rules of Civil Procedure for the reasons set forth in the attached Memorandum in Support of Matson Navigation Company, Inc.'s Motion for Summary Judgment.

Dated:    March 22, 2019

*/s/ Mark A. Perry*

Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Local Civil Rule 5.3, I hereby certify that, on March 22, 2019, I caused to be served on Defendants the foregoing Matson Navigation Company, Inc's Motion for Summary Judgment and supporting materials via CM/ECF.


Dated:    March 22, 2019                      */s/ Mark A. Perry*
                                              Mark A. Perry, DC Bar No. 438203

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.,

         Plaintiff,

    v.

DEPARTMENT OF TRANSPORTATION,

and

MARITIME ADMINISTRATION,

         Defendants.

Civil Action No. 18-2751

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MATSON NAVIGATION COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

    I.    Statutory And Regulatory Background .................................................. 2

        A.    Congress's Promotion Of U.S. Shipping In Domestic Trade Routes ........ 2

        B.    The Maritime Security Program ................................................ 4

    II.    The Administrative Proceedings ......................................................... 7

        A.    The APL GUAM .................................................................... 8

        B.    The APL SAIPAN ................................................................ 10

    III.    Matson's Interest and Harm ............................................................. 13

    IV.    Procedural History .......................................................................... 14

SUMMARY OF ARGUMENT ......................................................................................... 16

STANDARD OF REVIEW ............................................................................................. 17

ARGUMENT ................................................................................................................. 17

    I.    MARAD'S Approvals Of The New Vessels Were Arbitrary And
        Capricious And Not In Accordance With The Law ................................ 18

        A.    The New Vessels Are Ineligible Because They Operate In Trade
            Between Saipan And The Continental United States ............................. 18

        B.    MARAD's And APL's Counterarguments Are Unavailing .................... 29

    II.    Matson Is Entitled To An Adequate Remedy ....................................... 34

CONCLUSION .............................................................................................................. 36

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954)............................................................................30, 33

*Am. Mar. Ass'n v. Blumenthal*,
  590 F.2d 1156 (D.C. Cir. 1978)........................................................3, 26

*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983).......................................................................20

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).......................................................................20

*Garner v. Jones*,
  529 U.S. 244 (2000).......................................................................34

*Indep. U.S. Tanker Owners Comm. v. Lewis*,
  690 F.2d 908 (D.C. Cir. 1982).......................................4, 17, 22, 36

*King v. Burwell*,
  135 S. Ct. 2480 (2015)..................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)....................................................................17, 28

*OSG Bulk Ships, Inc. v. United States*,
  132 F.3d 808 (D.C. Cir. 1998)........................................................22

*Penn. R.R Co. v. Dillon*,
  335 F.2d 292 (D.C. Cir. 1964)..........................................................2

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
  444 U.S. 572 (1980).......................................................................22

*Service v. Dulles*,
  354 U.S. 363 (1957).......................................................................30

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010)..........................................................34

*The Emily & The Caroline*,
  22 U.S. (9 Wheat.) 381 (1824)........................................................20

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988)............................................................................19

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994)........................................................................18, 24

*Vermilya-Brown Co. v. Connell*,
    335 U.S. 377 (1948)............................................................................20

*Vessels: The Application of the Coastwise Laws to the Shipment of Food
    Commodities by an Agency of the U.S. Government*, 15 Cust. B. & Dec. 1082
    (1981).........................................................................................27, 32

*Williams v. Wash. Metro. Area Transit Comm'n*,
    415 F.2d 922 (D.C. Cir. 1968)...............................................................17

## Statutes

5 U.S.C. § 706(2)(A).............................................................................17, 34

46 U.S.C. § 12111...................................................................................32

46 U.S.C. § 12111(b)........................................................................5, 6, 28

46 U.S.C. § 12112.....................................................................................2

46 U.S.C. § 53101......................................................................................5

46 U.S.C. § 53101(4)..................................................................................5

46 U.S.C. § 53101(10)................................................................26, 29, 31, 32

46 U.S.C. § 53102(b)(2)..........................................................................5, 31

46 U.S.C. § 53102(b)(4)(A)..........................................................................21

46 U.S.C. § 53103(a).................................................................................27

46 U.S.C. § 53103(c).................................................................................33

46 U.S.C. § 53104(c).................................................................................31

46 U.S.C. § 53105(a)..................................................................................5

46 U.S.C. § 53105(a)(1)...........................................................................1, 31

46 U.S.C. § 53105(a)(1)(A)...........................................................16, 27, 29, 32, 36

46 U.S.C. § 53105(f)...................................................................................7

iii

46 U.S.C. § 53106(d)(3) .................................................................................30, 35

46 U.S.C. § 53107(b)(1) .............................................................................................21

46 U.S.C. § 55101(b)(2) .............................................................................................27

46 U.S.C. § 55102(b) ...............................................................................................2, 3

48 U.S.C. § 1801 ...................................................................................................3, 27

An Act Imposing Duties on Tonnage, 1 Stat. 27 (1789) ...............................................2

Maritime Security Act of 1996, Pub. L. No. 104-239, § 2, 110 Stat. 3118 (codified
    at 46 U.S.C. § 53102(a)) .................................................................................5, 20

Merchant Marine Act of 1920, Pub. L. No. 66-261, § 27 (1920)
    (codified at 46 U.S.C. § 55101) .......................................................................2, 3

Merchant Marine Act of 1936, 49 Stat. 1985, § 501 ..............................................4, 22

National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91
    (2017), 131 Stat. 1283 (codified at 46 U.S.C. § 53105(a)(2)) ......................6, 23, 34

**Other Authorities**

139 Cong. Rec. 27,231 (1993) (statement of Rep. Cunningham)...................................4

139 Cong. Rec. 27,231 (1993) (statement of Rep. Studds) ........................................21

139 Cong. Rec. 27,284 (1993) (statement of Rep. Lipinski)......................................21

139 Cong. Rec. 27,286 (1993) (statement of Rep. Ortiz)...........................................21

141 Cong. Rec. 35,540 (1995) (statement of Rep. Furse) .........................................21

141 Cong. Rec. 35,572 (1995) (statement of Rep. Quillen) ......................................21

141 Cong. Rec. 35,577 (1995) (statement of Rep. Lipinski).....................................21

2 Edward Coke, *The First Part of the Institutes of the Lawes of England, or a
    Commentary upon Littleton* (14th ed. 1791)...........................................................19

Matson, Inc. Form 8-K (Nov. 2, 2017),
    https://www.sec.gov/Archives/edgar/data/3453/000155837017008005/000155
    8370-17-008005-index.htm ...................................................................................14

Matson, Inc. Form 8-K (July 31, 2018),
    https://www.sec.gov/Archives/edgar/data/3453/000155837018005979/000155
    8370-18-005979-index.htm ...................................................................................14

Matson, Inc. Form 10-K, https://investor.matson.com/static-files/37eaeec2-946d-41fa-9dc-e8f589286d25 ..................................................................................14

Matson, Inc. Form 10-K, https://investor.matson.com/static/files/adfaa5e0-110c-46f1-86f8-de1915e31f13 ....................................................................................14

**Regulations**

19 C.F.R. § 4.80b(a) ..............................................................................................3

46 C.F.R. § 296.1 ..................................................................................................5

46 C.F.R. § 296.2 ....................................................................1, 6, 24, 26, 27, 30, 31, 32

46 C.F.R. § 296.3 ..................................................................................................6

46 C.F.R. § 296.11 ................................................................................................1

46 C.F.R. § 296.11(a)(2) ................................................................................6, 24

46 C.F.R. § 296.12 ................................................................................................5

46 C.F.R. § 296.50(a) ..........................................................................................7

46 C.F.R. § 3503 ..................................................................................................6

49 C.F.R. § 1.93(a) ..............................................................................................6

*Acceptance of Applications for the Award of Two Maritime Security Program Operating Agreements*, 81 Fed. Reg. 68,104 (Oct. 3, 2016) ...................................24

*Acceptance of Applications for the Potential Award of Maritime Security Program Operating Agreements*, 80 Fed. Reg. 74,209 (Nov. 27, 2015)...............................24

*Maritime Security Program*, 70 Fed. Reg. 55,581 (Sept. 22, 2005)........................25, 26

**Constitutional Provisions**

Commonwealth of the Northern Mariana Islands Const. art. VI..................................26

## INTRODUCTION

The federal government subsidizes certain U.S.-flag vessels engaged in foreign commerce to maintain a U.S. presence in international commercial shipping and ensure that the United States is able to meet its national defense needs.  To participate in the Maritime Security Program, a vessel must "be operated *exclusively* in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," and "*shall not* otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1) (emphases added); *see also* 46 C.F.R. §§ 296.2, 296.11.  The two vessels at issue in this litigation carry cargo between Saipan (part of the Northern Mariana Islands, a territory of the United States) and other ports in the United States, and are therefore engaged in domestic (and coastwise) trade not allowed under a registry endorsement.  Despite their ineligibility, the vessels were approved for inclusion in the subsidy program.  This final agency action was arbitrary and capricious and contrary to law, and has distorted the competitive balance in domestic trade routes.  Accordingly, this Court should set aside the challenged decisions.

## BACKGROUND

This case arises out of administrative proceedings in which Defendant Maritime Administration ("MARAD"), acting under authority delegated to it by Defendant Department of Transportation, approved the applications of Intervenors APL Lines, Inc., APL Marine Services, Ltd., and APL Maritime, Ltd. (collectively, "APL"), to replace two vessels already participating in the Maritime Security Program (the "MSP") with two new vessels, the APL GUAM and the APL SAIPAN (the "New Vessels"), that operate in the Guam and Saipan trades.  Plaintiff Matson Navigation Company, Inc. ("Matson"), which operates non-subsidized vessels that compete for carriage in those trades, was not given an opportunity to formally participate in the MARAD

proceedings, and before this litigation had no opportunity to formally raise an objection to MARAD's erroneous approvals of the New Vessels for inclusion in the MSP.

## I.      Statutory And Regulatory Background

The MSP is one component of a broader regulatory regime that seeks to encourage U.S. shipping and offer certain protections to those vessels that fly the U.S. flag.  While Congress has long protected U.S.-flag vessels operating in the domestic trade by imposing restrictions on which vessels may operate in domestic trade, the MSP directly subsidizes U.S.-flag vessels operating in foreign commerce.

### A.      Congress's Promotion Of U.S. Shipping In Domestic Trade Routes

Congress has long recognized the need to support U.S. vessels operating in domestic trade in the United States.  "From the earliest days of the Republic, Congress has been concerned with stimulating and protecting the growth of an American-built and controlled coastwise Merchant Marine."  *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964).  Congress has addressed that concern through various legal restrictions imposed on vessels operating in the U.S. domestic trade.  *See, e.g.*, An Act Imposing Duties on Tonnage, 1 Stat. 27–28 (1789).  In 1920, Congress strengthened the existing protections for domestic vessels by passing the Jones Act.  *See* Merchant Marine Act of 1920, Pub. L. No. 66-261, § 27 (1920) (codified at 46 U.S.C. § 55101).

The Jones Act is a comprehensive framework for giving preference to U.S.-flag vessels that operate in domestic trade.  Specifically, the Jones Act provides that "a vessel may not provide any part of the transportation of merchandise . . . between points in the United States to which the coastwise laws apply, either directly or via a foreign port," unless the vessel was built in the U.S. and is owned by a U.S. citizen (or if an exception applies).  46 U.S.C. § 55102(b); *see also id.* § 12112 (providing for registry endorsements for foreign-flag vessels to engage in limited domestic trade with certain designated territories).  Thus, rather than subsidize U.S.-flag vessels

in the domestic trade, Congress enacted the Jones Act to protect the U.S. shipping industry by restricting the vessels that may operate in the domestic trade.

Although the Jones Act's broad purpose is to promote domestic shipping—i.e., shipping between points in the United States—by U.S.-flag vessels, its restrictions apply more narrowly. The Jones Act restricts only trade that is "coastwise," a term of art under the Jones Act that refers to certain types of domestic trade that are governed by the "coastwise" laws. "[T]he coastwise laws apply to the United States, including the island territories and possessions of the United States," with partial exceptions for American Samoa, the Northern Mariana Islands, and the Virgin Islands. 46 U.S.C. § 55101. Although trade with the Northern Mariana Islands is generally exempt from the coastwise laws, Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America provides that "[t]he laws of the United States regarding coastal shipments . . . will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note.

The coastwise laws—and therefore the protective restrictions under the Jones Act—apply "when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is unladen at another coastwise point, regardless of the origin or ultimate destination of the merchandise." 19 C.F.R. § 4.80b(a). A carrier may not evade the requirements of the Jones Act and other coastwise laws simply by stopping at an intermediate foreign port in between stops at U.S. ports—the Jones Act covers shipping between points in the United States "either directly or via a foreign port," 46 U.S.C. § 55102(b), prohibiting vessels from evading the coastwise laws simply by "transshipping" their cargo through a foreign port, *see Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978) ("Congress, seeing how easily the protection to American shipping would be vitiated by a simple transshipment of the same cargo, inserted the words 'either

directly or via a foreign port' to prohibit such simple transshipment").  It makes no difference for this purpose whether or not the cargo changes vessels in a foreign port.

###### B.      The Maritime Security Program

While the Jones Act promotes and protects *domestic* shipping by U.S.-flag vessels, the MSP serves a similar purpose for *foreign* shipping.  In the domestic context, the United States can promulgate protective legislation that gives U.S.-flag vessels advantages over foreign-flag vessels. In the foreign context, however, "such protective legislation is not possible," because the United States cannot impose requirements on vessels that call foreign ports.  *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 912 (D.C. Cir. 1982).  Instead, the United States promotes foreign trade by U.S.-flag vessels by offering those vessels (and the entities that operate them) subsidies.

The MSP is not the first of Congress's efforts to promote foreign shipping by U.S.-flag vessels.  In 1936, as part of the Merchant Marine Act, Congress enacted the Construction-Differential Subsidy program and the Operating-Differential Subsidy program.  *See* Merchant Marine Act of 1936, 49 Stat. 1985, §§ 501–610.  For decades, these programs provided direct subsidies to qualified carriers operating in foreign commerce to help offset the higher costs associated with constructing vessels in the United States and using U.S.-citizen mariners.  But those programs were not available to vessels engaged in domestic trade, as "[i]t would be grossly unfair to allow U.S. vessels that have received a subsidy . . . to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards."  *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912; *see also* 139 Cong. Rec. 27,231, 27,287 (1993) (statement of Rep. Cunningham) ("Among those restrictions [in the Construction-Differential Subsidy program] is a requirement that subsidized vessels operate exclusively in foreign trade.  This restriction is intended to protect both the operators of unsubsidized vessels in the protected domestic trades and our domestic shipyards that have exclusive right to supply vessels for domestic trades.").  In other words, these

subsidies were reserved for vessels operating only in foreign commerce, because it would be unfair to allow subsidized vessels to compete with unsubsidized vessels operating only in domestic trade.

The United States currently subsidizes U.S.-flag vessels engaged in foreign commerce through the MSP.  *See* 46 U.S.C. § 53101 et seq.  The program was created in the Maritime Security Act of 1996 (the "MSA") to "meet national defense and other security requirements and maintain a United States presence in international commercial shipping."  Pub. L. No. 104-239, § 2, 110 Stat. 3118, 3118 (codified at 46 U.S.C. § 53102(a)).  Like its predecessor program, the MSP imposes restrictions on which vessels may participate.  In order to participate in the MSP, a vessel must, among other things, "provid[e] transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).  The statute defines "foreign commerce" as "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country," and "commerce or trade between foreign countries."  *Id.* § 53101(4).

Title 46 U.S.C. § 53102(b)(2) is clarified by other sections of the statute.  Carriers participating in the MSP must enter into "operating agreements" with MARAD with respect to the participating vessels.  *See* 46 U.S.C. § 53102(a); 46 C.F.R. §§ 296.1, 296.12.  A vessel operating under such an agreement—i.e., a vessel participating in the MSP—must "be operated *exclusively* in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title."  46 U.S.C. § 53105(a) (emphasis added).  A "registry endorsement" refers to 46 U.S.C. § 12111, which authorizes MARAD to allow a vessel to engage in trade with Guam, American Samoa, Wake, Midway, or Kingman Reef, even if the vessel does not otherwise meet the requirements under the coastwise laws.  *See id.* § 12111(b).  The territory of the Northern Mariana Islands (of which Saipan is part) is part of the United States, yet is not among the exclusive statutory list of islands eligible for a registry

endorsement.  *See id.*  Thus, a vessel may participate in the MSP only if it is engaged exclusively in foreign commerce, or exclusively in mixed foreign commerce and domestic trade to Guam, American Samoa, Wake, Midway, or Kingman Reef allowed under a registry endorsement.

The implementing regulations further reinforce these requirements.  The regulations regarding eligibility for inclusion in the MSP similarly require that a vessel be "operated . . . to provide transportation in the foreign commerce."  46 C.F.R. § 296.11(a)(2).  "Foreign [c]ommerce" is defined in the regulations as "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111."  46 C.F.R. § 296.2 (emphasis added).  Again, under the regulations as under the statute, a vessel is eligible for the MSP only if it is engaged exclusively in foreign commerce, or exclusively in mixed foreign commerce and domestic trade to Guam, American Samoa, Wake, Midway, or Kingman Reef allowed under a registry endorsement.

In 2017, Congress eliminated the narrow exception for domestic trade conducted pursuant to a registry endorsement.  The National Defense Authorization Act for Fiscal Year 2018 ("NDAA"), Pub. L. No. 115-91 (2017), among other things, amended 46 U.S.C. § 53105 to prohibit vessels participating in the MSP from engaging in *any* domestic trade:

> (2)    in the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port . . . .

*Id.* § 3503, 131 Stat. 1283, 1911 (codified at 46 U.S.C. § 53105(a)(2)).

The MSP falls within the purview of the Department of Transportation, and the Secretary of Transportation has delegated the administration of the MSP to MARAD.  *See* 49 C.F.R. § 1.93(a).  MARAD most recently accepted applications for new vessels to participate in the MSP up until October 15, 2004.  *See* 46 C.F.R. § 296.3.  But once a vessel has been accepted for

inclusion in the MSP, a carrier may apply to MARAD to have that vessel replaced with another vessel—that is, a carrier may substitute one of its existing vessels in the MSP with another. *See* 46 U.S.C. § 53105(f). However, the replacement vessel must still be eligible to participate in the MSP. A contractor who disagrees with the decision of the MARAD with respect to the administration of the MSP may appeal to the Secretary of Transportation and the Maritime Administrator, *see* 46 C.F.R. § 296.50(a), but there is no opportunity for carriers not participating in the MSP to raise objections to an application, participate in application or substitution proceedings, or file an administrative appeal to the Secretary of Transportation or the Maritime Administrator.

## II.    The Administrative Proceedings

In January 2005, MARAD awarded nine MSP Operating Agreements—Nos. MA-MSP-49 to -57—to APL and permitted nine APL vessels to operate under the MSP pursuant to those agreements. AR60–61, AR160.

On December 4, 2014, APL applied to MARAD by letter for a determination that it could replace two vessels that operated under its existing MSP Operating Agreements in the Middle East with two unspecified vessels that would operate in the Pacific Ocean. AR4–5. APL indicated that at least one of the then-unidentified "replacement" vessels would operate in service to Guam, a service APL had not offered for nearly two decades. AR5–6. Although APL emphasized it would carry cargo originating in the mainland United States to Guam, it made no representations about transportation of cargo originating in the continental United States to Saipan, or transportation of cargo originating in Saipan to other parts of the United States. *Id.* Instead, APL argued only that its service to Guam was needed because "[a]t this time, there is effectively a single carrier [Matson] providing service to Guam from the U.S. mainland," and "[t]he free market is never well served by a monopoly." AR6–7.

APL acknowledged in this initial application that its proposed "replacement" vessels must meet the restrictions applicable to all other vessels operating in the MSP. It argued that the domestic carriage of cargo between the continental United States and Guam did not render the vessels ineligible because "MSP vessels may be operated in mixed foreign commerce and domestic trade allowed under a registry endorsement," and Guam is among the ports authorized to be called under a registry endorsement. AR6 (internal quotation marks omitted). APL offered no explanation for how its trade between Saipan and the continental United States (which it had not disclosed in its application) would be permitted under the statute or regulations.

Relying on APL's representations, MARAD issued a letter approving APL's application in principle in January 2015 (AR13–14), although APL had not yet identified with specificity the proposed "replacement vessels" and did not begin providing service to Saipan (or Guam) at that time.

## A.     The APL GUAM

Eight months later, on August 27, 2015, APL told MARAD it had located a suitable replacement for one of its existing MSP vessels—a vessel then called the NEW DYNAMIC. AR15–24. APL again touted the vessel's anticipated service between Guam and the continental United States, but made no mention of Saipan.

On September 11, 2015, MARAD notified APL that it had determined the NEW DYNAMIC was eligible for the MSP. AR43–45. Despite that representation, MARAD offered no examination of the statutory or regulatory requirements for eligibility beyond a perfunctory statement that it had "determined that the Vessel meets the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11." AR43. Shortly thereafter, on September 16, 2015, APL requested formal approval to replace an existing MSP vessel operating under MSP Operating Agreement No.

MA/MSP-54—the APL CYPRINE—with the NEW DYNAMIC, which would be renamed the APL GUAM.  AR46–49.

Before MARAD had even acted on APL's formal application, APL issued a press release on October 12, 2015, announcing its new "Guam Saipan Express" or "GSX."  AR371.  In addition to plugging its anticipated service to Guam, APL advertised that the service would also give "Saipan shippers an alternative for shipping from the U.S. mainland." *Id.*  Not long after, the APL represented—in an article that was forwarded to MARAD on October 20, 2015 by APL—that the addition of GSX would let "Saipan shippers 'tap into APL's global service network for freight to and from many parts of the world.'"  AR301.

Other marketing materials confirmed these representations.  Although apparently not disclosed by APL in its applications to MARAD, a publicly available brochure stated that the APL GUAM was intended to carry cargo originating from the United States west coast, and operate in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands.  AR375–76.

On October 15, 2015, an internal memorandum was circulated within MARAD recommending that MARAD formally approve APL's request to substitute the APL GUAM for the APL CYPRINE.  AR60–80.  In discussing the vessel's compliance with the requirement that an MSP vessel operate in foreign commerce, the memorandum stated:

> Section 53102(b)(2) of Chapter 531 requires that an eligible vessel must be operated in providing transportation in foreign commerce.  As previously mentioned, Maritime will demise charter the Replacement Vessel and time charter the vessel to APL Lines.  The NEW DYNAMIC (tbn APL GUAM) will operate in APL Lines' established world-wide services.  Accordingly, it has been determined that the Replacement Vessel will be operated in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

AR67–68.  The memorandum did not separately address the regulatory requirements, saying only that "Section 296.11(a) implements 46 U.S.C. § 53102(b)" and that "[t]he requirements and

qualifications of section 53102(b) have previously been discussed and have been determined to be satisfied.  Accordingly, it can be determined that the requirements of section 296.11(a) have been satisfied."  AR70.  The memorandum formally recommended that MARAD:

> (P)   Find that the Replacement Vessel will be time chartered to American President Lines, Ltd. (APL Lines), a Delaware corporation and United States documentation citizen, for operation in its established world-wide services.

> (Q)   In view of (P) above, find that the Replacement [V]essel will provide transportation in foreign commerce pursuant to the requirement of 46 U.S.C. § 53102(b)(2).

AR76.  The memorandum made no mention of the APL GUAM's anticipated transportation of cargo to or from Saipan, and in fact, did not mention Saipan at all.

One week later, MARAD adopted the recommendations in the memorandum in full and issued a letter to APL formally approving the APL GUAM as a substitute for the APL CYPRINE. AR81–85.  The letter made the recommended findings regarding the APL GUAM's operation in APL's "established world-wide services," and, like the memorandum, failed to include a separate analysis of the regulatory requirements, instead noting only that "Section 296.11(a) implements 46 U.S.C. § 53102(b)" and that "the requirements and qualifications of Section 53102(b) [had] previously been discussed and [had] been determined to be satisfied."  AR84.  Again, however, the letter did not discuss the APL GUAM's anticipated service to Saipan at all.

### B.   The APL SAIPAN

On August 24, 2016, APL sought approval in principle to replace a second of its MSP vessels with another vessel to be operated alongside the APL GUAM.  AR116.  APL disclosed for the first time in a formal submission to MARAD that the APL GUAM operated in "US-flag service of Guam and Saipan via Korea," and represented that the proposed "replacement" vessel would do the same.  *Id.*  APL supplemented this application on October 11, 2016, saying it had identified a vessel, the ELISA ELMAS, suitable for substitution into the MSP.  AR120–30.  APL represented

that the ELISA ELMAS was "ideally suited to the APL Guam/Saipan service," and argued that there was "no question that the vessel [met] the eligibility standards of 46 USC [§] 53102(b)," because, among other things, it would "be operated in foreign commerce." AR120–21.

MARAD responded to APL's first application on November 9, 2016, approving the proposed substitution in principle, but did not address whether the substituted vessel would be operated in foreign commerce. AR139–40. On November 15, 2016, MARAD responded to APL's supplemental application and determined that the ELISA ELMAS met the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11, but did not otherwise discuss whether the ELISA ELMAS would operate in foreign commerce and did not discuss the vessel's trade to Saipan. AR141–42.

That same day, APL issued a press release announcing the addition of the ELISA ELMAS—now renamed the APL SAIPAN—to its "Guam Saipan Express" service. AR373. APL's General Manager explained that "[t]he more frequent GSX service will speed up essential cargo shipments from the U.S. mainland to the islands." *Id.* (internal quotation marks and emphasis omitted).

On December 9, 2016, an internal memorandum was circulated within MARAD recommending formal approval of APL's request to substitute the APL SAIPAN in place of an existing MSP vessel, the APL AGATE. AR160–78. With respect to the statutory requirement that the vessel operate in foreign commerce, the memorandum stated:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code. Under 46 U.S.C. § 12111(b), a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef. APL will time charter the Replacement Vessel from APLMS for operation in its established worldwide services, with mixed foreign commerce and domestic trade

> to Guam provided in accordance with the Replacement Vessel's registry endorsement. Accordingly, it has been determined that the Replacement Vessel will provide transportation in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

AR163. Like the previous memorandum, this memorandum did not separately discuss the regulatory requirements except to say that they mirrored the statutory ones. AR166.

Despite the proposed vessel's new name (the APL *SAIPAN*)—and public marketing materials showing the vessel's planned route to Saipan (AR373)—the memorandum did not once mention the vessel's proposed trade to and from Saipan, nor did it analyze whether that route disqualified the vessel from inclusion in the MSP. In fact, with the exception of the vessel's name, the memorandum did not mention Saipan even once.

Although neither MARAD nor APL ever formally notified Matson of the applications to approve the APL GUAM and the APL SAIPAN, Matson learned through other channels of the pending application for the APL SAIPAN, and on December 12 and 15, 2016, wrote letters to MARAD explaining that the APL GUAM and the APL SAIPAN could not be included in the MSP because they engaged in domestic trade in competition with unsubsidized vessels operated by Matson. AR179–80, AR183–88. MARAD did not respond to those letters.

Nevertheless, MARAD adopted the recommendations set forth in the memorandum and sent APL a letter on December 20, 2016, approving substitution of the APL SAIPAN in place of the APL AGATE. In approving the request, MARAD made the following determinations relevant here:

> (C)    Noted that APLMS will time charter the Replacement Vessel to American President Line, Ltd. (APL), a Delaware corporation and U.S. documentation citizen, for operation in APL's established world-wide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement:

> (D)    In view of (C) above, found that the Replacement Vessel will provide transportation in foreign commerce or in mixed foreign commerce and domestic

12

trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).

AR196–97.  Once more, the letter did not separately address the regulatory requirements.  AR197.

Like the memorandum recommending approval, and despite the vessel's name, the letter to APL included no discussion of the APL SAIPAN's anticipated transportation of cargo between the continental United States and Saipan.  Again, aside from the vessel's name, the word "Saipan" was not mentioned once.  Yet APL's marketing materials again confirmed that the APL SAIPAN, like the APL GUAM, would carry cargo originating from the United States west coast to Saipan.  AR376.

## III.    Matson's Interest and Harm

MARAD's decision to approve the inclusion of the New Vessels in the MSP, notwithstanding their trade with Saipan, has caused Matson substantial economic injury.  Matson and APL are competitors in the Guam and Saipan trades—both operate vessels that transport cargo from the United States and its territories to Guam and Saipan, and from Guam and Saipan to other parts of the United States.  (Separate Statement of Undisputed Facts ("SUF") ¶¶ 3–4.)  But unlike APL, none of Matson's vessels participate in the MSP.  (*Id.* ¶ 5.)

Matson welcomes fair competition in the Guam and Saipan trades, but the competition that APL has introduced is anything but.  In 2018 alone, APL received $5,000,000 from the United States for its operation of the APL GUAM (AR382), and *another* $5,000,000 for its operation of the APL SAIPAN (AR94).  Because APL receives such substantial MSP subsidies for the New Vessels—even though they operate in domestic trade—APL is able to offer lower prices than Matson for shipping cargo along the same routes.  (SUF ¶¶ 6–7.)  In fact, APL has said its entrance into the Guam/Saipan trade was "ONLY made possible with the help of Marad and the US Department of Defense."  AR300.  The result is that APL has driven carriage from Matson to APL

and altered the competitive balance in the domestic market.  Each quarter, Matson discloses the volume of containers it carries in the "Guam Service," a category that includes cargo shipped to or from Guam and Saipan.  (SUF ¶¶ 8–9.)  Between the fall of 2016 and the fall of 2017, when the APL SAIPAN was approved for inclusion in the MSP, the volume of containers Matson carried in the "Guam Service" declined by 23%.  (SUF ¶ 10 (citing Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 8 (Nov. 2, 2017), https://www.sec.gov/Archives/edgar/data/3453/ 000155837017008005/0001558370-17-008005-index.htm); *see also id.* ¶ 12 (citing Matson, Inc. Form 10-K, at 31, https://investor.matson.com/static/files/adfaa5e0-110c-46f1-86f8-de1915e31f13 (showing a decline in Guam Service volume of 18.1% between December 31, 2016 and December 31, 2017)).)  That volume has further declined since.  (*Id.* ¶ 11 (citing Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 7 (July 31, 2018), https://www.sec.gov/ Archives/edgar/data/3453/000155837018005979/0001558370-18-005979-index.htm); *see also id.* ¶ 13 (citing Matson, Inc. Form 10-K, at 29, https://investor.matson.com/static-files/37eaeec2-946d-41fa-9dc-e8f589286d25 (showing a decline in Guam Service volume of 3% between December 31, 2017 and December 31, 2018)).)

## IV.   Procedural History

On February 17, 2017, Matson filed an administrative appeal from MARAD's approvals of the substitution of the New Vessels.  AR201–70.  Matson submitted an amended appeal on March 17, 2017.  AR271–376.  In its appeal, Matson argued, among other things, that the MSP could not "be used to subsidize vessels operating in regular service to Guam, a domestic trade."  AR272.

MARAD rejected the appeal on April 7, 2017.  AR404–06.  It first concluded that Matson lacked standing to file an administrative appeal, because only a "Contractor" under the MSP regulations may file such an appeal, and Matson is not such a contractor because it does not operate

any vessels that participate in the MSP.  AR404.  Nevertheless, MARAD opined on the merits of

Matson's application.  It stated that the New Vessels' domestic service did not disqualify them

from the MSP:

> [T]he relevant language in the MSA could not be clearer regarding APL's ability
> to operate in the Guam trade.  The MSA provides in relevant part that MSP vessels:
>
>> shall be operated exclusively in the foreign commerce or in mixed foreign
>> commerce and domestic trade allowed under a registry endorsement issued
>> under section 12111 of this title.  (46 U.S.C. § 53105(a)(1)(A)).
>
> Section 12111, regarding registry endorsements, provides:
>
>> A vessel for which a registry endorsement is issued may engage in foreign
>> trade or trade with Guam, American Samoa, Wake, Midway, or Kingman
>> Reef.
>
> Thus, by incorporating Section 12111 into the MSA, Congress clearly and
> unambiguously established that trade with Guam under a registry endorsement, as
> provided in section 53105(a)(1)(A), is allowed in the MSP.

AR404–05.  Again ignoring the fact that one of the vessels in question was named the APL

*SAIPAN*, MARAD did not discuss the New Vessels' transport of cargo to and from Saipan.

On June 2, 2017, Matson filed a petition in the D.C. Circuit Court of Appeals seeking

review of MARAD's eligibility and subsidy determinations on the grounds that they were arbitrary

and capricious and contrary to law.  *See* Petition for Review, *Matson Navigation Co. v. U.S. Dep't

of Transp.*, 895 F.3d 799 (D.C. Cir. 2018) (No. 17-1144).  Both MARAD and APL argued that the

Court of Appeals lacked jurisdiction to hear Matson's petition and that the case should be brought

instead in district court.  *See* Brief for Respondents ("MARAD Br.") at 20–26, *Matson*, 895 F.3d

799 (No. 17-1144); Brief of Intervenors APL Marine Services, Ltd., and APL Maritime, Ltd.

("APL Br.") at 17–19, *Matson*, 895 F.3d 799 (No. 17-1144).  After briefing, argument, and

supplemental briefing, the Court of Appeals dismissed the petition for lack of jurisdiction, ruling

that Matson's challenges to MARAD's decision must be brought initially in the district court, and

15

that even if a challenge to MARAD's approval of the APL GUAM could be brought in circuit court under the Hobbs Act, the petition was untimely.  *See Matson*, 895 F.3d 799.

Matson filed this action under the Administrative Procedure Act ("APA") on November 27, 2018.  (Dkt. No. 1.)  APL moved to intervene as a defendant on January 25, 2019 (Dkt. No. 12), and Matson did not oppose (Dkt. No. 16).  This Court granted APL's motion to intervene on February 6, 2019.

## SUMMARY OF ARGUMENT

**I.**  MARAD's approvals of the New Vessels for inclusion in the MSP fleet were arbitrary and capricious and contrary to law.

**A.**  A vessel that engages in domestic trade is eligible for MSP subsidies *only* if the domestic trade is allowed pursuant to a registry endorsement.  The statute is clear on its face that a vessel participating in the MSP must operate either exclusively "in the foreign commerce" or exclusively "in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title."  46 U.S.C. § 53105(a)(1)(A).  The New Vessels are ineligible to participate in the MSP because they operate in trade between Saipan and the continental United States, which is domestic trade not conducted pursuant to a registry endorsement.  APL made it publicly known before MARAD approved either of the New Vessels that the vessels would operate in trade between Saipan and the continental United States.  Despite this, MARAD failed to even consider whether that trade route rendered the New Vessels ineligible for participating in the MSP.  MARAD's decisions approving the New Vessels were thus arbitrary and capricious and contrary to law.

**B.**  The arguments previously raised by MARAD and APL are unavailing.  First, Section 53105(a)(1) sets forth threshold, eligibility requirements that must be met for a vessel to participate in the MSP.  Second, although this Court need not reach the question, trade between Saipan and

the continental United States is "coastwise" as that term is used in the MSA. Third, MARAD must abide by its own regulations, which are both consistent with and in fact mandated by the statute. And fourth, Matson has established injury sufficient to confer standing.

**II.** Matson is entitled to appropriate relief, which includes at least declaring MARAD's approvals of the New Vessels unlawful and setting aside the awards. If MARAD is unwilling to confirm that it will not approve the New Vessels upon a successive application by APL, then injunctive relief will also be necessary. And even if Section 53105(a)(1)(A) does not render the New Vessels ineligible, MARAD is obliged to make pro rata reductions to the subsidies it pays to APL each day that the New Vessels are not operated in compliance with Section 53105(a)(1)(A), including all voyages that include domestic ports-of-call. Its failure to do so has caused and will continue to cause Matson harm.

**STANDARD OF REVIEW**

Under the APA, this Court must set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 922. An agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is "not in accordance with law" if it "reflects . . . misapplication of statutory standards." *Williams v. Wash. Metro. Area Transit Comm'n*, 415 F.2d 922, 939 n.86 (D.C. Cir. 1968).

**ARGUMENT**

MARAD's decisions approving the New Vessels should be set aside because they were arbitrary and capricious, and contrary to law. Matson is entitled to appropriate relief from MARAD's unlawful actions.

17

I.      **MARAD'S Approvals Of The New Vessels Were Arbitrary And Capricious And Not In Accordance With The Law**

Vessels are eligible for inclusion in the MSP only if they operate exclusively in foreign commerce or exclusively in mixed foreign commerce and domestic trade pursuant to a registry endorsement.  Because the New Vessels carry cargo between Saipan and the continental United States, they operate in domestic trade not allowed under a registry endorsement.  They are therefore ineligible for inclusion in the MSP, and MARAD's decisions approving the New Vessels were arbitrary and capricious and must be vacated.  MARAD's and APL's arguments to the contrary are unavailing.

A.      **The New Vessels Are Ineligible Because They Operate In Trade Between Saipan And The Continental United States**

"If the statutory language is plain," a court "must enforce it according to its terms."  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).  Title 46 U.S.C. § 53102(b)(2) provides that in order to participate in the MSP, a vessel must "provid[e] transportation in foreign commerce."   This eligibility requirement is further explained by 46 U.S.C. § 53105(a)(1), which provides that any vessel operating pursuant to the MSP "shall be operated *exclusively* in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," and "shall not otherwise be operated in the coastwise trade."  *Id.* (emphasis added); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68 (1994) (holding that the "most natural grammatical reading" of a statute is that an initial adverb modifies each verb in a list of elements).  MARAD recognized this statutory structure in granting APL's second application:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code.

AR163.  APL shared this understanding.  AR164.

The language of the statute is clear on its face that a vessel must operate exclusively in the foreign commerce or exclusively in mixed foreign and domestic trade pursuant to a registry endorsement issued under 46 U.S.C. § 12111, and must not otherwise operate in the coastwise trade.  But as described in more detail below, the New Vessels do engage in trade that is both domestic and coastwise, and not conducted pursuant to a registry endorsement—they carry cargo between Saipan and the continental United States.

The statute's unambiguous requirement that vessels are eligible only if they do not operate in domestic or coastwise trade is reinforced by the structure and context of the MSP, the purpose of the MSP, and the implementing regulations.

*First*, the structure and context of the MSP make clear that vessels are not eligible for the MSP if they engage in domestic trade other than pursuant to a registry endorsement.  "Statutory construction . . . is a holistic endeavor."  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  "[I]t is the most natura[l] and genuine exposition of a Statute to construe one part of the Statute by another part of the same statute . . . ."  2 Edward Coke, *The First Part of the Institutes of the Lawes of England, or a Commentary upon Littleton* § 728, at 381a (14th ed. 1791).  Taken as a whole, the structure of the MSP indicates that eligible vessels must operate exclusively in foreign commerce, with a narrow exception for domestic trade conducted pursuant to a registry endorsement.

While Section 53105(a)(1) speaks only to the requirements for a vessel to *operate* under the MSP, a court must interpret a statute "as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted).  It would make no

sense to say that Section 53105(a)(1)'s limitation on domestic trade bears no relation to Section 53102(b)(2)'s eligibility requirement regarding foreign commerce.  Such a reading would make a vessel *eligible* for the MSP simply if it carried a single container of cargo in foreign commerce at some point during its operation, yet that same vessel could not actually *operate* under an MSP operating agreement.  Far from reading the statute's parts "into an harmonious whole," such a facile distinction between "eligibility" and "operation" would put two statutory provisions at odds with each other.

*Second*, restricting eligibility to those vessels that operate exclusively in foreign commerce or mixed foreign commerce and domestic trade pursuant to a registry endorsement accords with the purpose of the MSA.  In construing a statute, a court "must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction."  *The Emily & The Caroline*, 22 U.S. (9 Wheat.) 381, 388 (1824).  Thus, the language of a statute must "be construed if reasonably possible to effectuate the intent of the lawmakers," considering, among other things, "the purposes of the law."  *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 386 (1948) (internal quotation marks omitted); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 133 (1983) ("If any doubt remains to the meaning of the statute, that doubt is removed by the legislative history.").

The MSP is the latest in a line of federal subsidy programs aimed at enhancing the "United States presence in *international* commercial shipping."  46 U.S.C. § 53102(a) (emphasis added).  Section 53102(b)(2)'s broad eligibility requirement demands that vessels "provid[e] transportation in foreign commerce."  The statute's provisions relating to participating vessels' military readiness also indicate that foreign or international transport is the focus: Participating vessels must be deemed suitable for use in "national defense or military purposes in time of war or national

emergency," *id.* § 53102(b)(4)(A), and the vessels' operators must agree to provide commercial transportation in cases of war time or national emergency, *see id.* § 53107(b)(1).

The legislative history confirms that the MSP is designed for foreign commerce and to provide international military support in times of war.  The MSP's supporters lauded the program's potential to make the United States more competitive in international commerce.  *See* 139 Cong. Rec. 27,231, 27,281 (1993) (statement of Rep. Studds) ("[W]e . . . have set a course that not only rescues our maritime industries, but will make them fully competitive in international commerce."); *id.* at 27,286 (statement of Rep. Ortiz) ("The [MSP] will increase the ability of our commercial fleet to compete internationally . . . ."); 141 Cong. Rec. 35,540, 35,580 (1995) (statement of Rep. Furse) ("I know just how important this legislation is to preserving but also to enhancing our sealift force and maintaining an international commercial transportation capability.").  Supporters accordingly understood that the MSP would subsidize "U.S.-flag vessel owners and operators that compete in international trade."  139 Cong. Rec. at 27,284 (statement of Rep. Lipinski).  Supporters of the MSP also pointed to its importance in providing a merchant marine "crewed by U.S. merchant seaman to provide sealift capacity for wartime or national emergencies."  141 Cong. Rec. at 35,572 (statement of Rep. Quillen); *see also id.* at 35,577 (statement of Rep. Lipinski) ("In addition to commercial shipping activities, privately owned vessels play a significant role in U.S. military readiness.").

Courts and legislators have long recognized the manifest unfairness that would result from maritime subsidy programs if vessels subsidized under those programs could compete with unsubsidized U.S.-flag vessels operating in domestic commerce.  Through the Jones Act and the Merchant Marine Act of 1936 (the precursor to the MSA), "Congress effectively divided the American commercial shipping fleet in two—one fleet for domestic trade and one for foreign—

21

and took different steps to support each." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 810 (D.C. Cir. 1998). Under the Operating-Differential Subsidy and Construction-Differential Subsidy programs, U.S.-flag vessels operating in foreign commerce could receive subsidies. Because "vessels built with the aid of the [Construction-Differential Subsidy] program would have an unfair advantage if allowed to compete directly with the unsubsidized Jones Act ships in domestic trade," the Merchant Marine Act of 1936 required that subsidized vessels operate "exclusively in foreign trade." *Id.* (internal quotation marks omitted); *see also* 49 Stat. 1985, 1999 (1936). As the Supreme Court put it:

> It was recognized from the outset that substantial limits would have to be placed upon the entry of the subsidized vessels into the domestic trade. Any other result would have been disastrous for the unsubsidized Jones Act fleet for which that trade was (and is) reserved. Burdened by higher construction costs, greater outstanding debt, and higher operating expenses, that fleet would simply have been unable to compete with new vessels enjoying the benefits of the 1936 Act.

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 586–87 (1980) (footnote omitted); *see also Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912 ("It would be grossly unfair to allow U.S. vessels that have received a subsidy of up to 50% of construction costs to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards."). Similar to Section 53105(a)(1), the Construction-Differential Subsidy program permitted a limited exception to the requirement that subsidized vessels operate exclusively in foreign commerce, but such exception applied only with the consent of the United States Maritime Commission. *See* 49 Stat. at 1999. These subsidies have therefore always been reserved for vessels operating only in foreign commerce (absent an express exception), because it would be unfair to allow subsidized vessels to compete with unsubsidized vessels operating in domestic trade.

The MSP's express and intended purpose is thus to promote a U.S. maritime presence in *international* shipping. It continues a long tradition, dating back to 1936, of providing subsidies

to U.S.-flag vessels engaged exclusively in foreign commerce because those vessels do not enjoy the protection of the Jones Act when they call a foreign port and compete with foreign-flag vessels. Permitting vessels to participate in the MSP merely because they offer *some* transportation in foreign commerce would thus be contrary to the MSP's very purpose—even the Merchant Marine Act of 1936 permitted vessels to call domestic ports only when expressly allowed by the United States Maritime Commission.   And such a reading would contravene decades of practice recognizing the manifest unfairness that would result if vessels receiving subsidies through their participation in the international merchant marine could compete with Jones Act vessels operating in domestic trade (and paying the full, unsubsidized costs associated with operating under the U.S. flag).

Indeed, Congress has recently made clear that MSP subsidies are unavailable to any vessels that engage in domestic trade.  In the National Defense Authorization Act for Fiscal Year 2018, Congress amended the MSA to prohibit vessels participating in the MSP from engaging in *any* domestic trade at all (whether pursuant to a registry endorsement or not).  *See* NDAA § 3503.  This most recent enactment confirms Congress's view that the MSA is designed to allow U.S.-flag vessels to compete in foreign commerce, not to allow vessels engaged in domestic trade to obtain an advantage over competitors by engaging in some token amount of foreign commerce.

*Third*, to the extent there is any ambiguity arising from the statutory language, the regulations make clear that vessels are eligible for the MSP only if they engage exclusively in either foreign commerce or mixed foreign commerce and domestic trade under a registry endorsement.  46 C.F.R. § 296.11 provides that a vessel is "eligible" to be included in the MSP if the vessel "is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."   46 C.F.R. § 296.11(a)(2).   "Foreign

Commerce" is defined under the regulation as "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. § 12111." *Id.* [§] 296.2 (emphasis added).  Thus, just like Section 53105, the regulations make clear that a vessel is not eligible to participate in the MSP unless it operates *exclusively* in foreign commerce or *exclusively* in mixed foreign commerce and domestic trade pursuant to a registry endorsement. *See X-Citement Video*, 513 U.S. at 68.

As noted above, MARAD reaffirmed *in this proceeding* its view that Section 53105 "clarifie[s]" Section 53102.  AR163.  Other regulatory guidance reflects this same understanding. In its regulatory notices soliciting vessels to participate in the MSP, MARAD made no mention of Section 53102(b)(2)'s broad requirement that participating vessels "provid[e] transportation in foreign commerce," but instead advised applicants that "[v]essels under MSP Operating Agreements shall be operated exclusively in foreign commerce as defined in 46 U.S.C. [§] 53101(4) or in permissible mixed foreign commerce and domestic trade as provided by 46 U.S.C. [§] 53105(a)(1)(A)." *Acceptance of Applications for the Award of Two Maritime Security Program Operating Agreements*, 81 Fed. Reg. 68,104, 68,105 (Oct. 3, 2016); *see also Acceptance of Applications for the Potential Award of Maritime Security Program Operating Agreements*, 80 Fed. Reg. 74,209, 74,210 (Nov. 27, 2015) (same).  If Section 53102(b)(2) set forth the only eligibility requirements for participating vessels, in soliciting applications, MARAD would have cited that provision, and not Section 53105(a)(1)(A).  Moreover, MARAD has stated its view in rulemaking proceedings that "MSP vessels may be operated in mixed foreign commerce and domestic trade allowed under a registry endorsement; however, the MSP vessel cannot otherwise be operated in 'coastwise trade.'" *Maritime Security Program*, 70 Fed. Reg. 55,581, 55,582 (Sept.

22, 2005).  These representations are wholly consistent with both the regulations and the statutory language.

Thus, under the plain text of the statute—as confirmed by every other tool of interpretive guidance—vessels are not eligible to participate in the MSP if they engage in any domestic trade, except that which is conducted pursuant to a registry endorsement under 46 U.S.C. § 12111, and may not otherwise operate in the coastwise trade.  But the New Vessels indisputably do engage in domestic trade not conducted pursuant to a registry endorsement, and they do operate in the coastwise trade:  They carry cargo between Saipan and the continental United States.

APL's marketing materials leave no doubt that the New Vessels carry cargo between Saipan and the continental United States.  In October 2015, APL announced that it would provide a new service, called the "Guam Saipan Express," that would give "Saipan shippers an alternative for shipping from the U.S. mainland."  AR265.  APL likewise advertised that the Guam Saipan Express would let "Saipan shippers tap into APL's global service network for freight to and from many parts of the world."  AR371.  APL elsewhere made clear that these statements about the Guam Saipan Express—and its service between Saipan and the continental United States— referred to the New Vessels.  AR116, AR375.  And were there any remaining doubt, one of the New Vessels is named the APL *SAIPAN*, a fact consistently overlooked or ignored by MARAD.

Nor is there any question that trade between Saipan and the continental United States is domestic trade not conducted pursuant to a registry endorsement.  Although the MSA does not define "domestic trade," it defines the "United States" as including "the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, [and] the Virgin Islands."  46 U.S.C. § 53101(10).  Saipan is part of the Northern Mariana Islands.  *See* Commonwealth of the Northern Mariana Islands Const. art. VI.  Neither Saipan nor the Northern

Mariana Islands is a territory for which a registry endorsement may be obtained under 46 U.S.C. § 12111.  Thus, trade between the continental United States and Saipan is trade between two points in the United States, and is domestic trade not conducted pursuant to a registry endorsement.  It does not matter whether the cargo from the continental United States changes ships at a foreign port before being carried on to Saipan—such "transshipment" does not affect whether trade is considered domestic or foreign.  *See* 46 C.F.R. § 296.2; *Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

Moreover, trade between Saipan and the continental United States is "coastwise" trade for purposes of the MSA and is thus squarely prohibited by Section 53105(a)(1)(B).  Regardless of whether trade involving Saipan is "coastwise" for all purposes (including the Jones Act prohibitions generally), the MSA regulations *define* "Coastwise Trade" for purposes of the MSP fleet to mean "trade between points in the United States."  46 C.F.R. § 296.2; *see also Maritime Security Program*, 70 Fed. Reg. at 55,582 ("The statute apparently uses both terms 'coastwise trade' and 'domestic trade' interchangeably to mean trade between points in the United States."). Saipan is plainly a part of the United States.  *See* 46 U.S.C. § 53101(10).

Additionally, trade between Saipan and the United States is "coastwise" as that term is used in other contexts.  The Jones Act excludes from the coastwise laws "the Northern Mariana Islands, except as provided in section 502(b) of the Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America."  46 U.S.C. § 55101(b)(2).  The Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America (the "Northern Mariana Covenant") is codified as a note to 48 U.S.C. § 1801, and provides, among other things, that "[t]he laws of the United States regarding coastal shipments and the conditions of employment, including the wages and

hours of employees, will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note. Thus, although the coastwise laws do not ordinarily apply to trade involving Saipan and the Northern Mariana Islands, they do if that trade is conducted by the United States or its contractors. *See Vessels: The Application of the Coastwise Laws to the Shipment of Food Commodities by an Agency of the U.S. Government*, 15 Cust. B. & Dec. 1082 (1981). APL is plainly a government contractor, as it was required to and did enter into operating agreements with the United States in order to participate in the MSP. *See* 46 U.S.C. § 53103(a); *see also* AR89–113, AR377–403. Its trade involving Saipan is therefore coastwise as that term is used in the Jones Act.

But, importantly, even if trade between Saipan and the continental United States were not "coastwise," that would not matter here. The statute and regulation permit domestic trade *only* if that trade is "allowed under a registry endorsement." 46 U.S.C. § 53105(a)(1)(A); 46 C.F.R. § 296.2. Title 46 U.S.C. § 12111, providing for registry endorsements, says nothing about registry endorsements involving Saipan, and Section 53105 says nothing about permitting non-coastwise trade that is otherwise domestic. Thus, simply engaging in domestic trade not conducted pursuant to a registry endorsement disqualifies a vessel from participating in the MSP, regardless of whether that trade is deemed "coastwise" under the MSA or some other statute.

Despite APL's unambiguous representation that the New Vessels would operate in service to Saipan—a fact that was made public before MARAD approved APL's substitution of the APL GUAM, and confirmed by the name of one of the vessels—and the statutory prohibition on such trade, in approving the two vessels for MSP subsidies MARAD did not ever discuss the service to Saipan. In fact, aside from using the name "APL SAIPAN," MARAD did not mention Saipan once in any of its correspondence with APL or its internal approval memoranda. Instead, MARAD

focused myopically on the New Vessels' service to Guam, a territory that is covered by the registry endorsement provisions of 46 U.S.C. § 12111.  This complete failure to even *consider* the New Vessels' service to Saipan itself renders MARAD's decisions arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem . . . .").

Although Matson is not challenging here MARAD's decision denying Matson's administrative appeal, that additional statement of agency reasoning confirms that MARAD failed to consider carriage to Saipan in evaluating the vessels' eligibility.  MARAD expressed its view, consistent with the above, that Section 53105(a)(1)(A) clarifies the eligibility requirements for a vessel in the MSP.  AR404–05.  Nevertheless, MARAD focused solely on the fact that trade involving Guam is domestic trade that may be conducted pursuant to a registry endorsement, ignoring the fact that the New Vessels also transport cargo between the United States and Saipan, a U.S. territory that is *not* listed in 46 U.S.C. § 12111 as a territory for which a registry endorsement may be obtained.  *See* 46 U.S.C. § 12111(b) ("A vessel for which a registry endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef.").

Had MARAD, at any point, considered the New Vessels' service to Saipan, it could not have concluded that the New Vessels are eligible for the MSP.  The New Vessels carry cargo between the continental United States and Saipan, which is part of the United States under the MSA.  *See* 46 U.S.C. § 53101(10).  Title 46 U.S.C. § 12111, which allows for the issuance of registry endorsements, does not provide for registry endorsements with respect to Saipan or the Northern Mariana Islands.  Therefore, every time the New Vessels carry cargo originating in the continental United States to Saipan, and vice versa, they are not operating "exclusively in the

foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement." 46 U.S.C. § 53105(a)(1)(A).  They are thus ineligible for inclusion in the MSP, and MARAD's decisions otherwise are not in accordance with the law.

MARAD's arbitrary and capricious decisions approving the New Vessels have unfairly tipped the competitive scales in APL's favor.  Unlike Matson, APL receives subsidies from the U.S. government to carry cargo between points in the United States.  APL has admitted that its ability to service the Saipan port is attributable to the subsidies it receives.  While Matson agrees that competition is a healthy and important part of the shipping industry, that competition must be fair.  Until MARAD's unlawful decisions are overturned, Matson will continue to suffer by losing market share and being forced to compete on an uneven playing field.

## B.      MARAD's And APL's Counterarguments Are Unavailing

In opposition to Matson's petition for review in the D.C. Circuit, MARAD and APL made several counterarguments in defense of the New Vessels' operation in trade between Saipan and the continental United States.  In anticipation of those arguments being recycled for use in this proceeding, Matson addresses them here.  All of them fall short.

*First*, MARAD and APL argued that Section 53105(a)(1) affects only what must be included in the agreements under which participating vessels operate, and does not set forth eligibility requirements.  *See* MARAD Br. 41–42; APL Br. 26–30.  As described in detail above, however, *every* tool of statutory interpretation—the text, the structure, the context, the purpose— as well as the regulatory guidance *and* the regulations themselves confirm that vessels cannot participate in the MSP if they engage in domestic trade not conducted pursuant to a registry endorsement.  MARAD lacks the statutory and regulatory authority to approve vessels for the MSP if they are engaged in unauthorized domestic trade, and its decisions approving the New Vessels were arbitrary and capricious and not in accordance with the law.  It is telling that until Matson

challenged MARAD's decision in its petition to the D.C. Circuit, both MARAD *and* APL took the position that Section 53105(a)(1)'s requirements must be met before vessels could be approved for the MSP.  AR6, AR163.  And as noted above, MARAD's own regulation defines "[f]oreign [c]ommerce" for eligibility purposes as "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. § 12111."  46 C.F.R. § 296.2 (emphasis added).  MARAD, like all other agencies, is bound by its own regulations.  *See Service v. Dulles*, 354 U.S. 363, 372 (1957) ("[R]egulations validly prescribed by a government administrator are binding upon him as well as the citizen, and . . . this principle holds even when the administrative action under review is discretionary in nature."); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954) (holding that the Attorney General was bound to follow his own regulations limiting his discretion over immigration and deportation cases).

Contrary to APL's assertions (APL Br. 27–28), this coherent reading of the statute is not undermined by the section of the MSA providing for pro rata reductions in subsidy payments for each day less than 320 in a year that an MSP vessel is not operated in accordance with Section 53105(a)(1) (*see* 46 U.S.C. § 53106(d)(3)).  Rather, this provision reinforces the commonsense interpretation set forth above:  A vessel must operate exclusively in foreign commerce or mixed foreign and domestic trade pursuant to a registry endorsement in order to be eligible for inclusion in the MSP, and must commit to continue that operation.  *See id.* §§ 53102(b)(2), 53105(a)(1).  If that vessel thereafter calls a domestic port (due to an emergency, weather, exigent circumstances, or some other reason not foreseen at the time of the operating agreement), it does not become ineligible for the MSP, but instead must relinquish a portion of the subsidy payments to which it otherwise would be entitled.  Although an MSP contract may be terminated by the Government

upon a material breach by the contractor (*see id.* § 53104(c))—such as when a vessel calls a domestic port (AR106–07, AR394–95)—the conditions under which an MSP contract may be terminated, or the payments thereunder reduced, are distinct from the statutory requirements for eligibility.   The statute does not contemplate MSP vessels *routinely* calling domestic ports; otherwise the "exclusively" provision of both the statute and the regulation would be meaningless.

*Second*, APL (but not MARAD) argued that because trade between Saipan and the continental United States is not "coastwise" within the meaning of the Jones Act, it is not prohibited by Section 53105(a)(1).   But whatever meaning "coastwise" has under the Jones Act, trade between Saipan and the continental United States is plainly "coastwise" as that term is used in the MSA.   The statute itself does not define "coastwise," but the MSA regulations do— "Coastwise Trade" means "trade between points in the United States."  46 C.F.R. § 296.2.  Saipan is of course part of the United States (*see* 46 U.S.C. § 53101(10)), and thus trade between Saipan and the continental United States is coastwise for purposes of the MSA.  It is squarely prohibited by Section 53105(a)(1)(B).

But even were the Jones Act's definition of "coastwise" relevant here, APL is wrong that its vessels' trade involving Saipan is not coastwise.   As explained above, the Northern Mariana Covenant makes the coastwise laws applicable to the United States and its contractors (of which APL is one) when operating in Saipan and the Northern Mariana Islands.  APL claims that trade with Saipan is excluded from the Jones Act under 46 U.S.C. § 55101, and that the Northern Mariana Covenant makes applicable only the law of "coastal shipments," which, APL claims, is different from the "coastwise laws."  APL Br. 30–33.  APL's argument, aside from being rejected by the U.S. Customs Service (*see* 15 Cust. B. & Dec. 1082) and ignored by MARAD in the petition (*see* MARAD Br.), makes no sense.  APL says that "coastal shipments" refers only to shipments

31

between parts of the same coast, but it cites no authority for that interpretation (other than a dictionary of standard usage).  *See* APL Br. 31–32.  Nor does it explain what the "laws of the United States regarding coastal shipments" are—if that does not mean the coastwise laws embodied in the Jones Act, then what laws does it mean?  There is no body of "coastal shipments" law, as distinguished from the coastwise laws, to apply.  APL ties itself in knots to avoid the plain meaning of the Northern Mariana Covenant, to no avail.

In reality, though, the question whether trade involving Saipan is "coastwise" is entirely academic.  While Section 53105(a)(1)(B) prohibits coastwise trade, Section 53105(a)(1)(A) does not use the term "coastwise."  Rather, it prohibits "domestic trade," except that conducted pursuant to a registry endorsement.  *See* 46 U.S.C. § 53105(a)(1)(A).  It matters not whether trade involving Saipan may be "coastwise" under the MSA, the Jones Act, or any other statute—trade between Saipan and the United States is indisputably "domestic," *see id.* § 53101(10); 46 C.F.R. § 296.2, it is not conducted pursuant to a registry endorsement, *see* 46 U.S.C. § 12111, and it is thus prohibited under the MSP.

*Third*, APL (but not MARAD) argued that the Court may simply disregard the controlling regulations—which unambiguously provide that participating vessels must be engaged exclusively in foreign commerce or domestic trade under a registry endorsement—because they must be "construed to mirror the MSP statute's distinction between eligibility requirements and contractual conditions."  Supplemental Brief of Intervenors APL Marine Services, Ltd., and APL Maritime, Ltd. 11 n.7, *Matson Navigation Co.* (No. 17-1144).  This gets it backward: MARAD's regulatory definition of "foreign commerce" is not only in line with the statute, it is compelled by it, and MARAD has *no* authority or discretion under the statute to award operating agreements to vessels engaged in unauthorized domestic trade.  And even if APL were correct that the regulations are

more restrictive than the statute, that would not permit this Court to ignore them.  APL is not *entitled* to participate in the MSP: the statute vests MARAD with discretion to accept new applicants, even if the vessels are otherwise eligible.  *See* 46 U.S.C. § 53103(c) ("The Secretary *may* enter into a new operating agreement" with eligible vessels (emphasis added)).  MARAD may impose whatever rational limitations on applicants it sees fit, and limiting applicants to those vessels that operate exclusively in foreign commerce or authorized domestic trade is certainly a rational limitation.  Having promulgated a regulation imposing such rational limitations, MARAD is bound to follow that regulation.  *See Accardi*, 347 U.S. at 268.  APL's request that the Court disregard unambiguous regulatory language is meritless.

*Finally*, MARAD argued in opposing the petition that Matson had failed to establish injury sufficient to confer standing to bring this suit.  *See* MARAD Br. 38–41.  In this proceeding, Matson has adduced substantial evidence that it competes directly with APL in the Guam and Saipan trade. (SUF ¶¶ 4–14; *see also* Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 7 (July 31, 2018), https://www.sec.gov/Archives/edgar/data/3453/000155837018005979/0001558370-18-005979-index.htm; Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 8 (Nov. 2, 2017), https://www.sec.gov/Archives/edgar/data/3453/000155837017008005/0001558370-17-008005-index.htm.)  The D.C. Circuit has held that there is "no reason any one competing for a governmental benefit should not be able to assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically."  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010).  APL has unlawfully earned a governmental benefit, and Matson has been injured economically.  That is all the law requires.

* * *

To be eligible for participation in the MSP, a vessel must engage exclusively in foreign commerce or domestic trade under a registry endorsement.  Because the New Vessels, by engaging in trade between Saipan and the continental United States, do not engage exclusively in foreign commerce or domestic trade under a registry endorsement, they are ineligible for the MSP.  MARAD acted arbitrarily and capriciously, and contrary to law, in concluding otherwise.  The award decisions must therefore be set aside.

## II.    Matson Is Entitled To An Adequate Remedy

When an agency issues an order that is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, the default statutory remedy is to "hold unlawful and set aside" that agency action.  5 U.S.C. § 706(2)(A).  Because MARAD's approvals of the New Vessels were contrary to law, this Court should, in addition to declaring such approvals unlawful, vacate and set them aside, reverting the MSP operating agreements back to the vessels for which they were originally awarded.

Federal courts ordinarily presume that federal agencies and officials will follow their statutory commands and obligations.  *See Garner v. Jones*, 529 U.S. 244, 256 (2000).  This would include not only the MSA as it existed at the time of the erroneous approvals, but also the National Defense Authorization Act for Fiscal Year 2018, which makes clear that the MSA prohibits MSP vessels from engaging in *any* domestic trade.  *See* NDAA § 3503.  Thus, once the awards at issue are set aside, Matson does not expect MARAD to entertain any future requests by APL to allow these vessels to participate in the MSP fleet.  If Defendants represent as much to Matson and the Court, there would be no need for injunctive relief.

If, instead, MARAD indicates that it may, in the future, consider these same or similar vessels for inclusion in the MSP fleet (or refuses to foreclose that possibility), then Matson's request for an injunction would be ripe for decision by this Court.  Given that this equitable relief

is contingent on both the Court's forthcoming liability ruling and MARAD's response to that ruling, Matson respectfully submits that the interests of efficiency and economy are best served by deferring the issue of injunctive relief until liability has been resolved.  If, however, the Court would prefer to have the issue of injunctive relief briefed at this time, Matson will submit a short supplement on this point.

Additionally, even if Section 53105's eligibility requirements could be read to limit only the agreements under which MSP vessels must operate, MARAD is required to make pro rata reductions when participating vessels fail to abide by those agreements.  Thus, at the very least, this Court should declare that MARAD must make the appropriate pro rata reductions in its payments to APL.

Section 53106(d)(3) provides that with respect to any vessel covered by an operating agreement, the Secretary "shall make a pro rata reduction in payment for each day less than 320 in a fiscal year that the vessel is not operated in accordance with paragraph (1) and (2) of section 53105(a)."  46 U.S.C. § 53106(d)(3).  Even if Section 53105(a)(1)'s requirements are interpreted to apply only to the agreements under which participating vessels must operate, the statute requires pro rata reductions for each day a vessel engages in domestic trade not conducted pursuant to a registry endorsement.  This means that if a vessel calls a domestic port (e.g., Saipan) at any point during a voyage, MARAD is statutorily required to make a pro rata reduction for that entire voyage, because the vessel was not "operat[ing] exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement."  *Id.* § 53105(a)(1)(A).  Indeed, the operating agreements for the APL GUAM and the APL SAIPAN permit MARAD to terminate the contracts if a vessel operates in domestic commerce for even one

day (AR106–07, AR394–95), making clear that even a single lapse in compliance with Section 53105(a)(1) carries significant consequences.

As set forth above, the New Vessels' carriage of cargo between the continental United States and Saipan is plainly domestic trade not conducted pursuant to a registry endorsement, as required by paragraph (1) of Section 53105(a).  Yet, upon information and belief, MARAD has not made the appropriate pro rata reductions in its subsidy payments to APL.  Matson has been harmed and will continue to be harmed so long as APL receives MSP subsidies for vessels operating in domestic trade.  *See Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912 ("It would be grossly unfair to allow U.S. vessels that have received a subsidy . . . to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards.").  MARAD's failure to make pro rata reductions is thus arbitrary and capricious.  If the Court finds that Section 53105(a)(1)'s requirements do not render the New Vessels ineligible to participate in the MSP, it should, in the alternative, declare that MARAD must retrospectively and prospectively comply with its statutory obligation to make pro rata reductions.

## CONCLUSION

For the foregoing reasons, the Court should grant Matson's motion for summary judgment and set aside as unlawful MARAD's approvals of the New Vessels.  The Court should therefore declare unlawful and vacate MARAD's decision approving the New Vessels for inclusion in the MSP.  In the alternative, the Court should declare that MARAD must make pro rata reductions from its subsidy payments to APL as required by law.

Dated:      March 22, 2019                          /s/ Mark A. Perry
                                                    Mark A. Perry, DC Bar No. 438203
                                                    MPerry@gibsondunn.com
                                                    Joshua M. Wesneski, DC Bar No. 1500231
                                                    JWesneski@gibsondunn.com
                                                    GIBSON, DUNN & CRUTCHER LLP
                                                    1050 Connecticut Avenue, N.W.
                                                    Washington, D.C. 20036
                                                    (202) 955-8500

                                                    Rachel S. Brass, *pro hac vice*
                                                    RBrass@gibsondunn.com
                                                    GIBSON, DUNN & CRUTCHER LLP
                                                    555 Mission Street, Suite 3000
                                                    San Francisco, CA 94105
                                                    (415) 393-8200

                                                    *Counsel for Plaintiff Matson Navigation
                                                    Company, Inc.*