# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.

    *Plaintiff*,

  *v.*

DEPARTMENT OF TRANSPORTATION;
MARITIME ADMINISTRATION

    *Defendants*,

APL MARINE SERVICES, LTD.;
APL MARITIME, LTD.

    *Intervenor-Defendants*.

**No. 1:18-CV-2751-RDM**

---

## MEMORANDUM IN SUPPORT OF INTERVENOR-DEFENDANTS' COMBINED OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

GERARD J. CEDRONE
  (D.D.C. Bar. No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
T: (617) 570-1000
F: (617) 523-1231
gcedrone@goodwinlaw.com

BRIAN T. BURGESS
  (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, D.C. 20001
T: (202) 346-4000
F: (202) 346-4444
bburgess@goodwinlaw.com

*Counsel for APL Marine Services, Ltd.,
and APL Maritime, Ltd.*

April 19, 2019

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ...............................................................................................................3

    I.      STATUTORY AND REGULATORY BACKGROUND ...................................... 3

          A.     Legal Background Concerning The Maritime Security Program ...............3

          B.     MSP Eligibility Criteria And MSP Operating Agreements ........................4

          C.     Background On The U.S. Vessel Documentation Laws.............................7

    II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................... 11

          A.     APL's Replacement Applications.................................................................11

          B.     Matson's Challenge To APL's Applications ...............................................13

          C.     The Current Action ...................................................................................15

STANDARD OF REVIEW ............................................................................................16

ARGUMENT ....................................................................................................................16

    I.      APL'S REPLACEMENT VESSELS WERE ELIGIBLE FOR
          INCLUSION IN THE MSP UNDER 46 U.S.C. § 53102(B)(2). ........................ 17

          A.     MARAD Properly Determined That APL's Replacement Vessels
                 Satisfied The Vessel-Eligibility Requirements Of Section
                 53102(b)(2) Because They Would Engage In Foreign
                 Commerce. .................................................................................................17

          B.     Matson's Arguments About Saipan Are Not Relevant To Vessel
                 Eligibility Under Section 53102(b), Which Was The Only Issue
                 Before MARAD...........................................................................................19

          C.     Matson Offers No Convincing Reason To Conflate Sections
                 53102(b) And 53105(a).............................................................................23

    II.     THE REPLACEMENT VESSELS' SERVICE TO SAIPAN IS
          CONSISTENT WITH 46 U.S.C. § 53105(A). .................................................. 29

          A.     APL's Registry Endorsements Authorize Its Vessels To Engage
                 In Trade With Saipan Provided That Trade Is Not Coastwise
                 Under The Jones Act..................................................................................30

i

B.      APL's Carriage Of Cargo Between The U.S. Mainland And Saipan Is Not "Coastwise" Trade Under The Covenant. .........................36

III.    MATSON'S REMEDIAL REQUESTS LACK MERIT. ..................................... 41

A.      There Is No Conceivable Basis To Award Injunctive Relief To Matson.....................................................................................................41

B.      Matson Lacks The Authority To Compel MARAD To Initiate A Contract-Enforcement Action. ...................................................................43

CONCLUSION...............................................................................................................44

## **TABLE OF AUTHORITIES**

**Page(s)**

<span style="font-variant: small-caps;">**Cases:**</span>

*American Maritime Association v. Blumenthal*,
    590 F.2d 1156 (1978) ...................................................................................34

*Bartko v. SEC*,
    845 F.3d 1217 (D.C. Cir. 2017) ....................................................................42

*Bates v. United States*,
    522 U.S. 23 (1997) .........................................................................................20

*Cherokee Nation v. Nash*,
    267 F. Supp. 3d 86 (D.D.C. 2017) ................................................................21

*Church v. General Motors Corp.*,
    74 F.3d 795 (7th Cir. 1996) ..........................................................................37

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ......................................................................................16

*City of Reading v. Austin*,
    816 F. Supp. 351 (E.D. Pa. 1993) ................................................................42

*Ctr. for Public Integrity v. Dep't of Energy*,
    191 F. Supp. 2d 187 (D.D.C. 2002) ..............................................................37

*Culbertson v. Berryhill*,
    139 S. Ct. 517 (2019) ....................................................................................23

*Dunn-McCampbell Royalty Interest, Inc. v. NPS*,
    112 F.3d 1283 (5th Cir. 1997) ......................................................................32

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
    353 U.S. 222 (1957) ......................................................................................35

*Gull Airborne Instruments, Inc. v. Weinberger*,
    694 F.2d 838 (D.C. Cir. 1982) .....................................................................43

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ......................................................................................43

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
    571 U.S. 161 (2014) ......................................................................................34

*Hosp. of Univ. of Pa. v. Sebelius,*
    634 F. Supp. 2d 9 (D.D.C. 2009) ........................................................................16

*Matson Navigation Co. v. U.S. Dep't of Transportation,*
    895 F.3d 799 (D.C. Cir. 2018) ......................................................................15, 28

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011) ..............................................................................................32

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) (Thomas, J., concurring) ...............................................23

*Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA,*
    891 F.3d 1041 (D.C. Cir. 2018) ..........................................................................32

*Pan Am World Servs., Inc. v. United States,*
    No. 87-cv-2522, 1987 WL 114843 (D.D.C. Sept. 30, 1987) ...............................43

*Sandifer v. U.S. Steel Corp.,*
    571 U.S. 220 (2014) ............................................................................................37

*Shipbuilders Council of Am. v. U.S. Coast Guard,*
    578 F.3d 234 (4th Cir. 2009) ...............................................................................31

*Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.,*
    934 F. Supp. 2d 1 (D.D.C. 2013) ..........................................................................8

*Wood v. Amerada Hess Corp.,*
    845 F. Supp. 130 (S.D.N.Y. 1994), *aff'd,* 37 F.3d 87 (2d Cir. 1994) ....................33

**STATUTES:**

5 U.S.C. § 704 .............................................................................................................43

5 U.S.C. § 706(2)(A) ...................................................................................................16

28 U.S.C. § 2342(3)(A) ...............................................................................................15

28 U.S.C. § 2344 .........................................................................................................15

46 U.S.C. § 109 ...........................................................................................................35

46 U.S.C. § 12102(a) ....................................................................................................7

46 U.S.C. § 12103 ......................................................................................................9, 10

46 U.S.C. § 12111 ...................................................................................................8, 9, 30

46 U.S.C. § 12111(a) ...................................................................................................10

\* 46 U.S.C. § 12111(b) ................................................................................................... 9, 10, 30, 33

46 U.S.C. § 12111(c) ............................................................................................................... 10

46 U.S.C. § 12112 ................................................................................................................ 8, 31

46 U.S.C. § 12112(a)(1) ............................................................................................................. 9

46 U.S.C. § 12112(a)(2) ........................................................................................................ 9, 33

46 U.S.C. § 12112(b) .................................................................................................................. 9

46 U.S.C. § 12113 ....................................................................................................................... 8

46 U.S.C. § 12114 ....................................................................................................................... 8

46 U.S.C. § 12117 ....................................................................................................................... 8

46 U.S.C. § 53101(2) ................................................................................................................ 38

46 U.S.C. § 53101(4) ............................................................................................................ 5, 18

46 U.S.C. § 53102(a) .................................................................................................................. 1

\* 46 U.S.C. § 53102(b) ..................................................................................................... *passim*

\* 46 U.S.C. § 53102(b)(2) ................................................................................................. *passim*

46 U.S.C. § 53102(b)(4) ............................................................................................................. 5

46 U.S.C. § 53102(b)(5) ........................................................................................................ 4, 20

46 U.S.C. § 53102(c) .................................................................................................................. 4

46 U.S.C. § 53103 ................................................................................................................. 5, 24

46 U.S.C. § 53103(a) .................................................................................................................. 5

46 U.S.C. § 53103(d) .................................................................................................................. 5

46 U.S.C. § 53104 ....................................................................................................................... 5

46 U.S.C. § 53104(c) .............................................................................................................. 7, 22

46 U.S.C. § 53105 ........................................................................................................... 1, 5, 7, 24

46 U.S.C. § 53105(a) ....................................................................................................... *passim*

46 U.S.C. § 53105(a)(1) ........................................................................................................ 20, 21

46 U.S.C. § 53105(a)(1)(A) ................................................................ *passim*

46 U.S.C. § 53105(a)(1)(B) ................................................................35

46 U.S.C. § 53105(a)(2) (2018) ..........................................................6

46 U.S.C. § 53105(b)(2) .....................................................................6

46 U.S.C. § 53105(c) ...................................................................6, 8, 20

46 U.S.C. § 53105(d) ..........................................................................6

46 U.S.C. § 53105(e) ..........................................................................6

* 46 U.S.C. § 53105(f) ................................................................ *passim*

46 U.S.C. § 53106 ...............................................................................4

46 U.S.C. § 53106(a) ..........................................................................1

46 U.S.C. § 53106(b) ...................................................................21, 25

* 46 U.S.C. § 53106(d)(3) ...........................................................7, 21

46 U.S.C. § 53106(e) ..........................................................................7

46 U.S.C. § 53106(e)(1) ....................................................................22

46 U.S.C. § 53106(e)(2) ....................................................................14

46 U.S.C. § 53107 ......................................................................1, 4, 38

46 U.S.C. § 55101(b) .........................................................................10

46 U.S.C. § 55101(b)(1) ......................................................................9

46 U.S.C. § 55101(b)(2) ...............................................................30, 36

46 U.S.C. § 55101(b)(3) .....................................................................10

46 U.S.C. § 55102(b) ....................................................................9, 40

Act of June 15, 1934, ch. 523, 48 Stat. 963 .......................................9

Coast Guard Authorization Act of 1989, Pub. L. No. 101-225, § 301(a), 103 Stat.
    1908, 1920..................................................................................34

Maritime Security Act of 1996, Pub. L. No. 104-239, 110 Stat. 3118 ...........................4

Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985

§ 501, 49 Stat. at 1995 ...................................................................................35

§ 506, 49 Stat. at 2000 ...................................................................................26

§ 506, 49 Stat. at 2003 ...................................................................................26

National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239,
§ 3508, 126 Stat. 1632, 2223 ..........................................................................4

National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91,
§ 3503, 131 Stat. 1283 (2017)......................................................4, 6, 41, 42

Panama Canal Act, ch. 390, 37 Stat. 562 (1912) ...............................................9

Pub. L. No. 98-89, 97 Stat. 500 (1983)...........................................................34

Pub. L. No. 98-454, § 301(b), 98 Stat. 1732, 1734 (1984) ............................34

Pub. L. No. 109-304, 120 Stat. 1485 (2006)..............................................34, 35

Rev. Stat. 4132 ...................................................................................................9

## REGULATIONS AND ADMINISTRATIVE DECISIONS:

19 C.F.R. § 177.9(c).........................................................................................41

* 46 C.F.R. § 67.17 .............................................................................3, 11, 31, 32

46 C.F.R. § 67.19 .............................................................................................31

46 C.F.R. § 67.21 ...............................................................................................8

46 C.F.R. § 296.2 .............................................................................................27

46 C.F.R. § 296.11(a)(2) ..................................................................................27

46 C.F.R. § 296.30(d)(1) ...................................................................................7

46 C.F.R. § 296.31(d)(2) ..................................................................................27

46 C.F.R. § 296.40 ...........................................................................................25

46 C.F.R. § 296.41(b)(1)(i)...........................................................................7, 27

46 C.F.R. § 296.41(c)........................................................................................27

46 C.F.R. § 296.41(c)(ii)....................................................................................7

49 C.F.R. § 1.93(a) ............................................................................................5

Documentation of Vessels, 47 Fed. Reg. 27,490 (Jun. 24, 1982) ...................10

Establishment of Interim National Multimodal Freight Network, 81 Fed. Reg.
    36,381 (Mar. 1, 2019) ..............................................................................40

U.S. Customs Service Ruling HQ 112917, 1993 WL 564563 (Oct. 19, 1993) ............................31

Vessel Documentation: Lease Financing for Vessels Engaged in Coastwise Trade,
    69 Fed. Reg. 5390 (Feb. 4, 2004) ......................................................8, 31

Vessels: The Application of the Coastwise Laws to the Shipment of Food
    Commodities by an Agency of the U.S. Government, 15 Cust. B. & Dec. 1082
    (1981) .........................................................................................................41

**INTERNATIONAL AGREEMENTS:**

* Covenant to Establish a Commonwealth of the Northern Mariana Islands in
    Political Union with the United States of America, 48 U.S.C. § 1801 note .......................3, 30

    Covenant § 502(b) ..........................................................................30, 36, 38, 39

    Covenant § 503(a) .......................................................................................36, 39

**LEGISLATIVE HISTORY:**

48 Cong. Rec. 11138 (Aug. 16, 1912) .............................................................9

H.R. Rep. No. 104-229 (1995) ......................................................................3, 4

S. Rep. No. 94-433 (1975) ...............................................................................36

**OTHER AUTHORITIES:**

APL, COMPANY OVERVIEW, https://bit.ly/2Pfk5Sc ........................................11

BLACK'S LAW DICTIONARY 400 (10th ed. 2014) ..........................................37

* Executive Order No. 6-A, 1 N. Mar. I. Reg. 13 (Jul. 13, 1978)

    ¶ 4, 1 N. Mar. I. Reg. at 14 ......................................................................40

    ¶ 5, 1 N. Mar. I. Reg. at 14 ......................................................................40

MARAD OFFICE OF POLICY & PLANS, UNITED STATES FLAG PRIVATELY-OWNED
    MERCHANT FLEET (rev. Nov. 28, 2018), https://bit.ly/2UNvYFa ...........38

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/contractor ..........................37

U.S. DEP'T OF DEFENSE, CONTRACTS: U.S. TRANSPORTATION COMMAND (Jan. 6, 2016), http://bit.ly/2mF3toS; ...................................................................................................38

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 433 (1976) ...............................................39

## GLOSSARY

| | |
|---|---|
| APL | APL Marine Services, Ltd., and APL Maritime, Ltd. (Intervenor-Defendants) |
| AR | Administrative Record |
| CNMI | Commonwealth of the Northern Mariana Islands |
| Covenant | Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, codified at 48 U.S.C. § 1801 note |
| MARAD | Maritime Administration (Defendant) |
| Maritime Security Act or Act | Maritime Security Act of 2003, Pub. L. No. 108-136, §§ 3531-3537, 117 Stat. 1392, 1803-1820 |
| Matson | Matson Navigation Company, Inc. (Plaintiff) |
| Matson Br. | Matson Navigation Company's Motion for Summary Judgment (Dkt. No. 20) |
| MSP | Maritime Security Program |
| 2018 NDAA | National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 3503, 131 Stat. 1283 (2017) |

## INTRODUCTION

In this case, plaintiff Matson Navigation Company challenges agency action on grounds that were neither raised before nor passed upon by the agency. There is a reason for that remarkable disconnect: under the controlling statute, Matson's legal arguments have *nothing* to do with the narrow agency decisions at issue. Matson's challenge under the Administrative Procedure Act ("APA") can and should be rejected on that basis alone.

This case involves an initiative known as the Maritime Security Program (MSP), which Congress established in order to maintain a fleet of privately owned, militarily useful vessels that can both meet national security needs and strengthen the United States' presence in international commercial shipping. 46 U.S.C. § 53102(a). Program participants enter into operating agreements, and they pledge to make their ships available to the military during a time of war or other national emergency. *Id.* §§ 53105, 53107. In exchange, they receive annual payments for each vessel enrolled in the MSP fleet. *Id.* § 53106(a). Under the Act, MSP participants may replace vessels under existing operating agreements, provided the new vessel "is eligible to be included in the Fleet under section 53102(b)." *Id.* § 53105(f). The present dispute arises out of the government's decision to allow intervenor-defendants APL Marine Services, Ltd., and APL Maritime, Ltd. (collectively, "APL") to replace two large MSP vessels in the Middle East with two smaller vessels in the Pacific. In approving APL's replacement applications, the U.S. Maritime Administration ("MARAD")—which oversees the MSP—concluded that APL's chosen vessels met all the statutory criteria, including that APL's replacement vessels would be "operated . . . in providing transportation in foreign commerce." *Id.* § 53102(b)(2). The legal basis for MARAD's finding is obvious: APL explained in its applications that the new vessels would transport cargo between the United States and Asia, which unquestionably qualifies as "foreign commerce" under the Act. *See* pp. 18-19, *infra*.

1

Matson opposes APL's participation in the Pacific trade and especially its service to Guam, as APL's presence has introduced competition to a region that Matson had monopolized since 2011.  Seeking to block such competition and restore its status as the region's only U.S.-flag international-container carrier, Matson has cast about for different (and inconsistent) legal theories to challenge MARAD's vessel-replacement decisions.  In submissions to the agency, Matson argued that APL's service *to Guam* violates the Maritime Security Act, on the theory that Section 53102(b)(2) supposedly requires MSP vessels to engage *exclusively* in foreign commerce.  MARAD rejected that argument as inconsistent with the statute, and Matson has conspicuously abandoned its agency-level position here.  Instead, Matson now relies on an entirely different argument, claiming that APL's service to Saipan (an island in the Commonwealth of the Northern Mariana Islands) violates Section 53105(a) of the Act, which sets conditions for MSP operating agreements.  There are several flaws with Matson's new argument, but one problem is fundamental: in approving APL's replacement applications, MARAD was only called upon to confirm the vessels were *eligible* for the MSP under *Section 53102(b)(2)*; the agency was not supposed to decide whether all aspects of the vessels' projected service would comply with the terms of an operating agreement under *Section 53105(a)*. Matson's attempt to conflate these two distinct statutory provisions is contrary to the plain text and structure of the Maritime Security Act.  And rejecting Matson's argument on this point would fully resolve this case.

In any event, Matson's contention that APL's service to Saipan violates Section 53105(a) also fails on its own terms.  Matson's lead argument depends on its assertion that trade between the continental United States and Saipan is not authorized by a registry endorsement.  But Matson ignores the controlling regulation issued by the United States Coast Guard, which has

authority to administer the U.S. vessel-documentation laws.  *See* 46 C.F.R. § 67.17.  Under that regulation, APL's U.S.-flag vessels may engage in trade to United States territories such as the Northern Mariana Islands *unless* the service would violate the coastwise laws.  *Id.*  And the political covenant that established the Commonwealth of the Northern Mariana Islands generally exempts the Commonwealth from the coastwise laws.  *See* 48 U.S.C. § 1801 note; p. 36, *infra*. Matson's assertion that APL's service to Saipan falls within a narrow exception to that exemption is inconsistent the Covenant's text, the contemporary understanding of the Northern Mariana Islands' government, and Matson's own conduct in the region.

In short, the Court should deny Matson's motion for summary judgment, and grant the cross-motions for summary judgment by APL and the Federal Defendants.

## BACKGROUND

I.   STATUTORY AND REGULATORY BACKGROUND

   A.   Legal Background Concerning The Maritime Security Program

The Maritime Security Program is the latest iteration of a longstanding federal effort to maintain a fleet of privately owned, militarily useful vessels that can assist the United States in times of war or other emergencies.  Congress created the program in 1996 to address "a state of crisis" in the merchant marine fleet.  H.R. Rep. No. 104-229, at 9-10 (1995).  At the time, legislators noted, the number of U.S.-flag ships engaged in foreign commerce had been shrinking dramatically due to the "higher operating costs" faced by U.S. carriers who, unlike foreign-flag carriers, bear the expense of complying with federal law with respect to labor agreements, the environment, and worker safety.  *Id.* at 11.  Members of Congress recognized that "[w]ithout remedial action" to provide "adequate financial incentives" for vessels to register under the U.S. flag, there "simply [would] be no U.S. fleet to conduct foreign commerce, and the United States

[would] have to rely on foreign-flag shipping" not only for "all imports and exports," but also for cargo needed to support "future military operations."  *Id.* at 9-11.

Congress thus enacted the Maritime Security Act of 1996, Pub. L. No. 104-239, 110 Stat. 3118, establishing the MSP to financially support and thereby maintain an active fleet of U.S.-flag vessels.  The program offers financial assistance to participating vessel owners and operators in exchange for agreeing to make their ships available to the military during a time of war or national emergency.  46 U.S.C. §§ 53106, 53107.  Thus, MSP vessels may engage in private, commercial carriage during the course of their participation in the program.  Vessel owners and operators assume obligations to provide capacity to the federal government in the case of emergencies, as established under the terms of an "Emergency Preparedness Agreement." Congress has amended and reauthorized the program several times, and the MSP is now authorized through 2025.  *See* Maritime Security Act of 2003, Pub. L. No. 108-136, §§ 3531-3537, 117 Stat. 1392, 1803-1820; National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 3508, 126 Stat. 1632, 2223; National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 3503, 131 Stat. 1283 (2017) ("2018 NDAA").[1]

### B.  MSP Eligibility Criteria And MSP Operating Agreements

To join the MSP, a vessel must satisfy several eligibility criteria, which are set forth in 46 U.S.C. § 53102(b).  For example, the vessel must be "a United States-documented vessel" (or on track to become one), and its owners and operators must satisfy certain U.S. citizenship requirements.  46 U.S.C. § 53102(b)(5), (c).  In addition, key decisionmakers must conclude that the vessel will fulfill the purposes of the MSP: the Secretary of Defense must determine that the

---

[1] As discussed further below, the amendments from the 2018 NDAA do not apply to this suit. *See* pp. 6-7, *infra*.  Therefore, except where expressly noted, this brief uses the pre-2017 language of the MSP statute.

vessel is "suitable for use by the United States for national defense or military purposes in time of war or national emergency," and MARAD (as the delegee of the Secretary of Transportation)[2] must find that the vessel is "commercially viable." *Id.* § 53102(b)(4). Finally, an applicant must show that its vessel is "operated (or in the case of a vessel to be constructed, will be operated) in providing transportation in foreign commerce." *Id.* § 53102(b)(2). The statute defines "foreign commerce" to include both "commerce or trade between foreign countries," and "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country." *Id.* § 53101(4).

MARAD is not required to accept every vessel that meets Section 53102(b)'s threshold eligibility criteria—indeed, the MSP is currently capped at 60 vessels. *Id.* § 53103(d). If MARAD does select a vessel for the MSP fleet, Section 53103 requires the owner or operator to enter into an operating agreement with the agency. *Id.* § 53103(a). The next several sections of the Act then specify the rights, obligations, and contractual remedies associated with the operating agreements. *See* 46 U.S.C. §§ 53103-53106.

One of those provisions, Section 53105, establishes mandatory terms for operating agreements. Paragraph (a) sets conditions that apply to a vessel's operation during the term of its agreement, specifying that the vessel must "operate[] exclusively in the foreign commerce *or* in mixed foreign commerce and domestic trade allowed under a registry endorsement," and may not "otherwise be operated in the coastwise trade." *Id.* § 53105(a) (emphasis added). Paragraph (b) stipulates that an operating agreement "constitutes a contractual obligation of the United States Government," and confers a right to payments for MSP participants, subject to the

---

[2] The MSP statute refers to the Secretary of Transportation in setting MSP requirements. Because the Secretary has delegated her authority to MARAD, *see* 49 C.F.R. § 1.93(a), this brief refers to MARAD throughout.

availability of appropriations. *Id.* § 53105(b)(2). Paragraph (c) provides that every vessel covered by an operating agreement "shall remain documented under chapter 121" of Title 46 (the "Vessel Documentation Laws"). *Id.* § 53105(c). Paragraph (d) sets certain national security requirements, which govern the duration and terms of an "Emergency Preparedness Agreement." *Id.* § 53105(d). Paragraph (e) establishes rights and conditions with respect to transferring operating agreements. *Id.* § 53105(e). Finally, and most relevant here, paragraph (f) confers a statutory right on MSP participants to "replace a vessel under an operating agreement with another vessel" provided two conditions are satisfied: (1) the new vessel "is eligible to be included in the Fleet under section 53102(b)," and (2) MARAD (in conjunction with the Department of Defense) approves the vessel replacement. *Id.* § 53105(f).

Two key points emerge from these statutory provisions. *First*, contrary to Matson's repeated insinuations that MSP vessels may not conduct domestic trade, the statute expressly contemplates that MSP vessels may engage in "mixed foreign commerce and domestic trade allowed under a registry endorsement." 46 U.S.C. § 53105(a)(1)(A). Matson tries to complicate this clear law by referring to recent amendments to the MSP enacted as part of the 2018 NDAA. According to Matson, the amended Maritime Security Act now "prohibits MSP vessels from engaging in *any* domestic trade." Matson Br. 34; *see also id.* at 23. But that is simply wrong. The restrictions on operation established by the 2018 NDAA are limited to "new entrants" who are "*first covered* by an operating agreement" after the 2018 NDAA's effective date. 2018 NDAA § 3503(a)(2) (emphasis added). Congress also specifically exempted "replacement vessel[s] under subsection (f)"—*i.e.*, the type of vessels at issue in this case—from the new operation restrictions. *See id.*; *see also* 46 U.S.C. § 53105(a)(2) (2018). The 2018 NDAA is thus inapplicable to this case, and in fact only confirms Congress's understanding that existing

MSP operators have been engaging in domestic trade authorized by their registry endorsements and should be allowed to continue such trade while participating in the MSP.

*Second,* the basic structure of the Maritime Security Act makes clear that the obligations and rights established under MSP operating agreements (pursuant to Section 53105) are distinct from the statutory eligibility requirements for joining the fleet (pursuant to Section 53102(b)). For that reason, vessel operators do not forfeit MSP eligibility anytime they violate conditions set by their operating agreements, including the conditions on operations required by Section 53105(a). To the contrary, the Act specifies different remedies for different forms of noncompliance. For example, neither the statute nor MARAD's implementing regulations allow the agency to cancel MSP payments if an operator engages in coastwise trade prohibited by an operating agreement. Instead, both the statute and the MSP regulations provide for only "a pro rata reduction in payment for each day less than 320 in a fiscal year" that a vessel is not operated in foreign trade or permissible mixed trade. *See* 46 U.S.C. § 53106(d)(3); 46 C.F.R. § 296.41(b)(1)(i).[3] MARAD also has authority to terminate an operating agreement for a material breach, but only after giving an MSP participant notice and an opportunity to cure. 46 U.S.C. § 53104(c); 46 C.F.R. § 296.30(d)(1).

### C.    Background On The U.S. Vessel Documentation Laws

Under the Vessel Documentation Laws, a commercial vessel sailing under the U.S. flag "may engage in trade only if the vessel has been issued a certificate of documentation with an endorsement for that trade." 46 U.S.C. § 12102(a). As noted, p. 6, *supra*, the Maritime Security Act cross-references the Vessel Documentation Laws in several places: for example, an

---

[3] By contrast, MARAD may not make any MSP payments "during a period" in which an owner/operator engages in impermissible "noncontiguous domestic trade"—a more limited subset of coastwise trade defined as trade between the continental United States and Hawaii, Puerto Rico, or most of Alaska. 46 U.S.C. § 53106(e); 46 C.F.R. § 296.41(c)(ii).

operating agreement must specify that MSP vessels "shall remain documented," and the nature of authorized "mixed foreign commerce and domestic trade" is set by reference to "trade allowed under a registry endorsement," which is one type of documentation available to U.S.-flagged vessels.  46 U.S.C. § 53105(a), (c).  Despite the significance of these laws to the MSP, MARAD has no authority over vessel-documentation requirements.  Rather, "Congress [has] entrusted the Coast Guard with the responsibility of administering the vessel-documentation laws."  Vessel Documentation: Lease Financing for Vessels Engaged in the Coastwise Trade, 69 Fed. Reg. 5390, 5391 (Feb. 4, 2004).  Unlike MARAD, the Coast Guard is part of the Department of Homeland Security.  See Wilmina Shipping AS v. U.S. Dep't of Homeland Sec., 934 F. Supp. 2d 1, 7 n. 3 (D.D.C. 2013).

The Vessel Documentation Laws recognize three primary "endorsements" that a commercial vessel may receive on its certificate of documentation.  One type, a "fishery endorsement," authorizes a vessel to catch and transport fish, and is not relevant here.  See 46 U.S.C. § 12113; 46 C.F.R. § 67.21.  The remaining two categories are a registry endorsement and a coastwise endorsement.  46 U.S.C. §§ 12111-12112.[4]  The nature of these endorsements— in terms of their eligibility conditions and the scope of the trade they authorize—are structured by reference to restrictions established by the "coastwise" laws—a term of art defined by the Merchant Marine Act of 1920, also known as the Jones Act, which places limits on domestic shipping.  Ch. 250, § 27, 41 Stat. 988, 999 (1920) (codified at 46 U.S.C. § 55101 et seq.).

As Matson recounts (Br. 2-3), the Jones Act restricts which vessels may engage in trade "between points in the United States to which the coastwise laws apply, either directly or via a

---

[4] Federal law also provides for a recreational endorsement for non-commercial vessels, 46 U.S.C. § 12114, and certain specialized endorsements for particular circumstances or vessels (e.g., oil spill response vessels, see id. § 12117).

foreign port." 46 U.S.C. § 55102(b).  The Jones Act generally limits such domestic trade (with exceptions discussed below) to vessels that (1) are "wholly owned by citizens of the United States for purposes of engaging in the coastwise trade," and (2) have been "issued a certificate of documentation with a coastwise endorsement" (or would be eligible to receive one).  *Id.* Consistent with the Jones Act, the Vessel Documentation Laws specify that a coastwise endorsement allows a vessel to "engage in the coastwise trade."  *Id.* § 12112(b).  To be eligible for a coastwise endorsement, a vessel must not only satisfy the Jones Act's ownership requirements, *id.* §§ 12103, 12112(a)(1), 55102(b), but also must comply with vessel-construction rules, which limit the endorsements to vessels "built in the United States" (subject to narrow exceptions not relevant here), *id.* § 12112(a)(2).

The mirror image of a coastwise endorsement is a registry endorsement.  Under the registry endorsement statute, 46 U.S.C. § 12111, a U.S.-flag vessel with a registry endorsement "may engage in foreign trade."  *Id.* § 12111(b).  Section 12111 further provides that a registry endorsement allows vessels to engage in trade with certain U.S. territories: Guam, American Samoa, Wake, Midway, and Kingman Reef.  *Id.*  All but one of these territories are otherwise subject to the coastwise laws and thus ordinarily would be off-limits to vessels without a coastwise endorsement.  *Id.*[5]  To receive a registry endorsement, a vessel must be U.S.-flag and

---

[5] The only exception is American Samoa, which is not subject to the coastwise laws.  46 U.S.C. § 55101(b)(1), but its inclusion on the list appears to be a product of the statute's history.  The language in Section 12111(b) traces back to the Panama Canal Act of 1912, which authorized trade to American Samoa (then referred to as Tutilia, the largest island in what is now American Samoa) under a registry endorsement. *See* Rev. Stat. 4132, as amended by the Panama Canal Act, ch. 390, 37 Stat. 562 (1912).  At that time, it was generally understood that American Samoa *was* subject to the coastwise laws as a U.S. territory.  48 Cong. Rec. 11138, 11139 (Aug. 16, 1912) (statement of Rep. Covington) (explaining the need to authorize service to Tutilia under a registry endorsement).  That changed in 1934, when Congress exempted American Samoa from coastwise restrictions.  Act of June 15, 1934, ch. 523, 48 Stat. 963**.**  Thus, although the registry statute's authorization of trade with American Samoa is now legally redundant, that

satisfy certain citizenship requirements.  *See* 46 U.S.C. §§ 12103, 12111(a).  Unlike the coastwise endorsement, however, a registry endorsement is not limited to vessels built in the United States.  The registry endorsement statute also exempts vessels from certain citizenship requirements applicable to a coastwise endorsement.  *Id.* §§ 12103, 12111(c).

Read together, the registry endorsement and coastwise endorsement provisions create a narrow but significant statutory gap.  A coastwise endorsement authorizes a vessel to engage in domestic trade that qualifies as "coastwise," while a registry endorsement lets a vessel engage in foreign trade and trade to specific domestic territories that otherwise would be off-limits under the coastwise laws.  That leaves open an important question: what type of endorsement permits trade with domestic territories that are *not* subject to the coastwise laws?  *See* 46 U.S.C. § 55101(b) (listing exceptions to the coastwise laws for trade with American Samoa, the Northern Mariana Islands, and the Virgin Islands).  For example, does a registry endorsement allow a vessel to engage in trade between the continental United States and the U.S. Virgin Islands given that (1) such a route does not qualify as "coastwise" trade, *id.* § 55101(b)(3), but (2) the Virgin Islands are not included in the list of U.S. territories in the registry endorsement statute, Section 12111(b)?

Exercising the authority delegated to it by Congress, the Coast Guard long ago resolved this potential ambiguity through regulations, which make clear that a registry endorsement *does* authorize such trade.  *See* Documentation of Vessels, 47 Fed. Reg. 27,490, 27,500 (Jun. 24, 1982).  The regulations, which the Coast Guard has not materially changed since 1982, provide that "[a] registry endorsement entitles a vessel to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; *and any other employment for*

---

was not the case when Congress first adopted the relevant statutory language.

*which a coastwise, or fishery endorsement is not required*."  46 C.F.R. § 67.17 (emphasis added).

Thus, in the example above, the Coast Guard's regulations establish that commercial trade between the U.S. mainland and the Virgin Islands is permissible; because that territory is exempt from the coastwise laws, "a coastwise . . . endorsement is not required."  *Id.*

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    APL's Replacement Applications

APL (through its affiliates) is one of the world's largest ocean carriers, with an international shipping network that reaches over 70 countries.  *See* APL, COMPANY OVERVIEW, https://bit.ly/2Pfk5Sc (all Internet sources as last visited April 19, 2019).  APL has long operated under the MSP and has nine vessels enrolled in the fleet.  AR 4, 60-61.

The present dispute stems from APL's decision to replace two of those vessels in response to changes in the market for global shipping services.  In the mid-2000s, during the United States' military buildup in Iraq and Afghanistan, APL dispatched several of its MSP vessels to the Middle East.  AR 3.  As those conflicts waned, APL decided to reorganize its fleet and redirect capacity to areas with greater need.  AR 4-5.

In December 2014, APL sought MARAD's permission to transfer two of its MSP operating agreements from larger vessels in the Middle East to two smaller vessels.  AR 2-7.  In its application, APL detailed its plan to assign one of the replacement vessels to a biweekly service between Guam and the Japanese port of Yokohama, with the ultimate goal of adding a second vessel in order to provide weekly service.  AR 7.  This new Guam service, the application explained, would carry (1) "U.S. mainland cargo moving to Guam," (2) "U.S. mainland cargo moving beyond Guam [to] Palau, Micronesia, the Marshall Islands and New Guinea," (3) "Asia cargo moving to Guam" by way of Japan, and (4) "Guam export cargo (principally to Asia)."  *Id.*  As APL noted, this service would inject much-needed competition into the Guam shipping

11

market: while Guam had traditionally been served by two U.S. carriers, Matson had since secured a monopoly on shipping between Guam and the mainland after a competitor exited the market in 2011.  AR 6.  APL's letter also explained that its new service would provide important benefits to the U.S. military, which was in the process of expanding its operations in Guam.  *Id.*

In January 2015, MARAD approved the basic outlines of APL's request.  AR 13-14. APL then proceeded to identify specific replacement vessels, submitting two follow-on applications to MARAD.  The first application, dated September 2015, sought to transfer Operating Agreement No. MA/MSP-54 to a vessel that is now under a registry endorsement called the *APL Guam*.  AR 43, 46-49.  On October 21, 2015, MARAD granted the application, finding, among other things, that the vessel satisfied Section 53102(b)'s "foreign commerce" requirement.  AR 81-85.  In reaching that determination, MARAD noted that the vessel would operate as part of APL's "established world-wide services."  AR 83.  The decision does not include any reference to operating requirements set by Section 53105(a).  *See* AR 81-85.  With the MSP approval in place, the *APL Guam* entered into service in late 2015.  AR 118.

APL filed its second application in October 2016, seeking permission to transfer Operating Agreement No. MA/MSP-57 to a vessel now under a registry endorsement called the *APL Saipan*, which would operate along the same route.  AR 116-122.  APL reiterated the strong commercial and military justifications for its service to Guam, which had introduced competition by ending Matson's monopoly in that market.  AR 118.  APL further indicated that although its biweekly service had support from many customers—"particularly foreign shippers to Guam"— a single vessel was insufficient because the largest shippers demanded weekly service.  AR 118-119.  A second vessel, APL explained, would allow the company to provide that service.  *Id.*

While APL's second application was pending, Senator Mazie Hirono of Hawaii (Matson's home state) sent a letter to MARAD expressing concerns about APL's application as well as the agency's previous approval of the *APL Guam*.  AR 143-144.  Senator Hirono asserted that it was improper for MARAD to allow an MSP vessel to operate in "the Guam trade."  *Id.* at 143.  Once APL became aware of the Senator's letter, it submitted a response, which reiterated the significant military and commercial benefits from APL's service.  AR 147-154.  APL also explained that the Senator's complaints about unfair competition in the Guam trade were legally unfounded, because Section 53105(a) of the Maritime Security Act provides APL with an "absolute right" to serve Guam.  AR 148.

On December 20, 2016, MARAD approved APL's second Section 53105(f) application, finding that the *APL Saipan*, like its sister ship, would operate in foreign commerce.  AR 196-200.  In apparent reference to the back-and-forth prompted by Senator Hirono's letter, an internal memorandum circulated within MARAD (on December 9) that recommended approval of the *APL Saipan* included a mention of Section 53105(a) that had not appeared in discussions regarding the *APL Guam*.  AR 160, 163.  The memorandum explained that because the *APL Saipan* would operate in "mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement," it necessarily followed that the vessel satisfied the "foreign commerce" requirement of Section 53102(b).  AR 163.

### B.     Matson's Challenge To APL's Applications

Matson is a dominant player in Pacific shipping.  AR 209.   Contrary to Matson's protestations of unfair competition from vessels receiving MSP payments (Br. 29), Matson itself receives substantial competitive benefits from the federal government.  For example, Matson participates in the Capital Construction Fund, which allows Matson to defer paying federal income taxes on deposits and investment income used to fund the construction, reconstruction, or

acquisition of vessels.  *See* 46 U.S.C. § 53501 *et seq.*  Indeed, in recent years, Matson has had as much as $174.7 million in accounts receivable assigned to the Fund and $31.2 million in cash on deposit in the Fund.  Abrams Decl. ¶ 5 & Exhibit 1.  Moreover, as a Jones Act carrier, Matson has the option to participate in the MSP while continuing to serve the major domestic markets of Hawaii, Alaska, and Puerto Rico—a valuable privilege that APL lacks.  *See* 46 U.S.C. § 53106(e)(2); *see also* AR 148, 152 (noting that Matson has an "important competitive benefit . . . relative to APL" because "[t]he entire trans-Pacific market, including the important Hawaii market, is open to Matson, but APL is explicitly barred from the Hawaii market").

In December 2016, Matson submitted letters to MARAD arguing that the agency should not approve APL's replacement application for the *APL Saipan*.  AR 179-180, 183-195.  After MARAD's approval decision, Matson filed an administrative appeal to challenge the agency's decisions to approve APL's two vessel-replacement applications.  AR 201.  Consistent with Matson's interest in restoring its Guam monopoly, Matson's argument focused on its contention that MSP payments could not be awarded to "vessels operating in regular service in Guam."  AR 202.  According to Matson, such vessels were ineligible for the MSP because they were "not being operated *exclusively* in foreign commerce."  AR 214 (emphasis added); *see also* AR 179-180 (earlier Matson letter arguing that MSP vessels must operate "exclusively in foreign commerce").  Under Matson's view at the time, an MSP participant could not engage in *any* domestic trade, including trade "authorized by a U.S. registry endorsement."  AR 204, 208.  Notably, Matson's arguments did *not* include any challenge to APL's right as an MSP participant to call at Saipan—indeed, Matson's filings did not reference Saipan *at all*.

MARAD issued a letter to Matson's counsel, in which the agency concluded that Matson lacked standing to bring an administrative appeal.  AR 404.  MARAD recognized that its

standing determination disposed of Matson's challenge, but the agency also offered brief comments "in response to Matson's concerns." *Id.* MARAD explained that, contrary to Matson's assertions, the Maritime Security Act "clearly and unambiguously established that trade with Guam under a registry endorsement . . . is allowed in the MSP." AR 404-405. The agency also noted that its regulations implementing the Act recognize that a vessel engaged in mixed foreign commerce and domestic trade necessarily satisfies the MSP's "foreign commerce" requirement for vessel eligibility. AR 405.

Matson then filed a petition for review in the D.C. Circuit. In its briefing, Matson argued that there was not substantial evidence to support MARAD's finding that APL's two replacement vessels would engage in "foreign commerce"[6]—an argument that ignored APL's letter to the agency describing its intended service to ports in Japan and South Korea, *see* p. 11, *supra*. Matson also argued, for the first time, that MSP participants may not engage in domestic trade to Saipan.[7] As both the government and APL explained, however, Matson's arguments were wrong on the merits, and the Court of Appeals lacked jurisdiction in any event. The D.C. Circuit agreed that it lacked jurisdiction, dismissing Matson's petition because its challenges were either untimely (under 28 U.S.C. § 2344) or else did not properly arise under the Hobbs Act, 28 U.S.C. § 2342(3)(A)). *See Matson Navigation Co.*, 895 F.3d at 803-806.

## C.    The Current Action

Matson now brings this suit to once again challenge MARAD's decisions approving APL's two vessel-replacement applications under Section 53105(f). In an about-face from its position before the agency, Matson no longer challenges APL's service to Guam. Matson also

---

[6] *See* Opening Br. for Pet'r Matson Navigation Co. at 34-38, 44-48 *Matson Navigation Co. v. U.S. Dep't of Transportation*, 895 F.3d 799 (D.C. Cir. 2018).

[7] Opening Br. for Pet'r Matson Navigation Co., n. 6, *supra*, at 38-44.

has dropped its argument from the D.C. Circuit litigation contesting whether there was substantial evidence for MARAD to find that APL's vessels would engage in foreign commerce and would be commercially viable.  Instead, Matson's remaining challenge centers on its contention that trade between Saipan and the continental United States violates Section 53105(a)—an issue that MARAD was not asked to address in either vessel-replacement decision. Matson contends that such service renders the *APL Guam* and the *APL Saipan* ineligible to participate in the MSP and thus requires vacatur of MARAD's Section 53105(f) approvals.  In the alternative, Matson asks the Court to compel MARAD to exercise contractual rights under its operating agreements with APL by declaring that the agency must make pro rata reductions to APL's MSP payments in order to account for APL's alleged breach of the agreements' terms.

## STANDARD OF REVIEW

The APA requires a court to "set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard of review is "narrow": "Agency actions are entitled to much deference," and "[t]he reviewing court is not permitted to substitute its judgment for that of the agency." *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009).  In other words, "[t]he court may only review the agency action to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## ARGUMENT

Matson's challenge to MARAD's approval of APL's replacement applications fails for two reasons.  First, Matson's key argument—that APL's service to Saipan is impermissible—has no relation to the agency decisions at issue.  In ruling on APL's applications, the statute asked MARAD to decide only a narrow question: whether the replacement vessels were *eligible* to

16

participate in the MSP under 46 U.S.C. § 53102(b).  Here, however, Matson's argument about service to Saipan addresses an entirely different issue: whether APL has complied with the terms of its operating agreements under 46 U.S.C. § 53105(a).  That question was never before the agency because it has no bearing on vessel eligibility.  As for the question MARAD *did* face, APL's replacement vessels clearly satisfied the pertinent statutory requirement—*i.e.*, that they "operate[] . . . in providing transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).  Second, and in any event, Matson's argument that APL engages in trade that violates the operating conditions imposed by Section 53105(a) is wrong.  The replacement vessels' transportation of cargo from the U.S. mainland to Saipan is permitted by Section 53105(a): such shipments are allowed under the replacement vessels' registry endorsements because they do not constitute impermissible "coastwise trade."

I.   **APL'S REPLACEMENT VESSELS WERE ELIGIBLE FOR INCLUSION IN THE MSP UNDER 46 U.S.C. § 53102(b)(2).**

A.   **MARAD Properly Determined That APL's Replacement Vessels Satisfied The Vessel-Eligibility Requirements Of Section 53102(b)(2) Because They Would Engage In Foreign Commerce.**

The two agency decisions at issue here involve MARAD's approval of APL's vessel-replacement applications under 46 U.S.C. § 53105(f).  Section 53105(f) provides that vessel owners and operators may replace existing vessels under an MSP operating agreement, subject to only two conditions: (1) the new vessel must be eligible for the MSP "under section 53102(b)," and (2) MARAD, in conjunction with the Secretary of Defense, must approve the replacement. It is undisputed that MARAD and the Secretary of Defense approved APL's transfer requests here, based on APL's showing that both the *APL Guam* and the *APL Saipan* would have "more militarily useful capability" than APL's existing vessels, and would bring competition to a growing market that, at the time, had just one U.S.-flag international container carrier.  AR 84,

197-198.  The only question then concerns whether the two vessels are "eligible to be included in the Fleet" under Section 53102(b).

They are.  As discussed above, Section 53102(b) outlines several eligibility requirements for MSP vessels; for example, such vessels must be self-propelled, United States documented, commercially viable, and militarily useful.  46 U.S.C. § 53102(b); *see* pp. 4-5, *supra*.  Matson's challenge concerns just one statutory requirement: that the "vessel is operated . . . in providing transportation in foreign commerce."  *Id.* § 53102(b)(2).  There is no serious question that APL's applications satisfied the plain text of this "foreign commerce" requirement—a term that the Act defines to include both "commerce or trade between foreign countries," and "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country."  *Id.* § 53101(4).

Specifically, in its initial 2014 application, APL explained that its vessels would engage in mixed foreign and domestic trade that would connect both the U.S. mainland and Guam to Asian markets.  AR 7.  In doing so, APL indicated that the vessels not only would carry U.S. mainland cargo to Guam (and vice versa), but also would carry (1) "U.S. mainland cargo moving beyond Guam" to Pacific destinations such as New Guinea, (2) "Asia cargo moving to Guam," and (3) "Guam export cargo (principally to Asia)."  *Id.*  Other materials in the administrative record confirm this description of APL's intended trade.  For example, in APL's second vessel-replacement application, APL noted that the *APL Guam* had been servicing "foreign shippers to Guam."  AR 118.  Based on APL's descriptions of its services, MARAD reasonably concluded that APL's replacement vessels would engage in "foreign commerce" because, as feeder vessels in APL's Pacific fleet connecting Guam and Saipan to major ports in Japan and South Korea, they would operate in APL's "established world-wide services."  AR 83, 196.  As MARAD

further explained, APL's ships engage in foreign commerce because they "operate on a rotation between" Japan, Guam, Saipan, and South Korea, and "carry cargo to and from Guam that originates in, or is destined for, other countries."  AR 406.

Despite all of the above, Matson argued in the D.C. Circuit that there was insufficient evidence in the record to support MARAD's finding that APL's vessels engage in foreign commerce.  *See* p. 15, *supra*.  Matson has now dropped that evidentiary challenge.  *Cf.* Matson Br. 23 (implicitly conceding that the two vessels do "offer some transportation in foreign commerce" (emphasis omitted)).  And for good reason: the record leaves no doubt that both the *APL Guam* and the *APL Saipan* engage in extensive foreign trade.  Because that is all that Section 53102(b)(2) requires to satisfy the Act's threshold "foreign commerce" requirement for MSP eligibility, Matson's (legally compelled) concession should resolve this case.

### B.  Matson's Arguments About Saipan Are Not Relevant To Vessel Eligibility Under Section 53102(b), Which Was The Only Issue Before MARAD.

Unable to dispute that APL's two replacement vessels "provid[e] transportation in foreign commerce," 46 U.S.C. § 53102(b)(2), Matson has repeatedly tried to read additional restrictions into the statutory text.  But Matson's arguments have no basis in the Maritime Security Act's language, structure, or purpose.

In proceedings before MARAD, Matson argued that Section 53102(b) requires vessels to "operate[] *exclusively* in foreign commerce," which, according to Matson, precluded MSP operators from providing service to Guam.  AR 214; *see also* AR 179-180, 203-204.  But Matson's argument was clearly inconsistent with the statute.  Not only did Matson's interpretation insert the term "exclusively" into Section 53102(b) where it does not appear, but it was also irreconcilable with the Act's overall structure.  Section 53105(a) expressly authorizes MSP operators to engage in "mixed foreign commerce and domestic trade allowed under a

registry endorsement," which includes trade to Guam.  46 U.S.C. § 53105(a)(1)(A).  It would make no sense to interpret the Act's *eligibility* requirements more narrowly than its *operating* requirements; under that view, the Act would authorize service that, if undertaken, would result in automatic ineligibility.  Unsurprisingly, MARAD rejected Matson's argument.  AR 404-405.

Matson has now retreated from the only statutory argument that it presented to the agency.  But Matson's current reading of the Act suffers from the same basic flaw as the one it discarded: it subverts the Act's structure and depends on "reading words or elements into a statute that do not appear on its face."  *Bates v. United States*, 522 U.S. 23, 29 (1997).  According to Matson (Br. 18-20), Section 53102(b)(2)'s "foreign commerce" requirement for vessel eligibility somehow incorporates by reference Section 53105(a)'s conditions for MSP operating agreements.  Having made this substitution, Matson proceeds to disregard Section 53102(b) and to base its argument entirely on Section 53105(a).  *See* Matson Br. 18-29 (repeatedly relying on Section 53105(a)(1) to support its argument).  Matson offers no textual support for conflating Section 53102(b) (which sets the requirements for determining "Vessel eligibility") with Section 53105(a) (which designates conditions for "Operation of [a] vessel" under an MSP agreement).

Indeed, if Congress had wanted to condition MSP eligibility on a finding of compliance with the obligations for MSP operating agreements, it would have been easy to do so, either by including a cross-reference to Section 53105(a) or by simply repeating its requirements within Section 53102(b).  For example, Congress included requirements regarding vessel documentation in both the statute's eligibility provision (Section 53102(b)(5)) and in the conditions for operating agreements (Section 53105(c)).  And the specific provision at issue here governing replacement vessels, Section 53105(f), cross-references Section 53102(b).  The fact

20

that Congress did not follow a similar path with respect to Section 53105(a) is telling, and confirms that Section 53102(b)(2) means exactly what it says: MSP applicants must show that a vessel is operated or will operate "in providing transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).  No less, and no more.

Lacking a textual hook for its argument in Section 53102(b) itself, Matson urges that its interpretation would allow the Court to "read[] the statute's parts into a harmonious whole." Matson Br. 19-20 (quotation marks omitted).  But the opposite is true.  As discussed, Congress's inclusion of conditions in Section 53105(a) that do not appear in Section 53102(b) shows that Congress intended for those two provisions *to differ* in scope.  After all, it is "a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey different meaning for those words."  *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 120 (D.D.C. 2017) (quotation marks omitted).

More generally, the structure of the Maritime Security Act leaves no doubt that Congress intended for Section 53102(b)'s *eligibility* requirements to remain distinct from Section 53105(a)'s *operating* conditions.  For example, and, as discussed, p. 7, *supra*, the Act presupposes that an MSP vessel may breach certain operating-agreement conditions—including by engaging in coastwise trade not permitted by a registry endorsement—while still retaining program eligibility and receiving MSP payments.  The Act states that in order to receive payments, an MSP participant must certify that its vessel has been "operated in accordance with [the limitations on domestic trade in] section 53105(a)(1) *for at least 320 days* in the fiscal year." 46 U.S.C. § 53106(b) (emphasis added).  The statute further specifies that "for each day less than 320" that a vessel "is not operated in accordance with section 53105(a)(1)," MARAD will reduce the annual MSP payments on a "pro rata" basis.  *Id.* § 53106(d)(3)  In other words, the

consequence for engaging in unauthorized coastwise trade is not an automatic rescission of MSP eligibility, but a potential reduction in MSP payments.[8]  Moreover, even in cases in which the statute *does* contemplate termination of an operating agreement, MARAD must first decide that the participant's breach is material *and* provide the participant with notice and an opportunity to cure.  46 U.S.C. § 53104(c).  These features of the statutory framework, which establish carefully calibrated remedies for noncompliance with an operating agreement's terms, contradict Matson's position that engaging in coastwise trade automatically renders a vessel *ineligible* to participate in the MSP.

In response, Matson suggests that Congress adopted these remedial provisions only to address the possibility that a vessel could be forced to call on a domestic port "due to an emergency, weather," or other unforeseen "exigent circumstances."  Matson Br. 30.  The problem with this argument is fundamental: Matson points to *nothing* in the Maritime Security Act or MARAD regulations to support it.  To be sure, the Act and MARAD regulations do not contemplate "routine[]" violations of Section 53105(a)'s operating restrictions, Matson Br. 31 (emphasis omitted), because material violations may lead to termination of an operating agreement following notice and an opportunity to cure.  46 U.S.C. § 53104(c).  But there is no legal basis for Matson's assertion that MARAD must determine whether an operator is likely to breach an operating agreement in the future as part of the agency's eligibility review under Section 53102(b).

---

[8] Notably, a different rule applies if an MSP operator engages in "noncontiguous domestic trade," which is not at issue here.  *See* n. 7, *supra*.  In that context, MARAD may not make any payments to the operator during the period in which it participates in such trade.  46 U.S.C. § 53106(e)(1).  But even there, the government's remedy is to withhold MSP payments—not to declare the operator ineligible for the MSP without providing notice and an opportunity to cure.

**C.**     **Matson Offers No Convincing Reason To Conflate Sections 53102(b) And 53105(a).**

Matson raises several additional arguments to support its interpretation, but none provides any basis for departing from the plain text of the Act.

**1.**     Matson contends that converting Section 53105(a)'s operation conditions into threshold eligibility requirements would "accord[] with the purpose of the MSA," and urges that the plain-text interpretation advanced by MARAD and APL would put Section 53102(b) and Section 53105(a) "at odds with each other."  Matson Br. 20-23.  Contemporary principles of statutory interpretation counsel strongly against arguments like Matson's that "privilege[] Congress's unexpressed 'intent' over the enacted text."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1487 n. * (2018) (Thomas, J., concurring); *see also Culbertson v. Berryhill*, 139 S. Ct. 517, 521-522 (2019) ("We begi[n] with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain." (quotation marks omitted)).  In any event, Matson's statutory-purpose arguments fail on their own terms.

Matson's overriding contention is that it would be anomalous for the MSP to have operating conditions that are stricter than the threshold requirements for program eligibility. According to Matson, such a distinction would frustrate the MSP's purpose "to promote a U.S. maritime presence in international shipping."  Matson Br. 22 (emphasis omitted).  But there is nothing odd about Congress's decision to establish different standards for Section 53102(b) and Section 53105(a).  To the contrary, the difference reflects Congress's effort to impose targeted remedies for breaches of operating agreements, which would not be possible if engaging in coastwise trade would automatically result in program ineligibility.  Thus, Section 53102(b) requires that MSP applicants commit to "providing transportation in foreign commerce," but

leaves the imposition of further conditions to the operating agreements that applicants enter once in the program. *See* 46 U.S.C. §§ 53103, 53105.[9]

In addition, the differing standards in Section 53102(b)(2) and Section 53105(a) reflect basic differences between the information that MARAD has before it when making eligibility determinations as compared to when the agency decides whether to issue (or reduce) payments under an operating agreement. This case proves the point. One of the most striking aspects of this litigation is that Matson's challenge is premised on questions involving the legal status of service to Saipan that MARAD was never asked to, and did not, address. Matson tries to turn that problem around on the agency, accusing MARAD of failing "to even *consider*" the significance of APL's representations regarding Saipan. Matson Br. 27-28.[10] Similarly, Matson offers (Br. 8-9) passing criticisms of APL's disclosures related to Saipan in its vessel-replacement applications. Notably, however, Matson does not point to any statutory or regulatory provisions that require (or even invite) MSP applicants to list every port that a vessel will visit over the next year or longer.

As a result, Matson's APA argument must rely heavily on "marketing materials" that *Matson* introduced into the record when challenging APL's second vessel-replacement application—a challenge that MARAD ultimately held Matson lacked standing to bring, *see* pp. 14-15, *supra*. *See* Matson Br. 25 (citing AR 265, 371, 375). But the presence of these materials in the administrative record is pure happenstance because APL was not required to designate every port that its vessels would serve in order to meet Section 53102(b)'s eligibility

---

[9] For vessel replacements under Section 53105(f), an approved vessel becomes subject to the terms of an existing operating agreement. *See* 46 U.S.C. § 53105(f).

[10] As an aside, it takes real cheek for Matson to complain (Br. 28) that MARAD "focused myopically on the New Vessels' service to Guam," when Matson's own submissions to the agency *only* discussed APL's Guam service, *see* p. 14, *supra*.

requirements.  It is thus unsurprising that Matson cannot identify any evidence regarding Saipan that was before MARAD when the agency approved the *APL Guam*.  *See* Matson Br. 9 (implicitly conceding that there was no such information before the agency).  Even as to the *APL Saipan*, the record does not include details about APL's service—such as whether the vessel carries government cargo between the Saipan and the U.S. mainland and under what circumstances—precisely because those details are not relevant under Section 53102(b).  In fact, the only evidence that Matson points to from APL's application materials merely noted that the *APL Saipan* would operate "in APL's existing U.S.-flag service of Guam and Saipan via Korea." AR 116; *see also* AR 149 (similar).  That statement does not support Matson's current argument, because even under Matson's (incorrect) reading of Section 53105(a), MSP vessels may carry cargo between Saipan and a foreign port (such as South Korea) or between Saipan and Guam; it is only service between Saipan and the U.S. mainland that is in dispute.  *See* Matson Br. 16 ("The New Vessels are ineligible to participate in the MSP because they operate in trade *between Saipan and the continental United States*." (emphasis added)).  The name of the vessel (*APL Saipan*) is not probative for the same reason: at most, the name suggests that the vessel will call Saipan, but that fact provides no information about the vessel's cargo or overall route.

By contrast, MARAD is well-positioned to apply Section 53105(a) during the payment process.  MSP participants must certify compliance with Section 53105(a) to receive payments, *see* 46 U.S.C. § 53106(b), and they submit monthly vouchers attesting to the number of days a vessel has operated in MSP service, *see* 46 C.F.R. § 296.40; AR 407-704.  *That* is the time for MARAD to apply Section 53105(a) and enforce the operating agreement—not at the eligibility stage, when the agency would need to rely on whatever information an applicant included to

satisfy a different statutory provision, or on the information that a competitor tried to smuggle into the record despite lacking any right to bring an administrative appeal.

For these reasons, Matson's extended digressions (Br. 20-23) regarding the overall goal of the MSP and its predecessor programs to promote U.S.-flag presence in international shipping are beside the point. No party disputes that basic congressional purpose or denies that MSP participants must comply with the terms of their operating agreements. But it simply does not follow that Congress must have decided to further those goals with an impractical eligibility requirement that bars an applicant from participating in the MSP if it might later engage in coastwise trade (subject to Matson's atextual "exigency" exception).

In fact, although Matson invokes the pre-MSP subsidy programs—the Operating-Differential Subsidy and the Construction-Differential Subsidy—to support its argument, the way those programs operated further undermines Matson's position. The statute establishing those programs made clear that the consequence for engaging in certain forms of domestic trade was a pro rata reduction in subsidy payments.[11] The fact that the MSP enforces restrictions on coastwise service in a similar manner is thus unremarkable, and surely does not undermine the overall purposes of the program.

**2.**     Leaving the statute behind, Matson next contends (Br. 23) that MARAD's implementing regulations for the MSP support its argument that the agency was required to evaluate Section 53105(a) compliance when determining Section 53102(b) eligibility. Matson

---

[11] *See* Merchant Marine Act of 1936, ch. 858, § 506, 49 Stat. 1985, 2000 (providing that the operator of a vessel that "engages in domestic trade on a round-the-world voyage or a round voyage from the west coast of the United States to a European port or ports," or of a vessel that "loads or discharges cargo or passengers at an island possession or island territory," shall "repay" a pro rata share of its Construction-Differential Subsidy to the government); *id.* § 605, 49 Stat. at 2003 (providing that a vessel's Operating-Differential Subsidy shall be "reduced" pro rata if it "earns any gross revenue on the carriage of mail, passengers, or cargo by reason of [certain] coastal or intercoastal trade").

relies in particular on 46 C.F.R. § 296.11(a)(2), which states that a vessel is "eligible" to be included in the MSP if that vessel "is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."  Matson also cites the regulatory definitions contained in 46 C.F.R. § 296.2, which provide that "foreign commerce" means "a cargo freight service . . . operated exclusively in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement."

But Matson's argument ignores key textual features of MARAD's regulations, which show that the regulations mirror—rather than contradict—the Act's distinction between eligibility requirements and contractual conditions.  In fact, MARAD's regulations expressly define an "[e]ligible vessel" as "a vessel that meets the requirements of § 53102(b)"—*not* Section 53105(a).  46 C.F.R. § 296.2.  Moreover, the regulation governing MSP operating agreements provides that participants must agree to operate "*exclusively* in the foreign commerce"—which, as noted above, MSP regulations define to include not only foreign trade but also "domestic trade allowed under a registry endorsement"—during the relevant time period.  *Id.* § 296.31(d)(2) (emphasis added).  By contrast, the regulation governing vessel eligibility conspicuously *omits* the term "exclusively" when describing the requirement that vessels engage in "foreign commerce."  *Id.* § 296.11(a)(2).  Thus, under the regulation, just as under the statute, a vessel is eligible for the MSP if it will engage in qualifying service.  Restrictions on *non*-qualifying service are imposed by operating agreements.

The surrounding MSP regulations confirm this interpretation of Section 296.2, because they also reflect the basic structure of the Act.  Specifically, the MSP regulations call for pro rata reductions to MSP payments for each day less than 320 in a fiscal year in which a vessel is "not operated exclusively in foreign commerce."  46 C.F.R. § 296.41(b)(1)(i); *see id.* § 296.41(c)

(describing separate conditions in which "[n]o payment" will be made).  As discussed above with respect to the statutory text, this remedial structure undermines Matson's argument that operating conditions are also eligibility requirements.[12]

    **3.**    Finally, Matson contends that MARAD previously endorsed Matson's view of the Maritime Security Act's structure, when the agency stated in an internal memorandum regarding APL's second application that Section 53102(b)(2) was "'further clarified by 46 U.S.C. § 53105(a)(1)(A).'"  Matson Br. 18-19, 24, 29-30  (quoting AR 163).  But Matson takes this passing statement from the agency entirely out of context.[13]

    As discussed, the *only* objection presented to MARAD concerned APL's service to Guam.  That was the basis for Matson's administrative appeal.  *See* p. 14, *supra*.  And several weeks before the agency memorandum at issue, Matson's home-state senator penned a letter to MARAD that essentially previewed Matson's argument, asserting that "[t]he MSP program . . . was not intended to permit . . . subsidized MSP vessels to compete against other U.S.-flag vessels operating in domestic trades like the Guam trade."  AR 143.  Having become aware of

---

[12] Matson refers (Br. 32) to APL's argument regarding the MSP regulations from D.C. Circuit briefing, but distorts APL's position beyond recognition.  It presumably will not surprise the Court to learn that APL did *not* argue "that the Court may simply disregard the controlling regulations," or suggest "that the regulations are more restrictive than the statute."  Matson Br. 32-33.  The argument that APL actually made to the D.C Circuit is the same as the one presented here: *i.e.*, that MARAD regulations are "best construed to mirror the MSP statute's distinction between eligibility requirements and contractual conditions—not to disregard the statute's clear structure."  Supp. Br. of Intervenors APL Marine Services, Ltd., and APL Maritime, Ltd. at 11 n. 7, *Matson Navigation Co.*, 895 F.3d 799.

[13] Matson also ascribes this view to APL, but the citations in Matson's brief do not support that characterization.  Matson first refers to APL's preliminary application in 2014, but there APL merely noted that service to Guam is authorized under a registry endorsement and that MARAD had "recognized that Guam may be served by MSP vessels."  AR 6.  APL never took the position—in this letter or elsewhere—that MSP *eligibility* under Section 53102(b) is determined by reference to Section 53105(a).  The only other citation that Matson provides appears to be a typographical error: Matson cites MARAD's internal memorandum, which does not reference any legal position taken by APL.  *See* Matson Br. 19 (citing AR 164).

the Senator's letter, APL explained in its own submission that her argument was wrong: it could not be inconsistent with the MSP to permit service to Guam because Section 53105(a) expressly authorizes such service.  AR 148.  MARAD agreed, and explained in a response to Senator Hirono on December 15, 2016, that Section 53105(a) makes clear that "MSP operators are . . . statutorily permitted to engage in trade with Guam."  AR 181.

Given this backdrop, the comment in MARAD's internal memorandum from six days earlier makes perfect sense.  Section 53105(a)(1)(A) does in fact "clarif[y]," AR 162, Section 53102(b)(2)'s foreign commerce requirement in one particular way: it forecloses Matson's now-abandoned argument that a vessel must engage *exclusively* in foreign commerce to satisfy Section 53102(b)(2), as well as Senator Hirono's suggestion that service to Guam is inconsistent with the MSP.  *See* pp. 13-14, *supra*.  But it does not follow that MARAD treated Section 53102(b)(2) and Section 53105(a) as functionally equivalent for all purposes—including with respect to an argument about Saipan that was never presented to the agency.  Nor does MARAD's discussion in its order denying Matson's administrative appeal bolster Matson's argument on this point.  Matson admits (Br. 28) that it "is not challenging" this decision, making the relevance of MARAD's order highly questionable.  In any event, MARAD was responding to the same argument from Matson challenging APL's service to Guam, AR 404-405, and Matson once again ignores that context.

## II.   THE REPLACEMENT VESSELS' SERVICE TO SAIPAN IS CONSISTENT WITH 46 U.S.C. § 53105(a).

As discussed, there is no reason for this Court to address Matson's arguments challenging APL's compliance with the terms of their operating agreements because that issue is not presented by MARAD's vessel-eligibility decisions.  If, however, the Court reaches the issue, it should reject Matson's contention that APL is violating the conditions of Section 53105(a).

Matson presents two arguments, both of which are premised on the notion that APL's vessels engage in impermissible coastwise trade between the U.S. mainland and Saipan. First, Matson contends (Br. 15, 25-26, 31) that trade between the continental United States and the Commonwealth of the Northern Mariana Islands ("CNMI"), where Saipan is located, qualifies as domestic trade and is not authorized by a registry endorsement under 46 U.S.C. § 12111(b). According to Matson (Br. 26, 31, 32), this disqualifies APL's vessels from the MSP *regardless* of whether its service is subject to coastwise-trade restrictions under the Jones Act. Second, Matson asserts (Br. 26-27, 31-32) that APL's vessels engage in impermissible "coastwise" trade within the meaning of the Jones Act. Matson's argument on this second point depends on its interpretation of the Covenant to Establish a Commonwealth of the Northern Mariana Islands ("Covenant"). 48 U.S.C. § 1801 note. That political agreement generally exempts the CNMI from the coastwise laws, but includes a narrow exception that applies the laws regarding "coastal shipments" to "the activities of the United States Government and its contractors in the Northern Mariana Islands." Covenant § 502(b); *see* 46 U.S.C. § 55101(b)(2).

As explained below, both of Matson's arguments fail. First, Matson's contention that APL's registry endorsements bar trade to Saipan that is *not* coastwise under the Jones Act is directly contradicted by the Coast Guard's controlling regulation implementing Section 12111. Second, Matson's assertion that APL's service to Saipan qualifies as "coastwise" under the Jones Act rests on a misreading of the Covenant that is inconsistent with contemporary evidence regarding the Covenant's proper construction as well as Matson's own practices.

**A.    APL's Registry Endorsements Authorize Its Vessels To Engage In Trade With Saipan Provided That Trade Is Not Coastwise Under The Jones Act.**

**1.**    Section 53105(a)(1)(A) authorizes MSP participants to engage in "mixed foreign commerce and domestic trade allowed under a registry endorsement." Matson contends that

30

trade between the continental United States and Saipan violates this provision on the theory that it is domestic trade not "allowed under a registry endorsement."  The most notable thing about Matson's argument is what it omits: *any* mention of the controlling regulation promulgated by the Coast Guard, which Congress "entrusted . . . with the responsibility of administering the vessel documentation laws."  Vessel Documentation, 69 Fed. Reg. at 5391; *see also Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 237 (4th Cir. 2009) (the Coast Guard is "the federal agency with the power to administer the vessel documentation laws").

As discussed, pp. 10-11, *supra*, the Coast Guard issued 46 C.F.R. § 67.17, which provides that "[a] registry endorsement entitles a vessel to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; *and any other employment for which a coastwise, or fishery endorsement is not required*" (emphasis added).  The plain text of this regulation undermines Matson's argument because it makes clear that a registry endorsement authorizes a U.S.-flag vessel to trade with Saipan *unless* such trade would require a coastwise endorsement (or a fishery endorsement, which is not relevant here).  A coastwise endorsement, in turn, is only required for a vessel to engage in "coastwise trade" within the meaning of the Jones Act.  46 U.S.C. § 12112; 46 C.F.R. § 67.19.  Thus, the question whether trade involving Saipan is "coastwise" under the Jones Act is hardly "academic."  Matson Br. 32.  To the contrary, that issue is *dispositive* of Matson's argument.  *See, e.g.*, U.S. Customs Service Ruling HQ 112917, 1993 WL 564563, at *2 (Oct. 19, 1993) (explaining that "a foreign-built, U.S.-flag vessel issued a certificate of documentation with a registry endorsement would not be prohibited from carrying passengers or cargo between the United States and the CNMI" unless it was

engaging in trade subject to the carve-out from the Covenant's coastwise exemption).[14]  And as explained below, Matson's argument on that issue is wrong.  *See* Part II.B, *infra*.

Because Matson fails to cite Section 67.17, one can only speculate why Matson thinks the regulation does not apply here.  To the extent Matson plans to question the validity of the Coast Guard's regulation, this APA challenge to orders issued by *MARAD* is not a proper forum. MARAD has no discretion to depart from the on-point regulation issued by another agency within that agency's zone of delegated authority.  And this Court should not entertain an improper collateral attack on a Coast Guard regulation that has been on the books for almost 37 years.  *See, e.g.*, *Dunn-McCampbell Royalty Interest, Inc. v. NPS*, 112 F.3d 1283, 1287-1288 (5th Cir. 1997) (collecting decisions recognizing that the APA's six-year limitations period begins to run once a regulation is published, which blocks facial challenges to the regulation outside of that period).  Indeed, the Coast Guard is not even a defendant here, and Matson never asked to set the Coast Guard's regulation aside.  *See* Compl. at 28 (Prayer for Relief).

In any event, the Coast Guard's vessel-documentation regulation is a lawful exercise of that agency's delegated authority.  Under *Chevron*, a delegation to an agency "to administer a congressionally created program" includes authority to "make[] rules to fill any gap left, implicitly or explicitly, by Congress."  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55-56 (2011) (quotation marks and ellipses omitted).  In that context, "[a] court has no authority to substitute its own construction of a statutory provision for a reasonable interpretation made by the . . . agency."  *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 891 F.3d 1041, 1050 (D.C. Cir. 2018) (quotation marks omitted).  Here, as discussed, pp. 10-11, *supra*, the Coast Guard's regulation fills an important statutory gap: *i.e.*, what type of

---

[14] Matson itself cited this Customs Service ruling favorably in the D.C. Circuit.  *See* Opening Br. for Pet'r Matson Navigation Co., n. 6, *supra*, at 7.

endorsement is needed to engage in trade to a U.S. territory that is not subject to the coastwise laws?  The Coast Guard's determination that a registry endorsement authorizes such service is entirely reasonable, because that documentation allows vessels to call foreign ports that are not covered by the coastwise laws, to which ports in the U.S. Virgin Islands and the Northern Mariana Islands are most closely analogous.

By contrast, Matson's statutory interpretation would lead to serious anomalies.  If, as Matson urges, a registry endorsement does *not* authorize trade to and from such ports, the question becomes—what does?  Requiring a coastwise endorsement makes little sense, since the point of exempting territories like the Virgin Islands and the CNMI from the coastwise laws is to allow trade by vessels that do meet the restrictive citizenship and domestic-construction requirements applicable to that endorsement.  *See* 46 U.S.C. § 12112(a)(2).  Moreover, Section 12112(b) provides only that "a vessel for which a coastwise endorsement is issued may engage in the coastwise trade"—and trade between the continental United States and the Virgin Islands, to pick an example, *is not coastwise trade*.[15]  The only remaining possibility is that U.S.-flag vessels are not allowed to engage in trade to ports in the Virgin Islands or the Northern Marianas *at all*.  And that result is absurd.  It is utterly implausible to suppose that Congress intended to reserve these markets entirely to foreign-flag ocean carriers that are not subject to United States vessel documentation rules.  Rather, as the Coast Guard has explained, Congress's decision to exempt certain territories from the coastwise laws was intended to "open[] the door wide to trade," including to "U.S. flag vessels trading only on registry endorsement."  *Wood v. Amerada*

---

[15] In fact, the Coast Guard has recognized that a vessel with a coastwise endorsement *may* serve these ports, but it has made clear that a coastwise endorsement is *not required*.  *See Wood v. Amerada Hess Corp.*, 845 F. Supp. 130, 138 (S.D.N.Y. 1994), *aff'd*, 37 F.3d 87 (2d Cir. 1994). It is not clear, however, that Matson could reconcile this result with its reading of the statute.

*Hess Corp.*, 845 F. Supp. 130, 138 (S.D.N.Y. 1994), *aff'd*, 37 F.3d 87 (2d Cir. 1994) (quoting position statement from the Coast Guard).

The logic underlying the Coast Guard's regulation finds further support from precedent, and in particular from the D.C. Circuit's decision in *American Maritime Association v. Blumenthal*, 590 F.2d 1156 (1978), which Matson cites favorably (Br. 3, 26). In *Blumenthal*, the court addressed challenges to shipments that sent crude oil from Alaska to the U.S. Virgin Islands, with products refined from the oil then sent to the U.S. mainland. *Id.* at 1157. As part of its analysis, the D.C. Circuit applied the phrase "either directly or via a foreign port" from the Jones Act, and made the observation that "[b]ecause of the explicit exemption of the Virgin Islands from the coastwise laws, the Virgin Islands are, for the limited purposes of the Jones Act, analogous to a 'foreign port.'" *Id.* at 1164 n. 43; *see id.* at 1170 (emphasis omitted). The Court's reasoning is consistent with the rationale underlying the Coast Guard's regulation, which also treats the Virgin Islands and the Northern Marianas as analogous to foreign ports in this context.

Finally, any challenge by Matson to the Coast Guard's regulation would have to contend with the fact that the regulation has provided the controlling legal standard in this area for almost four decades, and has been ratified by Congress several times over. Congress has amended the Vessel Documentation Laws numerous times over the years without ever purporting to displace the Coast Guard's regulations.[16] Moreover, courts "presume that Congress is aware of existing law when it passes legislation." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (quotation marks omitted). And by the time Congress enacted Section 53105(a) of

---

[16] *See* Pub. L. No. 98-89, 97 Stat. 500 (1983); Pub. L. No. 98-454, § 301(b), 98 Stat. 1732, 1734 (1984); Coast Guard Authorization Act of 1989, Pub. L. No. 101-225, § 301(a), 103 Stat. 1908, 1920; Pub. L. No. 109-304, 120 Stat. 1485, 1491 (2006).

the Maritime Security Act and cross-referenced the registry endorsement statute, the Coast Guard's controlling regulation had already been in place for years.[17]

2.      In passing, Matson appears to raise an additional argument based on the text of Section 53105(a), as it contends that MSP vessels may not engage in trade between Saipan and the continental United States because such trade is defined as "coastwise" "for purposes of the MSA" and "thus squarely prohibited by Section 53105(a)(1)(B)."  Matson Br. 26.  But this argument falls once Matson's attempt to restrict the scope of a registry endorsement is rejected.

Section 53105(a)(1)(A) provides that an MSP vessel may engage in "domestic trade allowed under a registry endorsement."  Section 53105(a)(1)(B), in turn, specifies that a vessel "shall not *otherwise* be operated in the coastwise trade." 46 U.S.C. § 53105(a)(1)(B) (emphasis added).  By using the qualifier "otherwise," Congress made clear that if trade is permitted under Subparagraph (A) because it is allowed under a registry endorsement, then MSP vessels may engage in that trade *regardless* of whether it is "coastwise" under Subparagraph (B). Accordingly, Matson's discussion of the definition of "coastwise" in MARAD's MSP regulations does nothing to advance its argument.

---

[17] In reply, Matson may point to the general definitions of "foreign commerce" and "foreign trade" that apply as a default in Title 46.  *See* 46 U.S.C. § 109.  But that definition was not part of the Vessel Documentation Laws before the 2006 codification of Title 46.  (It comes from Section 501 of the Merchant Marine Act of 1936, 49 Stat. at 1995.)  And Congress cautioned that the codification project for Title 46 was not intended to work significant substantive changes to the law.  *See* Pub. L. No. 109-304, 120 Stat. at 1485; *cf. Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226-227 (1957) (rejecting argument that changes in the arrangement of certain statutory provisions, including definitions, resulting from the recodification of the Judicial Code should be interpreted to disrupt established law).

**B.     APL's Carriage Of Cargo Between The U.S. Mainland And Saipan Is Not "Coastwise" Trade Under The Covenant.**

APL does not engage in prohibited "coastwise" trade between Saipan and the continental United States.  Matson's contrary argument (Br. 26-27) depends on a flawed reading of the Covenant establishing the Commonwealth of the Northern Mariana Islands.

As noted, p. 30, *supra*, both the Jones Act and the Covenant generally provide that the coastwise laws do not apply to trade with the CNMI.  The Jones Act, for example, states that "[t]he coastwise laws do not apply to . . . the Northern Mariana Islands, except as provided in section 502(b) of the Covenant."  46 U.S.C. § 55101(b)(2).  The Covenant likewise provides that, "except as otherwise provided in Subsection (b) of Section 502, the coastwise laws of the United States" "will not apply to the Northern Mariana Islands."  Covenant § 503(a) (codified at 48 U.S.C. § 1801 note).  The legislative history of the Covenant—which emerged from bilateral negotiations between the United States and the Northern Mariana Islands under the auspices of the United Nations Security Council—shows that its negotiators viewed this exception as critical, as they believed application of the coastwise laws to the Northern Mariana Islands could "cause serious economic dislocation."  S. Rep. No. 94-433, at 78 (1975).

Section 502(b) of the Covenant, in turn, recognizes a narrow exception to this rule and states that "[t]he laws of the United States regarding coastal shipments and the conditions of employment, including the wages and hours of employees, will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands."  *Id.* § 502(b).  Matson relies on this exception to contend that APL has engaged in impermissible coastwise trade through its service to Saipan.  That argument depends on two premises: (1) that APL is acting as a government "contractor" within the meaning of the Covenant merely by participating in the MSP even when its vessels carry only private commercial cargo, and (2) that Section

36

502(b) applies to trade between the continental United States and the Northern Marianas rather than only to trade *within* the Northern Mariana island chain.  Both premises are wrong.

1.     Matson contends (Br. 27) that "APL is plainly a government contractor because it was required to and did enter into operating agreements with the United States in order to participate in the MSP."  But Matson's argument relies on an unreasonably broad interpretation of the term "contractor" and a misunderstanding of how the MSP works.

The Covenant itself does not define "contractor," so that term must be understood "as taking [its] ordinary, contemporary, common meaning."  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014).  As relevant here, dictionaries generally define the term "contractor" to mean "one who contracts to do work for or supply goods to another; esp., a person or company that agrees to do work or provide goods for another company,"  Black's Law Dictionary 400 (10th ed. 2014); *see also* MERRIAM-WEBSTER,  https://www.merriam-webster.com/dictionary /contractor (defining "contractor" as "one that contracts to perform work or provide supplies"). Moreover, courts have recognized that in the specific "context of *government* contractors," the term "contractor" acquires a specialized meaning.  *Ctr. for Public Integrity v. Dep't of Energy*, 191 F. Supp. 2d 187, 194 (D.D.C. 2002) (emphasis added).  Thus, "'[a]lthough in the most broad and generic sense of the word, every party to a contract can be said to be a 'contractor,'" the term is "used in a more precise manner" when referring to government contractors, and is generally understood to mean "a private party with whom the government has a *procurement* contract for products or services."  *Id.* (quoting *Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996)).

Applying this ordinary meaning here, APL does not qualify as a "contractor" for purposes of the Covenant merely because it entered into operating agreements with the

government.  Joining the MSP is not like agreeing to a procurement contract.  An MSP vessel is not obliged to carry government cargo or to provide services to the government under normal conditions; rather, MSP operators only agree to guarantee *future* shipping capacity to the federal government in the event of a war or national emergency.  *See* 46 U.S.C. § 53107; AR 385 (operating agreement for the *APL Guam*).  Of course, MSP operators may separately contract with a federal agency to carry government cargo using an MSP vessel.  In that event, the operator would be a contractor subject to the rules imposed by the Covenant.  Crucially, however, the Covenant's restrictions would only apply to voyages on which the operator's vessel transports government cargo to or from the CNMI; the operator would not be a "contractor" within the meaning of the Covenant when its vessel carries private commercial cargo.

Matson's contrary argument—*i.e.*, that a company becomes a "contractor" under the Covenant merely by entering into an agreement with the government—not only conflicts with the ordinary meaning of the term, but would expand Section 502(b) dramatically in a way that the Covenant's negotiators could not have intended.  The federal government enters many different types of agreements with shipping companies.  Indeed, under Matson's view, Matson itself seemingly would qualify a government contractor as to *all* of its Saipan trade merely because Matson is a party to a universal-service contract with the Department of Defense and a participant in MARAD's Voluntary Intermodal Sealift Agreement.[18]  The Court should reject a reading of "contractor" that would cause Section 502(b)'s exception to swallow the rule.[19]

---

[18] *See* U.S. DEP'T OF DEFENSE, CONTRACTS: U.S. TRANSPORTATION COMMAND (Jan. 6, 2016), http://bit.ly/2mF3toS; MARAD OFFICE OF POLICY & PLANS, UNITED STATES FLAG PRIVATELY-OWNED MERCHANT FLEET (rev. Nov. 28, 2018), https://bit.ly/2UNvYFa (listing Matson vessels participating in the Voluntary Intermodal Sealift Agreement).

[19] Matson does not rely on the Maritime Security Act's definition for "contractor," which refers to MSP participants as "contractors."  *See* 46 U.S.C. § 53101(2).  And for good reason.  The fact that Congress adopted a specialized definition of contractor for purposes of the Maritime

**2.**     If the Court rejects Matson's overbroad understanding of the term "contractor," Matson's argument based on the Covenant would dissolve because APL's MSP vessels do not currently engage in the shipment of any government cargo between the continental United States and Saipan.  *See* Declaration of John Abrams ("Abrams Decl.") ¶ 7.  Nevertheless, Matson's contention that the Covenant subjects such service to the coastwise laws is flawed.  Under the plain language of the Covenant, and contemporary interpretations of the same, the coastwise laws only apply to shipments by the government and government contractors *within* the Northern Mariana island chain.

As noted, Section 502(b)'s carve-out applies only to "*activities . . . in* the Northern Mariana Islands."  48 U.S.C. § 1801 note.  Shipment of government cargo across 6,000 miles of open ocean between the continental United States and Saipan does not fit that test.  The Covenant's reference to the "laws . . . regarding coastal shipments" reinforces this interpretation.  Matson insists (Br. 27) that this phrase is coextensive with the "coastwise laws."  But as Matson acknowledges (Br. 3), "coastwise laws" is a legally defined "term of art."  And Section 502(b) conspicuously fails to use that term—even as the neighboring provision of the Covenant, Section 503, *does* refer to "coastwise laws."  The logical inference is that the Covenant uses the narrower term "coastal shipments" in its ordinary sense.  And the ordinary meaning of "coastal" applies only to shipments moving between points along a coast or within a particular chain of islands— not to a 6,000-mile open-ocean voyage.  *See* Webster's Third New International Dictionary 433 (1976) (defining "coastal" as "of or relating to a coast"; "located on or near a coast"; "bordering on a coast"); Establishment of Interim National Multimodal Freight Network,

---

Security Act sheds no light on the meaning of "contractor" as an undefined term in the Covenant.

81 Fed. Reg. 36,381, 36,383 (Mar. 1, 2019) (distinguishing between "coastal" and "open-ocean" routes).

Although Matson asserts (Br. 31) that this argument "makes no sense," the parties to the Covenant had a different view. Shortly after the Covenant became effective, the Governor of the Northern Marianas issued an executive order setting rules for the maritime industry. Executive Order No. 6-A, ¶ 4, 1 N. Mar. I. Reg. 13, 14 (Jul. 13, 1978). His order closely tracks APL's understanding of the Covenant. In particular, the order defines "coastal shipping" as equivalent to "inter-island shipping," *i.e.*, "carriage . . . from ports within the Northern Mariana Islands to other ports within the Mariana Islands." *Id.* The order also specifically contrasts "coastal shipping" with "overseas shipping," which is defined as "the carriage of goods and/or passenger[s], for hire or reward by sea to ports within from other ports outside of, and from ports within to other ports outside of, the Northern Mariana Islands." *Id.* ¶ 5, 1 N. Mar. I. Reg. at 14.

The Governor's executive order is no anomaly. For years, the shipping industry and the Department of Defense have acted on the understanding that the coastwise laws do not apply to the carriage of goods into and out of the Northern Mariana island chain, including by federal contractors. Indeed, Matson itself has long transported U.S. government cargo to and from Saipan using *foreign*-flag vessels. *See* Abrams Decl. ¶¶ 8-14 & Exhibits 2-8. That practice would be prohibited under United States coastwise laws under Matson's newfound view that federal contractors' trade with Saipan is domestic trade, since the coastwise laws ordinarily prevent foreign-flag vessels from engaging in domestic trade. 46 U.S.C. § 55102(b). The Court should reject Matson's opportunistic effort to uproot settled industry practice by advancing a novel argument that appears at odds with its own conduct.[20]

---

[20] Matson cites (Br. 27, 31) a 1981 ruling by the U.S. Customs Service that adopted the view that

## III.    MATSON'S REMEDIAL REQUESTS LACK MERIT.

After devoting most of its brief to a request for vacatur of MARAD's vessel-replacement decisions, Matson shifts course at the end and seeks two alternative remedies.  Matson Br. 34-36. First, Matson tentatively suggests that it may be entitled to an injunction that bars MARAD from reconsidering applications to include the *APL Guam* or the *APL Saipan* in the MSP.  Second, and even more remarkably, Matson contends that if the Court rejects Matson's attempt to read Section 53105(a)'s operating requirements into Section 53102(b), the Court should "at the very least . . . declare" that MARAD must pursue contractual remedies against APL.  Matson's arguments in favor of these extraordinary remedies are baseless and should be rejected.

### A.    There Is No Conceivable Basis To Award Injunctive Relief To Matson.

Matson's plea for injunctive relief is little more than a placeholder, as Matson suggests that its request might ripen after a decision by this Court depending on MARAD's position. Matson Br. 34.  APL agrees that full briefing on this issue is premature and indeed unnecessary, because Matson's claims fail on the merits.  But two points bear mention now.

First, Matson's premise for its hypothetical injunction rests on a clear mischaracterization of the applicable law.  According to Matson, MARAD is bound by the 2018 NDAA to "prohibit MSP vessels from engaging in *any* domestic trade," which supposedly bars MARAD from "entertain[ing] any future requests by APL to allow these vessels to participate in the MSP fleet."

---

the Covenant applied U.S. coastwise laws to shipments made by the Department of Agriculture between Saipan and the U.S. mainland.  *See* Vessels: The Application of the Coastwise Laws to the Shipment of Food Commodities by an Agency of the U.S. Government, 15 Cust. B. & Dec. 1082 (1981).  But the Customs Service's reasoning was cursory; after recounting inapposite legislative history, the agency announced its decision in a single, conclusory paragraph.  *Id.* at 1085.  Moreover, the decision is non-precedential, *see* 19 C.F.R. § 177.9(c), and it is not entitled to deference, particularly since the Customs Service has not been delegated authority to resolve ambiguities in the Covenant, which emerged from bilateral negotiations under the auspices of the United Nations.  APL is aware of no instance in which the ruling has been cited or applied.

Matson Br. 34.  But that is just wrong.  As discussed, pp. 6-7, *supra*, the limits on the 2018 NDAA's reach are built into the statute itself and could not be clearer: restrictions on service under the 2018 NDAA apply only to vessels "first covered by an operating agreement" after the 2018 NDAA's enactment, and do *not* extend to "replacement vessel[s]" under existing operating agreements.  NDAA § 3503.

Second, Matson's injunction request also runs afoul of standard equitable principles. "[T]he unclean hands doctrine requires that a party seeking equitable relief show that [its] conduct has been fair, equitable, and honest as to the particular controversy in issue." *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017) (quotation marks omitted).  Here, Matson's request for injunctive relief is tainted because it appears that Matson's own longstanding practices involving Saipan would qualify as impermissible coastwise trade under the interpretation of the Covenant that it now asks the Court to adopt and enforce against APL.

Once again, although Matson now contends that the carriage of U.S. government cargo between Saipan and the continental United States (following transshipment in Asia) is "coastwise" under the Covenant, *see* p. 30, *supra*, Matson has consistently acted in contravention of that understanding by transporting U.S. government cargo to and from Saipan using foreign-flag vessels, *see* Abrams Decl. ¶¶ 8-14 & Exhibits 2-8.[21]  Specifically Matson's public schedules reveal that Matson's ship the *Mana* previously operated in regular service to Saipan, *id.* ¶¶ 8-9 & Exhibits 2-3, and that its vessel the *Papa Mau* currently does so, *id.* ¶¶ 11-12 & Exhibits 5-6. Both ships sail under foreign flags.  *Id.* ¶¶ 10, 13 & Exhibits 4, 7.  And both ships have

---

[21] This evidence is properly before the Court because "the rule confining review to the administrative record before the agency is limited to the review of the agency's actions and does not apply to evidence concerning a court's . . . consideration of the appropriateness of an equitable remedy for unlawful agency action or defenses thereto." *City of Reading v. Austin*, 816 F. Supp. 351, 361 n. 7 (E.D. Pa. 1993).

indisputably carried U.S. government cargo on this route—indeed, Matson recently publicized its carriage of "equipment from the Federal Emergency Management Agency" to Saipan on the *Mana*. *Id.* ¶ 14 & Exhibit 8.  All of this would be prohibited by United States coastwise laws under Matson's newfound interpretation of the Covenant.  Matson cannot claim entitlement to injunctive relief based on a legal theory that it is currently—and openly—violating.

###### B.     Matson Lacks The Authority To Compel MARAD To Initiate A Contract-Enforcement Action.

Finally, Matson's alternative request for the Court to "declare" that MARAD must make pro rata reductions to APL's MSP payments is contrary to law.  Matson effectively argues that MARAD must take a contractual enforcement action against APL, but an agency's decision not to initiate enforcement proceedings is presumptively unreviewable.  *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985).  And the D.C. Circuit has specifically held that the APA does not provide a competitor like Matson with standing to challenge the government's "alleged maladministration of [a] contract."  *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841-842 (D.C. Cir. 1982); *see also Pan Am World Servs., Inc. v. United States*, No. 87-cv-2522, 1987 WL 114843, at *4 (D.D.C. Sept. 30, 1987) (holding that plaintiff lacked standing under the APA to "claim[] injury based on post-award administration of [a government] contract").  In addition, because Matson's APA suit only challenges MARAD's two vessel-replacement decisions, there is no agency action presented here—much less a *final* agency action—with respect to a hypothetical MARAD decision about whether to pursue contractual remedies against APL for allegedly breach its operating agreements.  *See* 5 U.S.C. § 704 (limiting judicial review under the APA to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court").

## CONCLUSION

The Court should deny Matson's motion for summary judgment, and grant the cross-motions for summary judgment filed by APL and the Federal Defendants.

April 19, 2019

Respectfully submitted,

 /s/ *Brian T. Burgess*
BRIAN T. BURGESS
   (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, D.C. 20001
T: (202) 346-4000
F: (202) 346-4444
bburgess@goodwinlaw.com

GERARD J. CEDRONE
   (D.D.C. Bar. No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
T: (617) 570-1000
F: (617) 523-1231
gcedrone@goodwinlaw.com

*Counsel for APL Marine Services, Ltd.,*
*and APL Maritime, Ltd.*