IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.,

Plaintiff,

v.

DEPARTMENT OF TRANSPORTATION,

and

MARITIME ADMINISTRATION,

Defendants.

Civil Action No. 18-2751

ORAL ARGUMENT REQUESTED

**MATSON'S COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO MOTION TO DISMISS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

     I.      This Court Has Jurisdiction To Review The 2015 Award ..................................... 4

     II.     The New Vessels Are Ineligible For The MSP ..................................................... 7

          A.      Defendants Must Rely On The Reasoning In The Administrative
                 Record ........................................................................................................ 8

          B.      Section 53105(a)(1)(A) Sets Forth An Eligibility Requirement .............. 11

          C.      The New Vessels Do Not Engage Exclusively In Foreign
                 Commerce Or Domestic Trade Allowed Under A Registry
                 Endorsement ............................................................................................. 22

     III.     Matson Is Entitled To An Adequate Remedy ...................................................... 35

CONCLUSION ................................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954)..........................................................................................20, 21

*Action on Smoking & Health v. C.A.B.*,
  713 F.2d 795 (D.C. Cir. 1983)........................................................................35

*Agee v. Cent. Intelligence Agency*,
  500 F. Supp. 506 (D.D.C. 1980)......................................................................37

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)......................................................................35

*Am. Mar. Ass'n v. Blumenthal*,
  590 F.2d 1156 (D.C. Cir. 1978)......................................................................24

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008)........................................................................24

*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983)........................................................................................17

*BP Energy Co. v. FERC*,
  828 F.3d 959 (D.C. Cir. 2016)........................................................................16

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)..........................................................................................9

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979)........................................................................................21

*Coastwise Trade; Guam*,
  HQ112917, 1993 WL 563563 (Oct. 19, 1993) ...............................................33

*Corley v. United States*,
  556 U.S. 303 (2009)..................................................................................16, 22

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005)..........................................................................................7

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)........................................................................................13

*Green v. Bock Laundry Mach. Co.*,
490 U.S. 504 (1989)...............................................................................13, 34

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)...........................................................................................35

*Heckler v. Chaney*,
470 U.S. 821 (1985)...........................................................................................38

*Miss. ex rel. Hood v. AU Optronics Corp.*,
571 U.S. 161 (2014)...........................................................................................29

*Indep. U.S. Tanker Owners Comm. v. Lewis*,
690 F.2d 908 (D.C. Cir. 1982)...........................................................................18

*Keystone Driller Co. v. Gen. Excavator Co.*,
290 U.S. 240 (1933)...........................................................................................37

*King v. Burwell*,
135 S. Ct. 2480 (2015).................................................................................12, 29

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)...........................................................................................12

*Matson Navigation Co., Inc. v. U.S. Dep't of Transp.*,
895 F.3d 799 (D.C. Cir. 2018).....................................................................4, 5, 28

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011)...........................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................9, 14, 28

*National Association of Manufacturers v. Department of Defense*,
138 S. Ct. 617 (2018).................................................................................5, 6, 7

*OSG Bulk Ships, Inc. v. United States*,
132 F.3d 808 (D.C. Cir. 1998)...........................................................................17

*Palisades Gen. Hosp. Inc. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005)...........................................................................27

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
444 U.S. 572 (1980)...........................................................................................18

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)..........................................................................1, 8, 10, 11

*Service v. Dulles,*
    354 U.S. 363 (1957)........................................................................................19

*Steenholdt v. FAA,*
    314 F.3d 633 (D.C. Cir. 2003).........................................................................19

*Sw. Airlines Co. v. U.S. Dep't of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016).........................................................................39

*TRT Telecomms. Corp. v. FCC,*
    857 F.2d 1535 (D.C. Cir. 1988).......................................................................13

*U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc.,*
    797 F.3d 116 (1st Cir. 2015)...........................................................................31

*U.S. Postal Serv. v. NLRB,*
    969 F.2d 1064 (D.C. Cir. 1992)...................................................................9, 11

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
    484 U.S. 365 (1988)........................................................................................12

*United States v. Brown,*
    333 U.S. 18 (1948)..........................................................................................13

*United States v. Fausto,*
    484 U.S. 439 (1988)........................................................................................13

*United States v. Granderson,*
    511 U.S. 39 (1994)....................................................................................13, 14

*Vermilya-Brown Co. v. Connell,*
    335 U.S. 377 (1948)........................................................................................17

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984).........................................................................24

*Wannall v. Honeywell, Inc.,*
    775 F.3d 425 (D.C. Cir. 2014).........................................................................28

*Watts v. SEC,*
    482 F.3d 501 (D.C. Cir. 2007)...........................................................................4

*Yates v. United States,*
    135 S. Ct. 1074 (2015)....................................................................................12

**Statutes**

5 U.S.C. § 702..................................................................................................35

5 U.S.C. § 706(2)(A)..............................................................................................21, 35

28 U.S.C. § 2343......................................................................................................4, 6

33 U.S.C. § 1369(b)(1)................................................................................................5

46 U.S.C § 296.31(d)(2).......................................................................................21, 22

46 U.S.C. § 12111.................................................................................................8, 29

46 U.S.C. § 50501.......................................................................................................6

46 U.S.C. § 51506(a)(3)..............................................................................................6

46 U.S.C. § 53101(2).................................................................................................30

46 U.S.C. § 53101(10)...............................................................................................23

46 U.S.C. § 53102(b)......................................................................................7, 12, 14

46 U.S.C. § 53102(c)(1).............................................................................................18

46 U.S.C. § 53103(b)(1).............................................................................................30

46 U.S.C. § 53103(c).................................................................................................19

46 U.S.C. § 53104(c)(1).......................................................................................16, 30

*46 U.S.C. § 53105.........................................................................7, 12, 15, 16, 23, 29

46 U.S.C. § 53106(a)(1).............................................................................................30

46 U.S.C. § 53106(d)(3).....................................................................................14, 15, 38

46 U.S.C. § 53107(a).................................................................................................30

46 U.S.C. § 53303.......................................................................................................6

46 U.S.C § 55109(a)....................................................................................................6

46 U.S.C. § 55111(a)(1)..............................................................................................6

46 U.S.C. § 56101(a)(1)(A).........................................................................................6

46 U.S.C. § 56102(a)(1)..............................................................................................6

46 U.S.C. § 56301.......................................................................................................6

Northern Mariana Covenant § 502(b)...................................................................32, 34

*Northern Mariana Covenant § 503(b) .................................................................30, 32

Pub. L. No. 115-91, 131 Stat. 1283 (2017) ..................................................................36

**Other Authorities**

139 Cong. Rec. 27,231 (1993) ......................................................................................17

141 Cong. Rec. 35,540 (1995) ......................................................................................17

S. Rep. No. 94-433 (1975) ............................................................................................33

*Vessels: The Application of the Coastwise Laws to the Shipment of Food
    Commodities by an Agency of the U.S. Government*, 15 Cust. B. & Dec. 1082
    (1981) .........................................................................................................................33

**Treatises**

*Contractor*, Black's Law Dictionary (10th ed. 2014) ..................................................31

**Regulations**

8 C.F.R. § 90.3(c) (1949) .............................................................................................20

8 C.F.R. § 90.12 (1949) ...............................................................................................20

46 C.F.R. § 67.17 .........................................................................................................28

46 C.F.R. § 296.2 ...........................................................................................19, 21, 24

46 C.F.R. § 296.11(a)(2) ................................................................................19, 21, 22

46 C.F.R. § 296.41 ............................................................................................22, 39

1 N. Mar. I. Reg. at 14 .................................................................................................34

Exec. Order No. 6-A, 1 N. Mar. I. Reg. 13, 14 (July 13, 1978) ...................................33

**INTRODUCTION**

At bottom, this case presents a discrete question of statutory interpretation—whether a vessel must be operated *exclusively* in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111 to be eligible for inclusion in the Maritime Security Program ("MSP"), as Matson argues, or whether a vessel is eligible for MSP subsidies so long as it engages in any amount of foreign commerce, as Defendants argue.  Every tool of statutory interpretation establishes that MSP-eligible vessels must be operated *exclusively* in foreign commerce or permitted mixed commerce.  Indeed, in promulgating regulations to implement the Maritime Security Act ("MSA"), and in reviewing the applications that led to the challenged awards, MARAD *agreed* that exclusive operation in foreign commerce or permitted mixed commerce is a prerequisite to inclusion in the MSP.  Yet, the administrative record conclusively establishes that the APL GUAM and the APL SAIPAN (the "New Vessels") are *not*—and never were intended to be—operated exclusively in foreign commerce or in mixed foreign and domestic conduct permitted under a registry endorsement; rather, they are engaged in impermissible domestic, coastwise trade with Saipan that disqualifies them from inclusion in the MSP.  Accordingly, the challenged subsidy awards must be set aside.

MARAD and APL have raised a host of arguments in opposition to Matson's motion for summary judgment, and in ostensible defense of MARAD's subsidy awards to APL, not one of which appears in the administrative record.  But under the Administrative Procedure Act ("APA"), an agency's final actions can be reviewed only on the grounds offered by the agency itself at the time the decisions were made.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  MARAD and APL are conspicuously silent about MARAD's contemporaneous basis for awarding subsidies to the New Vessels; if nothing else, their submissions confirm that MARAD failed even to *consider* the fact that calling Saipan disqualifies those vessels from participation in the MSP.  The

newly minted arguments, in any event, are wrong on their merits and, if accepted, would propagate an incoherent and absurd regime in which a vessel could be eligible for MSP subsidies even thought it could not actually operate as part of the MSP fleet.  Defendants' back-up argument—that trade to and from Saipan is not impermissible coastwise or domestic trade—would require this Court to ignore the plain language and context of both the MSA and the coastwise laws.  It should not do so.

Because the New Vessels operate and have always operated in impermissible trade to and from Saipan—including carriage of cargo (via transshipment) to and from the mainland United States—they were not eligible for the MSP at the time of the approvals or at any time thereafter, and MARAD's subsidy awards should be vacated.  If the Court were to set aside the awards, as it should, then no further relief should be needed at this time.  However, should MARAD resist implementing the Court's judgment, Matson would also be entitled to injunctive relief preventing MARAD from approving the New Vessels at a later time.  Finally, this Court would be well within its power, in the alternative, to issue a judgment declaring that MARAD must make pro rata reductions in its subsidy payments to APL for each day in a year less than 320 that the New Vessels are not operated exclusively in foreign commerce and permissible domestic trade.

## ARGUMENT

MARAD's decisions approving the New Vessels should be set aside because they were arbitrary and capricious, and contrary to law.  (*See* Matson Br. 18–34.)  Under the APA, Matson is entitled to appropriate relief from MARAD's unlawful actions.  (*See id.* at 36.)

This is a straightforward APA challenge that requires the Court to decide whether the New Vessels were eligible for the MSP for the reasons stated by MARAD in approving the subsidies at issue here.  The answer to *that* question is "no," and Defendants do not even pretend otherwise.  Instead, they try to defend MARAD's awards with a series of arguments not made by APL, or

accepted by MARAD, during the administrative process.  These arguments are all barred by the *Chenery* doctrine and meritless on their own terms, as explained below.

In addition to their unsuccessful attempts to defend the challenged decisions on the basis of entirely new arguments, Defendants levy a series of baseless and irrelevant accusations against Matson.  For instance, APL accuses Matson of merely advancing its "interest in restoring its Guam monopoly" (APL Br. 14), and discusses Matson's own receipt of government benefits (*id.* at 13–14), neither of which has anything to do with the issues in this litigation.  APL also suggests that the vessels Matson uses to call Saipan are somehow suspect (*id.* at 38, 40, 42–43), going so far as to submit a supplemental statement of undisputed material facts for this purpose (APL's Counter-Statement of Undisputed Material Facts (Dkt. No. 21-2)), even though not one of those facts is pertinent to any issue raised by Matson's complaint (and, thus, "material" within the meaning of Rule 56).  And both MARAD and APL blame Matson for not making an administrative challenge to the New Vessels' carriage to Saipan (MARAD Br. 7, 24 n.7; APL Br. 14–16, 24 n.10), despite the fact that Matson was excluded from the administrative process and, indeed, MARAD concluded that Matson lacked administrative standing to pursue *any* formal challenge to the awards before filing its complaint in this Court (AR404).

These collateral issues warrant no attention from this Court.  As Matson has explained, it welcomes competition in the Guam-Saipan trade, but that competition must be *fair*.  (*See* Compl. ¶ 119 (Dkt. No. 1).)  Regardless of what other benefits Matson (or APL) obtains from the federal government, which other vessels either company uses to carry private or government cargo, or the applicability of other laws and regulations governing ocean shipping, the subsidy awards challenged *in this case* were issued in violation of the MSA and have afforded APL an unfair advantage in operating the APL GUAM and the APL SAIPAN in trade routes served by Matson's

unsubsidized vessels.  *This case* is brought to resolve a discrete issue of statutory interpretation that, when correctly resolved, necessitates vacatur of the awards.  That should be the sole focus of this proceeding, and it is to that issue that Matson will devote the remainder of its briefing.

## I.    This Court Has Jurisdiction To Review The 2015 Award

MARAD, but not APL, seeks to avoid vacatur of its 2015 decision approving the APL GUAM as a replacement vessel by arguing that this Court lacks jurisdiction over that decision because any challenge must be brought in the D.C. Circuit.  But MARAD took the *exact opposite* position when Matson previously filed a petition for review in the D.C. Circuit, arguing that in the absence of jurisdiction under the Hobbs Act, 28 U.S.C. § 2343, "the default rule of district court jurisdiction applies."  Respondents' Motion to Dismiss for Lack of Subject-Matter Jurisdiction at 5, *Matson Navigation Co., Inc. v. U.S. Dep't of Transp.*, 895 F.3d 799 (D.C. Cir. 2018) (No. 17-1144); *see also Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) ("[T]he normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." (internal quotation marks omitted)).  MARAD doubled down on that position in its merits brief (Brief for Respondents ("Appellate MARAD Br.") at 21, *Matson*, 895 F.3d 799 (No. 17-1144) ("MARAD's decision here was not issued pursuant to any of the statutes included in the Hobbs Act.")), and again in its supplemental brief (Supplemental Brief for Respondents ("Supplemental Appellate MARAD Br.") at 5, *Matson*, 895 F.3d 799 (No. 17-1144) ("The Hobbs Act does not apply to these orders, however, because they were issued pursuant to section 53105(f)—which is not listed in the Hobbs Act.")).

It does the Justice Department no credit to play a jurisdictional shell game in a misguided effort to avoid judicial review of MARAD's decisions.  When Matson filed in the D.C. Circuit, MARAD took the position that the challenge had to be brought in the district court.  When the D.C. Circuit dismissed that case, Matson re-filed in this Court—only to have MARAD argue that

the case should have been brought in the D.C. Circuit.   Matson respectfully submits that jurisdiction must lie in one court or the other.

In any event, MARAD's jurisdictional argument is wrong on the merits.   Contrary to MARAD's highly misleading citation to the D.C. Circuit's decision (MARAD Br. 10–11), the court of appeals did not reach the question whether the Hobbs Act provides appellate jurisdiction over the approval of the APL GUAM, ruling instead only that *if* the Hobbs Act did apply, Matson's petition would be untimely.   *See Matson*, 895 F.3d at 804–05 ("[T]he court has no occasion to decide this question because Matson failed to file a timely petition for review.").

Supreme Court precedent confirms that Matson's APA challenge is properly brought in the district court.   In *National Association of Manufacturers v. Department of Defense*, 138 S. Ct. 617 (2018), decided after Matson filed its petition for review in the D.C. Circuit, the Supreme Court considered, among other things, whether challengers to an EPA rule under the Clean Water Act could file their suit directly in appellate courts pursuant to a statute allowing for direct filing in federal appellate courts for review of agency action "approving or promulgating any effluent limitation or other limitation under [33 U.S.C. §] 1311."   33 U.S.C. § 1369(b)(1); *see also Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 624.   In holding that the challenge must be brought in district court, the Court reasoned that while the challenged rule provided a definition of "Waters of the United States" as used in the Clean Water Act, Section 1311 merely "bans the discharge of pollutants into navigable waters absent a permit[;] [n]owhere does that provision direct or authorize the EPA to *define* a statutory phrase appearing elsewhere in the Act."   *Id.* at 630.   The Court rejected the government's argument that review in the appellate courts was appropriate because the "legal and practical effect [of the new rule] [was] to make effluent and other limitations under Section 1311

applicable to the waters that the Rule covers," saying that such a "practical-effects" test is "not grounded in the statutory text." *Id.* (internal quotation marks omitted).

The same result obtains here.  The Hobbs Act provides for direct review in the appellate courts of final orders of "the Secretary of Transportation issued pursuant to [46 U.S.C. §] 50501." 28 U.S.C. § 2342(3)(A).  Section 50501 relates only to whether an entity will be deemed a citizen of the United States for various purposes under Title 46, the vast majority of which are unrelated to eligibility determinations under Section 53102(c)(2).  *See* 46 U.S.C. § 50501; *see also id.* § 55111(a)(1) (limitation on towing operations by vessels not owned by citizens of the United States); *id.* § 56101(a)(1)(A) (restriction on sale of vessel employed in the Merchant Marine to persons who are not citizens of the United States); § 56102(a)(1) (prohibition during wartime of foreign registry of a vessel owned by a citizen of the United States).[1]  Section 50501 does not give MARAD any rulemaking authority, nor does it empower MARAD to award subsidies pursuant to the MSP—that authority derives principally from Section 53102(a).  Indeed, one reason MARAD previously took the position that both the 2015 and 2016 decisions could not be reviewed in the appellate court is because "MARAD does not make freestanding determinations of a vessel operator's citizenship under section 50501."  Supplemental MARAD Br. at 13.

MARAD's entire argument in this Court is premised on a statement in the letter advising APL of the agency's determination, in which MARAD found that the APL GUAM "will be owned by R&D, a Guam corporation and citizen of the United States within the meaning of 46 U.S.C.

---

[1]    *See also* 46 U.S.C. § 51506(a)(3) (requiring State maritime academies to agree that each individual who is a citizen of the United States pass a license examination as a condition for graduation); *id.* § 53303 (setting forth certain citizens of the United States eligible to establish construction reserve funds); *id.* § 55109(a) (limiting dredging in the navigable waters of the United States to those vessels owned by citizens of the United States); *id.* § 56301 (authority of the Secretary of Transportation to requisition or purchase a vessel owned by citizens of the United States during national emergencies).

§ 50501."  AR83.  But as in *National Association of Manufacturers*, the relevant question is whether the 2015 award was issued "'pursuant to' or 'by reason of the authority'" of Section 50501.  138 S. Ct. at 630.  It plainly was not—while MARAD must necessarily have made a determination of the vessel owner's citizenship, Section 50501 does not provide MARAD with the authority to approve replacement vessels for the MSP.  Moreover, adopting MARAD's reading would mean that any decision by MARAD or the Department of Transportation under the myriad sections referencing Section 50501 would trigger direct appellate review.  The Supreme Court rejected such an outcome in *National Association of Manufacturers*, reasoning that courts must respect "Congress' decision to grant appellate courts exclusive jurisdiction only over [certain] enumerated . . . actions," and that courts "are required to give effect to Congress' express inclusions and exclusions, not disregard them."  *Id.* at 631; *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) ("We must not give jurisdictional statutes a more expansive interpretation than their text warrants . . . .").

MARAD's jurisdictional argument contradicts its position in the prior petition for review, is unsupported by the Supreme Court's most recent authority, and has not even garnered the support of APL.  This Court therefore has jurisdiction to review MARAD's decision to approve the APL GUAM for inclusion in the MSP.

## II.   The New Vessels Are Ineligible For The MSP

Defendants do not defend the challenged MARAD decisions on the basis actually articulated by the agency in approving the subsidies.  Indeed, not a single argument raised by Defendants in this Court was presented by APL or accepted by MARAD in the administrative proceedings below.  The *principal* argument made by Defendants in this Court is that the MSA's *eligibility* requirements (46 U.S.C. § 53102(b)) are distinct from the statute's *operational* requirements (*id.* § 53105).  (*See* MARAD Br. 12–21; APL Br. 19–29.)  The challenged decisions,

however, did not rest on any such distinction.   To the contrary, MARAD *invoked* Section 53105 as a partial basis for its determinations, and agreed, contrary to its position here, that Section 53105 imposes eligibility limitations on vessels seeking to participate in the MSP.   MARAD's subsidy awards *assumed* that the New Vessels would be operated exclusively in foreign commerce or in mixed foreign and domestic commerce permitted under a registry endorsement, even though the administrative record showed that assumption to be false (and APL knew it was false).   Even assuming MARAD's and APL's new arguments are properly before the Court, they are insufficient to support MARAD's approvals of the New Vessels.

### A.      Defendants Must Rely On The Reasoning In The Administrative Record

Nowhere in the administrative record did MARAD grapple with the New Vessels' service to and from Saipan, and nowhere did MARAD offer the contorted and labored interpretations of the MSA that it and APL advance here.   In fact, not a single argument raised by Defendants in this case was articulated by MARAD below.   Instead, MARAD took the position in the administrative proceedings below that an eligible vessel *must* "be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 1211 of title 46, United States Code" (AR163; *see also* AR196–97), and that Section 53105(a)(1)(A)'s application to the New Vessels "could not be clearer" (AR404).   MARAD never construed the statute to permit vessels to operate in domestic or coastwise service.   Even APL, in its initial letter seeking approval of its proposed vessels, noted that MARAD "has recognized that Guam may be served by MSP vessels operating in foreign commerce," citing 46 U.S.C. § 12111. AR6.

It is a longstanding and fundamental rule of administrative law that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."   *SEC*

*v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("*Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."). Thus, "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). This principle applies also to intervenors who participate to defend agency action. *See U.S. Postal Serv. v. NLRB*, 969 F.2d 1064, 1069 (D.C. Cir. 1992) ("In short, we reject [the intervenor's] endeavor to achieve disposition of this case on a rationale not set forth by the agency itself." (alteration and internal quotation marks omitted) (citing *Chenery*)).

Every word submitted to this Court by APL and MARAD was developed by their counsel in response to Matson's challenge—the very definition of *post hoc* rationalizations. A clearer violation of the *Chenery* doctrine would be difficult to envision. If the Court were to limit Defendants to defending the decisions below on their own terms—as the *Chenery* doctrine requires—then Defendants have offered literally no defense and the summary judgment motion is uncontested. This is not surprising, because MARAD *entirely failed to consider the New Vessels' carriage to Saipan* throughout the entirety of the administrative proceedings.

The sole ground on which MARAD based its approval of the APL GUAM with respect to its operation in foreign commerce was that the APL GUAM would "be time chartered to [APL], a Delaware corporation and United States documentation citizen, for operation in its established world-wide services." AR76. Its approval of the APL SAIPAN went further, expressly stating that Section 53105 "clarifie[s]" the eligibility requirements of 46 U.S.C. § 53102(b)(2):

> 46 U.S.C. § 53102(b)(2), *further clarified by 46 U.S.C. § 53105(a)(1)(A)* requires that *an eligible vessel* be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code. Under 46 U.S.C. § 12111(b),

> a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef. APL will time charter the Replacement Vessel from APLMS for operation in its established worldwide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement.  Accordingly, *it has been determined that the Replacement Vessel will provide transportation in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).*

AR163 (emphasis added).   MARAD reaffirmed this understanding in its order dismissing Matson's administrative appeal, saying that the "relevant language in the MSA *could not be clearer* regarding APL's ability to operate in the Guam trade," citing Section 53105(a)(1)(A)'s allowance for domestic trade conducted pursuant to a registry endorsement under 46 U.S.C. § 12111.  AR404–05 (emphasis added).

MARAD does not even acknowledge the above statements, despite each having been cited in Matson's opening brief.  (Matson Br. 11–12, 15.)  MARAD has the audacity (there is no other word for it) to argue in this Court that Section 53105 is not "relevant" to the question of eligibility (MARAD Br. 21), even though MARAD said in the administrative proceedings that Section 53105 "clarifie[s]" the eligibility requirements.  The relevance of a statute to an agency decision is judged by the reasoning employed in the underlying administrative proceeding (*see Chenery*, 332 U.S. at 196), and here, MARAD plainly believed Section 53105 was relevant at the time it awarded the subsidies.  The challenged awards are clearly unlawful under the rationale that MARAD itself articulated at the time the awards were made.

APL, for its part, argues that MARAD's statement in its memorandum recommending approval of the APL SAIPAN "makes perfect sense" in light of an objection by Senator Hirono from Hawaii about the APL SAIPAN's carriage to Guam, saying that Section 53105 does "clarif[y]" Section 53102(b) by "foreclos[ing] Matson's now-abandoned argument that a vessel must engage *exclusively* in foreign commerce to satisfy Section 53102(b)(2)."  (APL Br. 29.)  The

administrative record does not support this reading.  What MARAD said in its memorandum (and reaffirmed in its letter to APL), is that Section 53102(b)(2), as "clarified by 46 U.S.C. § 53105(a)(1)(A)," requires that "*an eligible vessel* be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code."  AR163 (emphasis added).  Nowhere did MARAD say anything about Section 53105 foreclosing Matson's interpretation of the statute—by contrast, MARAD expressly *adopted* the view that Section 53105(a)(1)(A)'s requirement of exclusive operation in foreign commerce is an element of eligibility.

MARAD took the position in the administrative proceedings that Section 53105(a)(1)(A) is a component of eligibility satisfied by the New Vessels' service to Guam.  Indeed, MARAD said that this reading "could not be clearer."  Matson is entitled to summary judgment under that reading—the construction actually applied by the agency in awarding and explaining the challenged subsidies—because it is undisputed that the New Vessels do not operate exclusively in foreign commerce or permitted mixed commerce, as Section 53105 requires.  Yet, in this Court, MARAD does not even acknowledge its previous position, let alone try to explain it.  That should be the end of the case:  MARAD and APL cannot defend the orders on other grounds now.  *See Chenery*, 332 U.S. at 196; *U.S. Postal Serv.*, 969 F.2d at 1069.

## B.  Section 53105(a)(1)(A) Sets Forth An Eligibility Requirement

Even if Defendants' entirely new arguments were not precluded by the *Chenery* doctrine, they are wrong on the merits.  The ultimate statutory question in this case is whether 46 U.S.C. § 53105(a)(1)(A) sets forth eligibility requirements for vessels seeking to participate in the MSP, or whether MARAD may disregard Section 53105 and approve vessels for inclusion in the MSP, even though those vessels would not be permitted to operate as part of the MSP fleet.  If, as set forth in Matson's opening brief and as determined by MARAD in the administrative proceedings,

Section 53105's requirement of "exclusive[]" operation in foreign commerce or permitted domestic trade is a threshold issue of eligibility, then the New Vessels did not qualify for the MSP at the time of their approval and the awards must be vacated.

The plain language of the statute is dispositive. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("If the statutory language is plain, [a court] must enforce it according to its terms."). Section 53102(b)(2) provides that a vessel is not eligible for the MSP unless it "provid[es] transportation in foreign commerce." As MARAD has explained in this administrative proceeding (AR163), this eligibility requirement is "further clarified by 46 U.S.C. § 53105(a)(1)(A)," which requires that an eligible vessel be "operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," and "shall not otherwise be operated in the coastwise trade" (46 U.S.C. § 53105(a)(1)(A)–(B)). Read in tandem, as they must be (*see Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) ("[T]he plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole" (alterations and internal quotation marks omitted)), these two provisions contemplate a meaningful barrier to entry for vessels seeking to participate in the MSP—at the time of application, the vessels must be operated or intended to be operated *exclusively* in foreign commerce or domestic trade permitted under Section 12111. In addition to the plain text and context, every tool of statutory interpretation accords with this interpretation.

*First*, the structure of the MSA confirms this reading. The Supreme Court has instructed that "[s]tatutory construction . . . is a holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also King v. St. Vincent's Hosp.*, 502

U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole").  It is therefore proper for courts to "examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *United States v. Fausto*, 484 U.S. 439, 444 (1988); *see also TRT Telecomms. Corp. v. FCC*, 857 F.2d 1535, 1545 (D.C. Cir. 1988) (looking to "the overall statutory scheme that Congress erected" for interpretive guidance).  A corollary to this principle is that courts should construe statutes consistent with "common sense and evident statutory purpose" (*United States v. Brown*, 333 U.S. 18, 25 (1948)), and thereby avoid readings of statutes that yield "odd result[s]" (*Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989)), or an "implausible" interpretation (*United States v. Granderson*, 511 U.S. 39, 45 n.4 (1994)).

Defendants insist that Matson has confused eligibility and operation (MARAD Br. 13; APL Br. 20), but it is Defendants who have done so by artificially separating what MARAD itself has recognized is a unitary inquiry—in both the administrative proceedings here and in its own regulations.  As previously explained (Matson Br. 19–20), it would make no functional sense to say that Section 53105(a)(1)'s limitation on domestic trade is unrelated to eligibility, because that interpretation would mean a vessel may be eligible for participation in the MSP, yet not actually be able to operate under the MSP.  Such a reading violates the maxim that courts must interpret statutes "as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation and internal quotation marks omitted).

MARAD argues that this absurdity is irrelevant because "such a vessel may be eligible for inclusion in the MSP program, but it could not receive payments if it would not be operating in compliance with section 53105(a), making it unlikely that any contractor would pursue that option."  (MARAD Br. 17.)  That is precisely the point—Defendants' interpretation makes no

sense because it results in stricter terms for operation than for eligibility, meaning that vessels may be eligible to participate in the MSP, but cannot subsequently operate thereunder.  The fact that a rational operator would scoff at such a regime serves only to prove that Defendants have advanced a facially "implausible" interpretation.  *Granderson*, 511 U.S. at 45 n.4.

Defendants rely on Section 53106(d)(3)'s provision for pro rata reductions "for each day less than 320 in a fiscal year that the vessel is not operated in" foreign commerce or mixed foreign commerce and domestic trade pursuant to a registry endorsement (46 U.S.C. § 53106(d)(3)), claiming that the provision makes clear that impermissible operation in domestic trade does not disqualify a vessel from participating in the MSP (*see* MARAD Br. 16–18; APL Br. 21–22). According to MARAD, Section 53102(b) and Section 53105(a)(1)(A) set forth "two different foreign commerce requirements," one for eligibility, and one "to avoid pro rata reductions in the MSP payments."  (MARAD Br. 15.)

Section 53106(d)(3) has no relevance here.  Matson is not asking this Court to revoke previously valid eligibility determinations based on APL's subsequent operations in the domestic Saipan trade.  Rather, the New Vessels were not eligible for the MSP *at the time they were approved* (*see State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43)—the administrative record is clear that APL intended (and represented to MARAD that it intended) to operate the New Vessels in impermissible domestic trade.

Vessels are not eligible to be included in the MSP unless they are "operated (or in the case of a vessel to be constructed, will be operated) in providing transportation in foreign commerce." 46 U.S.C. § 53102(b)(2).  Once the vessel has entered into a valid operating agreement, Section 53106(d)(3) sets forth the consequences for an eligible vessel that was *already validly participating in the MSP* if it thereafter operates in domestic or coastwise trade.  *See* 46 U.S.C.

§ 53106(d)(3) ("With respect to payments under this chapter *for a vessel covered by an operating agreement*, the Secretary . . . ." (emphasis added)).   The contract—assuming it was valid at the time the parties entered into it—is not automatically terminated.   Rather, MARAD is statutorily obliged to make pro rata reductions in payment for each day less than 320 the vessel is not operating exclusively in foreign commerce or permitted domestic trade.   *See id.*   Moreover, the pro rata reductions for less than substantial compliance attach regardless of whether the vessel is engaged in impermissible domestic trade—if, for example, the owner simply chooses not to operate a covered vessel in *any* trade for more than 45 days a year, MARAD is obliged to make pro rata reductions.   The eligibility requirement of exclusive operation in foreign commerce is thus distinct from the minimum number of days a vessel must be operated in foreign commerce.

Section 53106(d)(3) has no application here because the New Vessels were *never* eligible for the MSP.   Were it the case that the New Vessels were eligible for inclusion in the MSP and thereafter breached the terms of their operating agreements, a different question would arise.   But here, the New Vessels were always intended to operate and do operate in impermissible domestic trade to and from Saipan, and thus statutory provisions regarding subsequent breaches of a valid operating agreement are irrelevant.   If the challenged awards are set aside, as they should be, then the New Vessels would not be covered by any operating agreements.

Indeed, Defendants' reading must be rejected because it would read the requirement of operation *exclusively* in foreign trade or permitted domestic trade out of the MSP.   Under their reasoning, Section 53105(a)(1)(A)'s requirement of "exclusiv[e]" operation in foreign commerce or mixed foreign commerce and domestic trade does not *really* mean "exclusiv[e]," because vessels would be permitted to operate up to 45 days a year in pure domestic, coastwise trade without any repercussions.   Indeed, MARAD acknowledges in its discussion of statutory purpose

that the "two different foreign commerce requirements" reading it proposes (MARAD Br. 15) would produce this anomalous result, claiming that "[i]t would be legally permissible for a coastwise-endorsed vessel to participate in the MSP, operate in foreign trade for 320 days, then operate in coastwise trade for the remaining 45 days" (*id.* at 20).   In other words, Section 53105(a)(1)(A)'s requirement of "exclusive[]" operation in foreign commerce really means operation for only 320 days.  This remarkable reading of the statute would render the exclusivity provision of Section 53105(a)(1)(A) entirely meaningless, violating the rule that statutes should be interpreted so as to give effect "to all its provisions."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks omitted); *see also BP Energy Co. v. FERC*, 828 F.3d 959, 968 (D.C. Cir. 2016) ("[A]n agency cannot read statutory provisions out of existence . . . .").  In Defendants' view, Section 53105(a)(1)(A) is a dead letter.

For similar reasons, Section 53104(c)(1) is inapposite.  (MARAD Br. 16–17; APL Br. 22.) That Section provides the procedure for terminating a contract after substantial noncompliance by the contractor.  *See* 46 U.S.C. § 53104(c)(1).  But the fact that there exists a procedure for terminating a contract sheds no light on what the threshold eligibility requirements are for obtaining that contract.  Indeed, there is no dispute that vessels must operate in "foreign commerce" to qualify for the MSP; recognizing and enforcing that minimum qualification is not in tension with the statute's provisions for termination of a valid contract.  For the same reasons, there is nothing incongruent about requiring vessels seeking placement in the MSP to operate exclusively in foreign commerce or permitted domestic trade while also providing a mechanism for terminating contracts if the vessels fall out of compliance.  Only Matson's interpretation harmonizes this statutory framework.

*Second*, any ambiguity in the statute is resolved by the legislative history and statutory purpose.  It is well settled that "clear evidence of congressional intent may illuminate ambiguous text." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 133 (1983) ("If any doubt remains as to the meaning of the statute, that doubt is removed by the legislative history.").  Thus, the language of a statute must "be construed if reasonably possible to effectuate the intent of the lawmakers." *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 386 (1948) (internal quotation marks omitted).

As set forth in Matson's opening brief (Matson Br. 20–23), Congress clearly understood that the MSP was designed to subsidize the operation of U.S.-flag vessels in *foreign* trade (*see, e.g.*, 139 Cong. Rec. 27,231, 27,286 (1993) (statement of Rep. Ortiz) ("The [MSP] will increase the ability of our commercial fleet to compete internationally . . . ."); 141 Cong. Rec. 35,540, 35,580 (1995) (statement of Rep. Furse) ("I know just how important this legislation is to preserving but also to enhancing our sealift force and maintaining an international commercial transportation capability.").  That legislative understanding accords with Congress's longstanding history of treating its domestic fleet and international fleet differently, recognizing the potential issues that may arise if subsidized vessels were permitted to compete with unsubsidized vessels. *See OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 810 (D.C. Cir. 1998) ("[V]essels built with the aid of the [Construction-Differential Subsidy] program would have an unfair advantage if allowed to compete directly with the unsubsidized Jones Act ships in domestic trade.").

MARAD contends that the statute's provision for pro rata reductions of payments to vessels engaged in impermissible domestic trade is sufficient to satisfy that statutory purpose.  (MARAD Br. 18.)  Setting aside the fact that MARAD believes this statutory provision is neither binding (*id.* at 30–32) nor enforceable (*id.* at 33), MARAD's own reading of Section 53106(d) confirms that

this is not the case.  In MARAD's view, Section 53106(d) permits "a coastwise-endorsed vessel to participate in the MSP, operate in the foreign trade for 320 days, then operate in coastwise trade for the remaining 45 days." (*Id.* at 20.)  Thus, without a threshold eligibility requirement of exclusive operation in foreign commerce, subsidized MSP vessels will be able to compete with unsubsidized vessels for *at least* 45 days (and longer, if they so choose and are willing to forfeit a portion of their award), in direct contravention of Congressional intent and longstanding practice.

Next, MARAD falsely claims that Matson has argued for strict division between coastwise-qualified vessels and MSP vessels.  (MARAD Br. 19.)  Not so.  The issue is not that coastwise-qualified vessels may participate in the MSP—they surely can, as MARAD recognizes.  (*Id.*)  Rather, the "disastrous" results "for the unsubsidized Jones Act fleet" described by the Supreme Court (*Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 586–87 (1980)) arise where, as here, a subsidized vessel is permitted to engage in coastwise trade, competing against unsubsidized vessels.  *Some* MSP vessels otherwise may be qualified to operate under the Jones Act, but certainly not all are.  *See* 46 U.S.C. § 53102(c)(1) (requiring only that MSP vessels be owned and operated by citizens of the United States).  That is why the D.C. Circuit has recognized in the context of a prior subsidy program that "[it] would be grossly unfair to allow U.S. vessels that have received a subsidy of up to 50% of construction costs to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards." *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 912 (D.C. Cir. 1982).  That admonition rings just as true now as under prior vessel subsidy programs, and only Matson's interpretation of the statute accords with that plain statutory purpose.

*Third*, even were the statute ambiguous, the implementing regulations are not.  Long before this litigation was commenced, MARAD unequivocally provided that a vessel is "eligible" for the

MSP if the vessel "is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."  46 C.F.R. § 296.11(a)(2).  "Foreign Commerce" is defined in the regulation as "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111."  *Id.* § 296.2 (emphasis added).  Under the plain terms of the regulations, thus, a vessel is not "eligible" for the MSP unless it is operated "exclusively" in the foreign trade or in mixed foreign and domestic trade allowed under a Section 12111 registry endorsement, just as Section 53105(a)(1)(A) requires.

MARAD does not dispute that "this is a correct summation of 46 C.F.R. § 296.2," but instead perfunctorily claims that "[t]he statute itself defines 'foreign commerce' more broadly than the regulations, and therefore, at least in the context of eligibility, the statutory definition controls." (MARAD Br. 20 (citation omitted).)  This bizarre assertion has no support in law or logic, and turns the ordinary process of statutory construction and rulemaking on its head.  No vessel is *entitled* to participate in the MSP—rather, the statute vests MARAD with discretion to accept new vessels into the program.  *See* 46 U.S.C. § 53103(c) ("The Secretary *may* enter into a new operating agreement" with eligible vessels (emphasis added)).  Even APL recognizes this discretion.  (APL Br. 5 ("MARAD is not required to accept every vessel that meets Section 53102(b)'s threshold eligibility criteria.").)  MARAD may therefore impose additional restrictions beyond those contemplated by the statute, and may do so through the implementation of regulations.  Such regulations "prescribed by a government administrator are binding upon him as well as the citizen, and . . . this principle holds even when the administrative action under review is discretionary in nature."  *Service v. Dulles*, 354 U.S. 363, 372 (1957); *see also Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("[F]ederal agencies [must] follow their own rules, even gratuitous

procedural rules that limit otherwise discretionary actions."). Even assuming that the statute does not unambiguously require exclusivity (and thus gives MARAD discretion in this respect), the regulations unambiguously *do* require exclusivity, and MARAD (like APL) is bound by this regulatory command.

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), demonstrates this fundamental principle of administrative law. There, a statute gave the Attorney General discretion to suspend the deportation of certain aliens not ineligible for naturalization. *See id.* at 262–63. Pursuant to that authority, the Attorney General had delegated via regulations his discretion to suspend deportation to three administrative bodies—a hearing officer, the Commissioner of Immigration, and the Board of Appeals. *See id.* at 265–66 (citing 8 C.F.R. § 90.3(c) (1949)). The Attorney General's ability to review a decision issued by those bodies was limited by regulation to three discrete procedural mechanisms: whenever the Attorney General directed the Board to refer a case to him, whenever the Board referred a case to the Attorney General of its own accord, and whenever the Commissioner requested a case be referred to the Attorney General and the Board agreed. *Id.* at 266 (quoting 8 C.F.R. § 90.12 (1949)). Notwithstanding that self-imposed structure of review, the Attorney General had published a list of "unsavory characters," including the petitioner, whom he wanted deported, and the Board of Appeals had in fact declined to exercise its discretion to suspend deportation and ordered the petitioner deported upon recommendation by the government's attorney. *See id.* at 267 (internal quotation marks omitted). The Court held that the Attorney General's list violated the regulations—although the Attorney General was vested with discretion to suspend (or not suspend) an alien's deportation, the Attorney General had validly delegated that discretionary power via regulation, and "as long as the regulations remain operative,

the Attorney General denies himself the right to sidestep the Board or dictate its decision in any matter." *Id.*

So, too, here.  Even were Defendants correct that the statute *permits* MARAD to accept into the MSP vessels that do not operate or are not intended to operate exclusively in foreign commerce or permitted domestic trade under a registry endorsement, MARAD has promulgated regulations restricting itself from doing so.  "Properly promulgated, substantive agency regulations have the force and effect of law" (*Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (internal quotation marks omitted)), and thus an administrative decision in violation of validly promulgated regulations is "not in accordance with law," within the meaning of the APA (5 U.S.C. § 706(2)(A)).  MARAD is no less bound by its own regulations than it is by the MSA, or even by the Constitution.

Apparently recognizing the legal force of the regulations, APL instead argues that the regulations do not actually mean what they say.  (APL Br. 27.)  Diverting attention from the straightforward provisions cited by Matson, APL engages in a meandering tour of unrelated regulatory provisions that, APL claims, "show that the regulations mirror—rather than contradict—the Act's distinction between eligibility requirements and contractual conditions." (*Id.*)  APL contrasts 46 C.F.R. § 296.31(d)(2)—which relates to the terms of MSP operating agreements and uses the term "exclusively" with respect to vessels' operation in foreign commerce—with 46 C.F.R. § 296.11(a)(2)—which describes an eligible vessel as one that it "is operated or . . . will be operated to provide transportation in the foreign commerce."  But APL misses the last step in the analysis—what do the regulations mean when they say a vessel must be operated in "foreign commerce"?  That question is answered, as noted above, by 46 C.F.R. § 296.2, which defines "[f]oreign [c]ommerce" to mean freight service "operated exclusively in the foreign

trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C.
[§] 12111."

APL's argument that the regulatory definition of foreign commerce does not apply would render the provision entirely superfluous.  Indeed, the regulations refer to "foreign commerce" only *three* times—once at Section 296.11(a)(2), once at Section § 296.31(d)(2) (where it is already qualified by the word "exclusively"), and once at Section 296.41 (where it is again qualified by the word "exclusively").  APL's misreading would mean that the regulatory definition does not apply in one out of the only three times the term is used in the regulations, and would not apply in the single instance where the definition's reference to "exclusiv[e]" trade in foreign commerce would actually add meaning.  This is the prototypical situation for application of "one of the most basic interpretive canons" that a law "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley*, 556 U.S. at 314 (internal quotation marks omitted).

MARAD has promulgated valid regulations that confine its discretion to approve vessels for inclusion in the MSP and that preclude its argument—advanced for the first time in this Court—that the statute contemplates "two different foreign commerce requirements."  (MARAD Br. 15.)  Having prescribed such regulations, MARAD may not now avoid or disavow their legal force for purposes of litigation.  In the event the statutory language is ambiguous—or even if it unambiguously favors Defendants' interpretation—the regulatory language nonetheless limits MARAD's authority.

## C.   The New Vessels Do Not Engage Exclusively In Foreign Commerce Or Domestic Trade Allowed Under A Registry Endorsement

Because operation exclusively in foreign commerce or permitted domestic trade is a threshold eligibility requirement, the New Vessels were not eligible for inclusion in the MSP at

the time of the awards by virtue of their intended and actual operation in domestic trade to and from Saipan.  Trade between Saipan and the continental United States—whether direct or transshipped through a foreign port—is domestic under the MSA.  *See* 46 U.S.C. § 53101(10) (defining "United States" to include "the Northern Mariana Islands").  The only domestic trade permitted under Section 53105(a)(1)(A) is that "allowed under a registry endorsement issued under section 12111 of [] title [46]."  Section 12111 lists a limited number of territories for which a registry endorsement may be obtained, and the Northern Mariana Islands are not among them.  The New Vessels are therefore engaged—and have always been engaged—in impermissible domestic trade, and were therefore ineligible for inclusion in the MSP at the time MARAD approved them. Defendants' efforts to countermand this straightforward argument are without merit.

*First*, both MARAD and APL suggest that the evidence before the agency did not show that the APL GUAM and the APL SAIPAN would be engaged in impermissible trade between Saipan and the continental United States.  (MARAD Br. 21–25; APL Br. 24–26.)  That is incorrect. On October 20, 2015, *before* MARAD issued its letter approving the APL GUAM, APL forwarded to MARAD an article describing the APL GUAM's anticipated service, including to Saipan. AR300–02.  APL claims that "Matson cannot identify any evidence regarding Saipan that was before MARAD when the agency approved the *APL GUAM*" (APL Br. 25), and MARAD likewise states that "absent from the record before the agency when making the APL GUAM determination is any discussion of Saipan" (MARAD Br. 22).[2]  That plainly is false—MARAD had in its possession materials describing the APL GUAM's anticipated service to Saipan.  MARAD

---

[2]   MARAD misleadingly cites to a factually accurate statement in Matson's opening brief that APL did not advise MARAD in its December 4, 2014 letter that either of the proposed "replacement" vessels would transport cargo originating in the continental United States to Saipan.  (Matson Br. 7.)  That of course says nothing about subsequent representations by APL.

apparently believes that its decision not to reference these materials "in the approval documents" (*id.* at 23) somehow insulates those materials from scrutiny by this Court, but the D.C. Circuit has squarely rejected that approach, explaining that "[i]f a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243 (D.C. Cir. 2008) (Tatel, J., concurring) ("[A]n agency must make the '*whole* record' available, especially where, as here, the undisclosed portions might very well undercut the agency's ultimate decision.").

MARAD and APL are therefore reduced to arguing that the evidence with respect to the New Vessels' anticipated service is too vague to support Matson's challenge, because the record does not specify whether the *vessels* would travel between Saipan and the continental United States.  (MARAD Br. 23–24; APL Br. 25.)  That argument ignores the well-settled rule regarding transshipment, which provides that a carrier may not evade the application of coastwise laws simply by "transshipping" cargo through a foreign port.  *See Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).  In other words, if a vessel carries cargo from a foreign port to a domestic port, it may still be engaged in domestic or coastwise trade if that cargo originated at a domestic port before being dropped off at the intermediate foreign port.  This concept is reflected in the MSA regulations, albeit in a different context, which provide that "[f]oreign [c]ommerce" under the MSP includes trade "where the origination point or the destination port of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country." 46 C.F.R. § 296.2.  The relevant question is thus not whether the New Vessels ship cargo *directly* from the continental United States to Saipan, but rather

24

whether they deliver cargo to Saipan originating in the United States, or receive cargo in Saipan destined for the United States.

The administrative record reflects that APL has always intended to and does in fact operate both the APL GUAM and the APL SAIPAN in such domestic trade.  When APL first notified MARAD that it intended to seek approval of MSP replacement vessels, it told MARAD that at least one of the vessels would be operated "in a to-be-established service in trans-Pacific trade calling Guam that would be operated in conjunction with APL's CC3 service between the US Pacific Coast and China, Japan and Korea."  AR2.  APL later clarified its "intention . . . to expand its CC3 trans-Pacific US-flag service to add a reflagged vessel of approximately 1000 TEU capacity that would provide fortnightly service between Yokohama and Guam.  The service could carry *U.S. mainland cargo* moving to Guam, U.S. mainland cargo moving beyond Guam to Palau, Micronesia, the Marshall Islands and New Guinea."  AR7 (emphasis added).  The need for this service, APL said, was that there currently was only one carrier "providing service to Guam from the U.S. mainland."  *Id.*  APL thus made clear that the New Vessels would carry U.S. cargo to and from Guam and the surrounding island territories—the fact that this cargo would be transshipped through foreign ports is, as described above, of no import.

APL later clarified that Saipan was among those island territories being serviced by this new route.  In an article regarding the anticipated route of the APL GUAM forwarded to MARAD on October 20, APL stated its intention to operate the APL GUAM in "its inaugural service to Guam *and Saipan* on the Guam Saipan Express."  AR300 (emphasis added).  That service, APL said, would "let Guam *and Saipan* shippers 'tap into APL's global service network for freight to and from many parts of the world.'"  AR301 (emphasis added).   And when APL sought approval for the APL SAIPAN (which, of course, has "Saipan" in its name), it represented to MARAD that

25

the APL SAIPAN "would be operated alongside the APL GUAM in APL's existing US-flag service of Guam *and Saipan* via Korea" (AR116 (emphasis added)), and reiterated that "prior to APL's entry into the market [via the APL GUAM], . . . there was only a single container operator—Matson—serving Guam from the US mainland" (AR118). Other APL marketing materials—released prior to MARAD's approval of the APL GUAM—stated that the Guam Saipan Express would "giv[e] Guam and Saipan shippers an alternative for shipping from the U.S. mainland" and would "facilitat[e] cargo shipments from the U.S. mainland." AR371.

Perhaps most tellingly, APL has at no point denied in this proceeding or in the petition for review in the D.C. Circuit that the New Vessels carry cargo originating from or destined for the United States in their route to Saipan. There is thus no serious dispute that the New Vessels currently operate and have always operated in domestic trade between the continental United States and Saipan. Indeed, that is the whole commercial purpose of APL's "Guam Saipan Express" service—to provide a trade route between the west coast of the United States and its island territories. APL itself admits this in its marketing materials, which include this map:



AR270.

Even were it true, however, that MARAD failed to consider the New Vessels' trade to Saipan because the record was unclear on that point, the proper course would not be to dismiss this case, but rather to "remand[] [the case] to the agency for further action consistent with the correct legal standards." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (internal quotation marks omitted).  At the very least, remand to the agency is appropriate so that MARAD may adequately consider whether the New Vessels' carriage to and from Saipan make them ineligible for the MSP—a consideration that MARAD concededly never has undertaken.  It is now undisputed that the New Vessels have carried goods between Saipan and the mainland United States since the approvals were granted, and (to the extent the subsidy awards are not simply vacated) MARAD should be required to determine their eligibility for the subsidized fleet as well as any reductions in the previously paid subsidies required by their carriage to and from Saipan.

27

*Second*, while MARAD argues that trade involving Saipan is not "coastwise" within the meaning of the Jones Act (MARAD Br. 25–29), it does not dispute that if the New Vessels are engaged in trade between Saipan and the continental United States, such trade would be impermissible domestic trade not conducted pursuant to a registry endorsement under Section 12111, or that such trade would be "coastwise" as defined in the MSA.  It did not dispute this conclusion on appeal either.  Appellate MARAD Br. at 37–42.  It therefore has conceded that argument.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

APL, however, has doubled down on its vessels' impermissible trade to Saipan, arguing that a Coast Guard regulation permits it to engage in trade to and from Saipan.  (APL Br. 31 (citing 46 C.F.R. § 67.17).)  It bears noting at the outset that this "controlling regulation" (APL Br. 31) was not cited anywhere in the administrative record, has never been cited by MARAD in any of the judicial proceedings (whether here or in the D.C. Circuit), and was cited by APL only in passing in its appellate briefing (*see* Brief of Intervenors APL Marine Services, Ltd., and APL Maritime, Ltd. at 7 & n.4, *Matson*, 895 F.3d 799 (No. 17-1144); Supplemental Brief of Intervenors APL Marine Services, Ltd., and APL Maritime, Ltd. at 11–12 n.7, *Matson*, 895 F.3d 799 (No. 17-1144)).  The notion that this regulation is the master key to this case is belied by this procedural history.  Moreover, MARAD's unlawful awards to APL cannot be justified on grounds not raised in the administrative proceedings (*see State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 50), particularly when not even MARAD endorses APL's reading of the regulation.

In any event, APL is wrong that this regulation overrides the express statutory limitation in Section 53105(a)(1)(A).  Section 53105(a)(1)(A) permits only a limited exception for "domestic

trade allowed under a registry endorsement issued under section 12111 of this title."  46 U.S.C. § 53105(a)(1)(A).  Section 12111(b) authorizes a vessel with a registry endorsement to "engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef."  46 U.S.C. § 12111(b).  Neither Saipan nor the Northern Mariana Islands are included in that list.  That is the end of the matter—Section 53105(a)(1)(A) cross-references Section 12111, and nowhere does Section 12111 reference carriage to Saipan.  As APL itself points out (APL Br. 34–35), 46 C.F.R. § 67.17 was on the books long before Congress enacted the MSA, and thus had Congress intended to incorporate that regulation into the exceptions provided for under Section 53105(a)(1)(A), it could have done so (*see Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (holding that courts "presume that Congress is aware of existing law when it passes legislation" (internal quotation marks omitted))).[3]  The Coast Guard may have authority to implement regulations governing the operation of vessels in the coastwise trade, but it does not have authority to alter the text of the MSA.

Unable to support its position by reference to the statutory text, APL instead turns to the underlying purpose of the regulation, asking if "a registry endorsement does *not* authorize trade to and from [Saipan], the question becomes—what does?"  (APL Br. 33.)  But the structure and coherence of the Coast Guard's regulations regarding coastwise endorsements, registry endorsements, and fishing endorsements are issues far beyond the scope of this case.  What matters in *this* case is whether the New Vessels operate in domestic trade pursuant to a registry endorsement under Section 12111.  As the plain text of that statute makes clear, the New Vessels do not, and that alone is sufficient to resolve the question.  *See King*, 135 S. Ct. at 2489.

---

[3]   Contrary to APL's speculation (APL Br. 32–33), Matson does not seek to vacate or hold unlawful 46 C.F.R. § 67.17.

Even if APL's interpretation of the Coast Guard regulation were correct and relevant, however, the New Vessels' trade between Saipan and the continental United States is "coastwise" trade within the meaning of the Jones Act, and therefore is squarely prohibited by Section 53105(a)(1)(A).  While trade with the Northern Mariana Islands is generally exempt from the coastwise laws, Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "CNMI") provides that "[t]he laws of the United States regarding coastal shipments . . . will apply to the activities of the United States Government *and its contractors* in the Northern Mariana Islands."  48 U.S.C. § 1801 note (emphasis added) ("Northern Mariana Covenant").  APL, through its operation of the New Vessels, plainly is a "contractor[]" of the United States—it has contracted with the Department of Transportation to provide vessels that operate in foreign commerce, specifically vessels that operate in trade to and from Saipan (among other places).  And APL receives substantial compensation—$5,000,000 annually for *each* of the New Vessels (AR94, 382)—to operate those vessels in trade to and from Saipan.  That is the very definition of a contractor, and in fact, the MSA uses the term "contractor" in multiple places to refer to participants in the MSP.  *See* 46 U.S.C. § 53103(b)(1); *id.* § 53104(c)(1); *id.* § 53106(a)(1); *id.* § 53107(a); *see also id.* § 53101(2) (defining "contractor" to mean "an owner or operator of a vessel that enters into an operating agreement for the vessel with the Secretary under section 53103").

Contrary to the arguments of MARAD and APL (MARAD Br. 26–29; APL Br. 37–38), Matson does not claim that all vessels operated by a party to a contract with the government are subject to the coastwise laws when operating in trade to or from Saipan.  Rather, the New Vessels fall within the exception to the CNMI because they operate in Saipan *pursuant to* their operating agreements with the Department of Transportation.  APL has contracted with the government to

30

operate its vessels—whether carrying government cargo or not—and when those vessels operate in trade to or from Saipan, they are doing just that.

APL relies on dictionary definitions of "contractor" to support its argument (APL Br. 37), but those definitions merely reinforce that APL is a contractor when it operates the New Vessels in trade to or from Saipan.  APL skips right over the *first* definition of "contractor" in Black's Law Dictionary:  "A party to a contract."  *Contractor*, Black's Law Dictionary (10th ed. 2014); *see also U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc.*, 797 F.3d 116, 124 (1st Cir. 2015) ("'Anyone with a contract' is surely a reasonable definition of the word 'contractor' . . . .").  APL obviously satisfies that definition by virtue of the operating agreements with the Department of Transportation.  But even the definition APL does cite supports application of the coastwise laws: "one who contracts to do work for or supply goods to another."  *Contractor*, Black's Law Dictionary, *supra*.  APL has plainly "contract[ed] to do work for" the government—it is obliged under the operating agreements to "operate the Vessel, or cause the Vessel to be operated, for a minimum of three-hundred twenty (320) days per fiscal year exclusively in the United States foreign commerce" (AR380), must "carry two U.S. Merchant Marine Academy cadets upon request of the Administrator" (AR381), and must maintain "the documentation of the Vessel . . . until the date the Agreement would have terminated according to its terms" (*id.*).  And by virtue of their inclusion in the MSP fleet, the New Vessels are also available to the Department of Defense during times of national emergency.  AR385.

APL protests that "[j]oining the MSP is not like agreeing to a procurement contract" because "[a]n MSP vessel is not obliged to carry government cargo or to provide services to the government under normal conditions."  (APL Br. 38.)  Nothing in the CNMI refers to the carriage of government cargo, though, and limiting "contractors" to those who carry government cargo is

simply self-serving in this context.  What APL cannot deny is that it operates the APL GUAM and the APL SAIPAN pursuant to contracts with the government, that those vessels engage in trade to and from Saipan, and they engage in that trade in a (failed) effort to comply with their obligations under the operating agreements to operate in foreign commerce or permitted domestic trade.  APL is a contractor by virtue of its operation of the New Vessels pursuant to the operating agreements, and it operates those vessels in trade to and from Saipan in furtherance of that contract.  The coastwise laws apply.

APL—but not MARAD—next argues that even if it is a "contractor" within the meaning of the CNMI, the exception in the CNMI for government contractors makes applicable only the "laws . . . regarding coastal shipments," which, APL says, is a concept distinct from the coastwise laws embodied in the Jones Act.  (APL Br. 39 (internal quotation marks omitted).)  That interpretation is not grounded in any statutory or regulatory text, but rather derives entirely from what APL says is "the ordinary meaning of 'coastal.'"  (*Id.*)  The text of the CNMI compels a different result.  Section 503 of the CNMI sets forth certain provisions of the law that "will not apply to the Northern Mariana Islands," and includes in that list "*except as otherwise provided in subsection (b) of Section 502*, the coastwise laws of the United States."  Northern Mariana Covenant § 503(b) (emphasis added).  Section 502(b), in turn, provides that "[t]he laws *of the United States* regarding coastal shipments . . . will apply to the activities of the United States Government and its contractors." *Id.* § 502(b) (emphasis added).  The CNMI thus clearly explains that the "coastwise laws of the United States" will not apply to the Northern Mariana Islands "except as otherwise provided" in the very section APL now claims has nothing to do with the coastwise laws.  APL's reading is directly contrary to the text of the CNMI.

Relegated to a footnote in APL's brief is a decision by the U.S. Customs Service rejecting APL's reading and concluding that Sections 502(b) and 503(a) together make the coastwise laws codified in the Jones Act applicable to government contractors operating in the Northern Mariana Islands.  (APL Br. 40–41 n.20 (citing *Vessels: The Application of the Coastwise Laws to the Shipment of Food Commodities by an Agency of the U.S. Government*, 15 Cust. B. & Dec. 1082 (1981)).  APL calls the U.S. Customs Service's analysis "cursory" (*id.*), but in fact the agency engaged in a thorough review of the statutory text (which APL ignores) and of the legislative history (also unmentioned by APL).  *See The Application of the Coastwise Laws to the Shipment of Food Commodities*, 15 Cust. B. & Dec. at 1083–84.  In particular, the agency pointed to legislative history emphasizing that the exception in Section 502(b) was important because the coastwise laws "will be generally inapplicable to the Northern Mariana Islands until the Congress undertakes to fully apply these laws to the Northern Mariana Islands as provided in section 503 (b) and (c)."  *Id.* at 1084 (internal quotation marks omitted) (quoting S. Rep. No. 94-433 (1975)).  And entirely unmentioned by APL is the fact that one of the administrative decisions *APL* cites in support of its discredited argument regarding 46 C.F.R. § 67.17 adopts this same reading.  *See Coastwise Trade; Guam*, HQ112917, 1993 WL 563563, at *2 (Oct. 19, 1993) ("In regard to the carriage of passengers or merchandise between the United States and the Commonwealth of the Northern Mariana Islands (CNMI), 502(b) and 503(b) of the [CNMI] provide in part that except for activities of the U.S. Government and its contractors in the CNMI, the coastwise laws of the United States do not apply to the CNMI.") (cited at APL Br. 31).

APL argues that its reading is supported by an Executive Order from the Governor of the Northern Marianas defining "coastal shipping" as the equivalent of "inter-island shipping."  (APL Br. 40 (citing Exec. Order No. 6-A, ¶ 4, 1 N. Mar. I. Reg. 13, 14 (July 13, 1978)).  A territorial

governor, however, has no authority to interpret federal statutes, and certainly no authority to alter their plain text.  The cited order is not binding on this Court.  And, in any event, the primary purpose of the section APL cites was not to define "coastal shipping," but to define "inter-island shipping."  *See* 1 N. Mar. I. Reg. at 14 ("Inter-Island Shipping is defined as the carriage of goods, and/or passenger, for hire or reward by sea from ports within the Northern Mariana Islands to other ports within the Mariana Islands.").  More critically, though, reading the Executive Order in tandem with the CNMI (signed into law two years earlier) makes no sense.  APL does not explain why the CNMI would need to include a specific section making the Northern Mariana Islands' rules with respect to Inter-Island Shipping applicable to government contractors.  Indeed, the bizarre implication of APL's reading is that the Northern Mariana Islands' Inter-Island Shipping rules apply *only* to government contractors, and not any other shipping operator in the Northern Mariana Islands, an "odd result" to say the least.  *Green*, 490 U.S. at 509.  Moreover, Section 502(b) of the CNMI makes applicable to government contractors the "laws of the United States" regarding coastal shipments, not the laws (or in this case, regulations) of the Northern Mariana Islands.  Northern Mariana Covenant § 502(b).  It is unsurprising that MARAD has declined to endorse this reading of the CNMI either here or in the prior petition—it simply makes no sense.

* * *

The text, structure, and purpose of the statute are clear, and the implementing regulations—promulgated by MARAD itself—direct the same result:  A vessel is not *eligible* to participate in the MSP if it does not operate or intend to operate *exclusively* in foreign commerce or mixed foreign commerce and domestic trade conducted pursuant to a registry endorsement under Section 12111.  The New Vessels engage, and have always engaged, in impermissible, domestic, and

coastwise trade to and from Saipan.  The administrative record is clear that MARAD's awards approving the New Vessels for inclusion in the MSP were contrary to law.

### III.    Matson Is Entitled To An Adequate Remedy

Because MARAD violated the APA in approving the New Vessels for participation in the MSP, Matson is entitled to an adequate remedy.

*First*, because MARAD's approval of the New Vessels for inclusion in the MSP was arbitrary and capricious, or contrary to law, Matson is entitled under the APA to vacatur of those awards:  "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Courts have therefore not hesitated to vacate agency action where it was rendered in violation of the law.  *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014); *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 802 (D.C. Cir. 1983).  Even MARAD agrees that vacatur is the appropriate remedy, if any, here.  (MARAD Br. 29.)

*Second*, Matson's claim for injunctive relief would ripen if, and only if, MARAD represents or intimates that it intends to defy this Court's declaratory ruling in future administrative proceedings.  MARAD appears to claim that injunctive relief is categorically unavailable in APA proceedings.  (MARAD Br. 29.)  That position is contradicted by the plain text of the APA, which provides that in an APA proceeding, "any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."  5 U.S.C. § 702.  That provision would be nonsensical were injunctive relief unavailable in APA proceedings.  And Section 702 further provides that an APA action may be brought "seeking relief other than money damages" (*id.*), confirming the broad authority of a court reviewing agency action to fashion equitable relief (*cf. Hecht Co. v. Bowles*, 321 U.S. 321, 329

(1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.")).

If prospective relief were required, the Court would have to take into account the National Defense Authorization Act for Fiscal Year 2018 ("NDAA"), Pub. L. No. 115-91, 131 Stat. 1283 (2017), which amended 46 U.S.C. § 53105 to prohibit vessels participating in the MSP from engaging in *any* domestic trade—providing further confirmation, if any were needed, that vessels are eligible for the MSP fleet only if they engage *exclusively* in foreign commerce.  Because the New Vessels engage in domestic trade to and from Saipan, they are not eligible under Section 53105(f) to be approved as replacement vessels.  Regardless of whether the NDAA is read as narrowly as Defendants suggest (MARAD Br. 29–30; APL Br. 41–42), they may not be approved for inclusion in the MSP under subsection (f) or under amended Section 53105(a)(2).  If MARAD nonetheless evinces an attempt to do so, injunctive relief would be appropriate to spare Matson and this Court the expenses and inefficiencies of yet another protracted legal battle.

APL raises the specter of "unclean hands," arguing that Matson's request for injunctive relief is "tainted" because it purportedly has engaged in impermissible coastwise trade with Saipan. (APL Br. 42.)  As noted at the outset, these attacks on Matson have no place in this APA challenge, which is limited to MARAD's approvals of MSP subsidies for the New Vessels.  And APL—as an intervenor—lacks standing to assert an unclean hands defense because the requested injunction would run against MARAD, not APL.

It also bears mentioning that the conduct at the heart of APL's accusation of "unclean hands" is Matson's transportation via the *Mana* of emergency disaster relief to aid the victims in Saipan of Super Typhoon Yutu in 2018.  (*See* Abrams Decl. Ex. 8 (Dkt. No. 21-11).)  In addition to equipment from the Federal Emergency Management Agency, Matson also shipped bottled

36

water and ice that it had donated as part of its $125,000 pledge to assist with emergency relief efforts. (*See id.*)  APL cites no other evidence that Matson shipped government goods to or from Saipan on the *Mana*, and no evidence at all that Matson has ever operated the *Papa Mau* in carriage to or from Saipan pursuant to a government contract.

In any event, the doctrine of unclean hands is limited to those situations in which a party seeking relief has "acted fraudulently, or [] by deceit or any unfair means has gained an advantage." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (internal quotation marks omitted).  And the doctrine applies "only where some unconscionable act of one coming for relief has *immediate and necessary* relation to the equity that he seeks in respect of the matter in litigation."  *Id.* (emphasis added); *see also Agee v. Cent. Intelligence Agency*, 500 F. Supp. 506, 508 (D.D.C. 1980) ("[I]t is necessary that the wrongs complained of have a close nexus to the cause of action.").  Here, the relief Matson seeks is an order setting aside the challenged subsidy awards, together with any equitable decree that may be required to ensure that the agency does not continue to violate the law in administering the MSP.  None of Matson's own vessels receives MSP subsidies.  (Separate Statement of Undisputed Material Fact ¶ 5 (Dkt. No. 20-1); Resp. to Matson's Separate Statement of Undisputed Material Facts ¶ 5 (Dkt. No. 21-2); Fed. Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 5 (Dkt. No. 23-2).)  Accordingly, it is entirely irrelevant to this proceeding whether the vessels *Matson* operates in the Saipan trade fly a domestic or foreign flag.  (*See* APL's Counter-Statement of Undisputed Material Facts ¶¶ 1–6 (Dkt. No. 21-2).)  MARAD's actions in approving the subsidies must be reviewed on their own terms, and the Court has ample authority to fashion a remedy tailored to the violations that are apparent in the administrative record.

*Third*, as an alternative remedy, Matson requests that this Court order MARAD to make the pro rata reductions the statute commands for APL's operation of the New Vessels in impermissible domestic trade.  Both MARAD and APL object that this Court lacks jurisdiction to order this alternative relief, claiming that a district court cannot order an agency to initiate enforcement proceedings.  (MARAD Br. 30–33; APL Br. 43 (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).)  Matson has not asked this Court to compel MARAD to "take an enforcement action against APL."  (MARAD Br. 30.)  Rather, Matson seeks an order compelling MARAD to do what the statute *requires* it to do—withhold a pro rata portion of the payments APL is otherwise (allegedly) entitled to under the operating agreements.  No enforcement action need be brought by MARAD.

Nor does Matson challenge MARAD's "post-award administration of a government contract."  (APL Br. 43 (alteration and internal quotation marks omitted).)  The statute provides MARAD with *no* discretion to refuse to reduce payments to contractors operating in impermissible domestic trade—the Secretary "*shall* make a pro rata reduction payment for each day less than 320 in a fiscal year that the vessel is not operated in accordance with [Section 53105(a)(1)]."  46 U.S.C. § 53106(d)(3) (emphasis added).  Recognizing this mandatory language, MARAD falls back on its argument that the "existing evidence in the administrative record" does not show that the New Vessels are operating in impermissible domestic trade.  (MARAD Br. 31.)  That argument has already been refuted above.  Moreover, MARAD cannot evade judicial scrutiny of its inaction simply by declining to create an adequate administrative record.

Remarkably, MARAD argues that there is no reviewable final agency action because "the record does not reflect that MARAD has made a final determination about whether APL has complied with the operating agreements."  (MARAD Br. 32–33.)  This approach, if adopted, would

insulate MARAD's noncompliance with the law from any judicial scrutiny—MARAD has made clear its position in this case that it believes APL has not violated the terms of the operating agreements, and APL of course would never institute agency action to evaluate its own compliance. MARAD essentially claims that its decision not to follow the statutory mandate to make pro rata reductions is unassailable, with no party having the ability to enforce MARAD's statutory obligations.

MARAD cites 46 C.F.R. § 296.41(c)(3) for the proposition that "MARAD must find 'good cause' to withhold such payments." (MARAD Br. 33.) That is false. Section 296.41, like the statute, obliges MARAD to withhold a pro rata portion of subsidy payments if the vessel is operated for less than 320 days exclusively in foreign commerce. *See* 46 C.F.R. § 296.41(b)(1). MARAD may separately and for "good cause" withhold funds otherwise payable if the vessel fails to comply with 46 C.F.R. § 296.31(d)'s requirements.

In short, there is nothing "tentative" or "interlocutory" about MARAD's monthly, unreduced payments to APL for its continued operation of vessels in violation of the plain terms of the MSA. *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (internal quotation marks omitted). To the contrary, MARAD agreed before the D.C. Circuit that the 2015 and 2016 awards were final agency actions. *See generally* Supplemental Appellate MARAD Br. The harm to Matson is real and ongoing, and indeed, Matson has introduced evidence— uncontested by MARAD or APL—that the New Vessels compete with and have caused harm to Matson, whose unsubsidized vessels ply the same routes. (Separate Statement of Undisputed Material Fact ¶¶ 4–14 (Dkt. No. 20-1); Resp. to Matson's Separate Statement of Undisputed Material Facts ¶¶ 4–14 (Dkt. No. 21-2); Fed. Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶¶ 4–14 (Dkt. No. 23-2).) This Court is empowered to afford effective relief.

## CONCLUSION

For the foregoing reasons, the Court should grant Matson's motion for summary judgment and set aside as unlawful MARAD's awards of subsidies to the New Vessels.  In the alternative, the Court should declare that MARAD must make pro rata reductions from its subsidy payments to APL as required by law.

Respectfully submitted.

Dated:    May 10, 2019

/s/ Mark A. Perry
Mark A. Perry, DC Bar No. 438203
MPerry@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Civil Rule 5.3, I hereby certify that, on May 10, 2019, I caused to be served on Defendants the foregoing Combined Reply in Support of Motion for Summary Judgment and Opposition to Motion to Dismiss and Cross-Motions for Summary Judgment and supporting materials via CM/ECF.


Dated:    May 10, 2019                            */s/ Mark A. Perry*
                                                  Mark A. Perry, DC Bar No. 438203