**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MATSON NAVIGATION COMPANY, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*,<br><br>and<br><br>APL MARINE SERVICES, LTD., *et al.*,<br><br>*Intervenor-Defendants*. | Civil Action No. 18-2751 (RDM) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Matson Navigation Company, Inc. ("Matson") seeks review of Defendant Maritime Administration's ("MARAD") decisions approving the replacement of two vessels that operated under the Maritime Security Program ("MSP") with two other vessels—the APL Guam and the APL Saipan—operated by Intervenor-Defendants APL Marine Services, Ltd. and APL Maritime, Ltd. (together "APL"). Dkt. 1. (Compl.). Matson moves for summary judgment, arguing that an MSP contractor may replace a vessel operating under an MSP agreement with another vessel only if the replacement vessel "operate[s] exclusively in foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [§] 12111 of [Title 42]." 46 U.S.C. § 53105(a); Dkt. 20 at 16; *see also* 46 U.S.C. § 53105(f). It asserts that MARAD's decisions permitting APL to replace existing MSP vessels with the APL Guam and the APL Saipan, which Matson asserts do not so operate, were therefore

arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 *et seq.*, and were otherwise contrary to law or unsupported by

substantial evidence in the administrative record.  Dkt. 1 at 23–28 (Compl. ¶¶ 121–54); Dkt. 20

at 24–25.

      Defendant MARAD responds with a partial motion to dismiss and a cross-motion for

summary judgment, Dkt. 24, and Intervenor-Defendant APL also cross-moves for summary

judgment, Dkt. 21.  MARAD first argues that this Court lacks subject-matter jurisdiction over

MARAD's 2015 determination concerning the APL Guam because that decision was made, in

part, pursuant to 46 U.S.C. § 50501, and the courts of appeals have exclusive jurisdiction under

the Hobbs Act, 28 U.S.C. § 2342(3)(A), to review orders issued pursuant to § 50501.  Dkt. 24-1

at 16–18.  Second, MARAD and APL argue MARAD may approve the replacement of an MSP

vessel with another vessel, so long as the new vessel is "operated . . . in providing transportation

in foreign commerce," 46 U.S.C. § 53102(b)(1), even if the vessel also operates in domestic

trade.  Dkt. 24-1 at 18–27.  Because all agree that the APL Guam and the APL Saipan operate at

least in part in foreign commerce, Defendants contend that MARAD correctly determined that

the vessels were eligible for participation in the MSP as replacement vessels.  *Id.*

      First, the Court concludes that it has jurisdiction to consider only Plaintiff's challenge to

the 2016 eligibility determination for the APL Saipan.  Because MARAD's 2015 eligibility

determination for the APL Guam turned, in part, on 46 U.S.C. § 50501, exclusive jurisdiction

over that determination is vested in the courts of appeals, and this Court is without jurisdiction to

review that order.  Second, the Court concludes that it cannot discern the basis for MARAD's

2016 determination respecting the APL Saipan and, in particular, cannot discern whether the

agency (1) construed the statute to permit an MSP contractor to replace an MSP vessel with

another vessel, so long as that vessel operates at least in part in foreign commerce; (2) failed to consider the fact that the APL Saipan might not operate exclusively in foreign or mixed foreign and domestic trade due to its service to Saipan; or (3) concluded that the APL Saipan operates under a registry endorsement under 46 U.S.C. § 12111 that permits it to engage in trade between Saipan and the coastal United States.  As a result, the agency either completely failed to explain its reasons for approving the replacement or entirely failed to consider an important aspect of the question before it and thus failed to comply with the APA.  The Court will, accordingly, remand the matter to MARAD so that the agency can address in the first instance the important questions of statutory interpretation presented by this case and can set forth its reasoning in a manner that will permit judicial review, if appropriate.  Finally, the Court will provide the parties the opportunity to provide additional factual and legal submissions addressing whether the remand should be with or without vacatur.

## I.  BACKGROUND

### A.      The Parties

Plaintiff Matson provides ocean freight carrier services from the U.S. west coast to various locations including Guam.  AR 6, 179.  APL is another shipping company that operates vessels in commerce between the U.S. mainland, Guam, and Saipan, among other locations.  AR 83, 116, 179, 195.  APL presently has nine vessels enrolled in the Maritime Security Fleet.  AR 4, 60–61.  MARAD is the agency responsible for the administration of the Maritime Security Program, including the approval of applications to replace vessels operating under MSP agreements with Secretary of Transportation.  *See* 49 C.F.R. § 1.93(a).

**B.      Maritime Security Program (MSP)**

In the Maritime Security Act of 1996, Pub. L. No. 104-239, 110 Stat. 3118, Congress

provided for the establishment by "the Secretary of Transportation, in consultation with the

Secretary of Defense" of "a fleet of active, commercially viable, militarily useful, privately

owned vessels to meet national defense and other security requirements and maintain a United

States presence in international commercial shipping." 46 U.S.C. § 53102(a). This Maritime

Security Fleet "consist[s] of privately owned, United States-documented vessels for which there

are in effect operating agreements." *Id.* Pursuant to this authority, the Secretary established the

Maritime Security Program, *see* 46 U.S.C. §§ 53101–53111, and delegated its administration to

the Maritime Administrator, who heads MARAD. *See* 49 C.F.R. § 1.93(a). Contractors must

enter into "operating agreements" with MARAD that cover vessels subject to the Program. *See*

46 C.F.R. § 296.2 (defining "MSP [o]perating [a]greement" as "the assistance agreement

between a Contractor and MARAD that provides for MSP payments"). Operating agreements

are "effective only for 1 fiscal year" but are "renewable." 46 U.S.C. § 53104(a). The Secretary

makes fixed payments to the contractors under the operating agreements. *See* 46 U.S.C. §

53106(a)(1)(A) (setting the annual payment for each vessel for fiscal years 2018, 2019, and 2020

at $5,000,000).

"A vessel is eligible to be included in the [Maritime Security] Fleet if," among other

things, it "is operated . . . in providing transportation in foreign commerce." 46 U.S.C.

§ 53102(b)(2). Before the passage of the National Defense Authorization Act for Fiscal Year

2018 ("NDAA"), Pub. L. No. 115-91 (2017), 131 Stat. 123 (codified at 46 U.S.C.

§ 35105(a)(2)), another section of the statute, 46 U.S.C. § 53105(a), provided that "[a]n

operating agreement under this chapter shall require that . . . the vessel . . . shall be operated

exclusively in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [§] 12111 of [the] title; and . . . shall not otherwise be operated in coastwise trade."  46 U.S.C. § 53105(a).  "[R]egistry endorsements" are available for vessels that meet certain eligibility conditions.  *See id.* § 12111(a) (citing *id.* § 12103 (listing eligibility requirements)).  "A vessel for which a registry endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef," *id.* § 12111(b), which are all unincorporated territories of the United States.

The statute also provides a mechanism for replacing vessels subject to MSP agreements with new vessels.  Under 46 U.S.C. § 53105(f), "[a] contractor may replace a vessel under an operating agreement with another vessel that is eligible to be included in the Fleet under section 53102(b), if the Secretary, in conjunction with the Secretary of Defense, approves the replacement of the vessel."  The statute further specifies that, "[a]s a condition of receiving payment . . . for a fiscal year for a vessel, the contractor for the vessel shall certify . . . that the vessel has been and will be operated in accordance with paragraph (1) and (2) of [§] 53105(a) . . . for at least 320 days in the fiscal year."  46 U.S.C. § 53106(b).  It further provides that the Secretary

> shall make a pro rata reduction in payment for each day less than 320 in a fiscal year that the vessel [covered by an operating agreement] is not operated in accordance with paragraph (1) and (2) of [§] 53105(a), as otherwise applicable with respect to such vessel, with days during which the vessel is drydocked or undergoing survey, inspection, or repair considered to be days on which the vessel is operated.

46 U.S.C. § 53106(d)(3).  Finally, the statute requires the Secretary to terminate an operating agreement "[i]f the contractor . . . materially fails to comply with the terms of the agreement," *id.* § 53104(c)(1).  Before taking that action, however, the Secretary must "notify the contractor and

provide a reasonable opportunity to comply with the operating agreement," and the contractor must "fail[] to achieve such compliance." *Id.*

## C.      MARAD's Approvals of APL Vessels

In January 2005, the Secretary entered into nine agreements with APL, permitting nine APL vessels to operate as part of the MSP.  AR 60–61.  Nearly ten years later, in December 2014, APL applied to MARAD for authorization to replace two of those vessels.  AR 4–5.  In January 2015 MARAD preliminarily approved the two unspecified replacement vessels, "provided they meet all MSP eligibility requirements."  AR 13–14.

### 1.      *APL Guam*

On August 27, 2015, APL informed MARAD that it had found a replacement vessel—the New Dynamic, later renamed the APL Guam—that would operate between Guam and the United States mainland.  AR 15–24.  On September 11, 2015, MARAD informed APL that the New Dynamic qualified "for inclusion in the [MSP]."  AR 43.  On September 16, 2015, APL sought MARAD's formal approval to replace the APL Cyprine, which had operated under MSP operating agreement No. MA/MSP-54, with the New Dynamic.  AR 46–49.  On October 15, 2015, MARAD's Associate Administrator for Strategic Sealift sent a memorandum to the MARAD Administrator recommending that MARAD approve the substitution.  AR 60–80. MARAD's Secretary notified APL on October 22, 2015 that the Administrator had determined that the New Dynamic was "suitable as a replacement for the container ship APL C[yprine] . . . under . . . [the] [o]perating [a]greement" and approved "amendment of the [a]greement to provide for transfer of the [a]greement and replacement of the Existing Vessel with the Replacement Vessel."  AR 81.  The Approval Order further explained that the replacement vessel's owner was a 'citizen of the United States within the meaning of 46 U.S.C. § 50501."

AR 83.  It also determined that the replacement vessel would "operat[e] in . . . established world-wide services" and would "provide transportation in foreign commerce pursuant to the requirement of 46 U.S.C. § 53102(b)(2)."  *Id.*

       2.     *APL Saipan*

      On August 24, 2016, APL sought MARAD's approval to replace a second vessel.  AR 116, 121.  On October 11, 2016, APL informed MARAD that it specifically proposed to replace the APL Agate with the Elisa Delmas, later renamed the APL Saipan.  AR 120–30, 196.  On November 9, 2016, MARAD advised APL that the substitution of a "smaller vessel" for the APL Agate "would be acceptable . . . provided the [replacement] vessel meets all MSP eligibility requirements," AR 139–40, and six days later it notified APL that the Elisa Delmas met "the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11 and was therefore, a vessel eligible for inclusion in the MSP," AR 141.  On December 9, 2016, MARAD's Associate Administrator for Strategic Sealift sent a memorandum to the Administrator recommending that the MARAD approve the proposed replacement.  AR 160–78.  Matson, which learned through non-administrative channels of this pending replacement application, sought to prevent approval by submitting two letters to MARAD, one on December 12 and another on December 15, 2016, arguing that the vessel's inclusion in the program was precluded by its contemplated service to Guam.  AR 179–80, AR 183–88.  Even before the Associate Administrator sent the December 9 memorandum to the Administrator, Senator Mazie Hirono of Hawaii also sent a letter to the Administrator expressing her "concerns about . . . APL['s]" request, AR 143–44, and APL responded to that letter, AR 147–54.  According to Senator Hirono, "[t]he MSP program . . . was not intended to permit . . . subsidized MSP vessels to compete against other U.S.-flag vessels operating in domestic trades like the Guam trade."  AR 143.  The December 9 memorandum,

which all agree sets forth the agency's reasoning for purposes of this case, Hrg. Tr. (Rough at 4–

5, 32), offered the following analysis of the question posed in Senator Hirono's letter:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A), requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code.  Under 46 U.S.C. § 12111, a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef.  APL will time charter the Replacement Vessel . . . for operation in its established worldwide service, with mixed foreign commerce and domestic commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement.  Accordingly, it has been determined that the Replacement Vessel will provide transportation in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

AR 163.  The memorandum addressed the vessel's service to Guam but not Saipan, despite the

fact that APL had informed the agency that the "vessel is subject to the . . . application would be

operated . . . in APL's existing U.S.-flag service of Guam *and Saipan* via Korea," AR 116

(emphasis added).  Saipan is a part of the Commonwealth of the Northern Mariana Islands,

which is a territory of the United States.  *See* Saipan, Encyclopaedia Brittanica,

https://www.britannica.com/place/Saipan (last accessed May 29, 2020); Dkt. 21-1 at 14; Dkt. 20

at 9.

MARAD's Secretary notified APL on December 20, 2016 that the Administrator had

"approve[d] replacement of the . . . APL A[gate] . . . under the [MSP operating agreement] with

the . . . E[lisa] D[elmas]" and had "approve[d] amendment of the [a]greement to replace the

Existing Vessel with the Replacement Vessel."  AR 196; *see also Matson Navigation Co.*, 895

F.3d at 802 (citing 2016 Approval Order at 1–2).  The Approval Order explained that APL "will

time charter the Replacement Vessel . . . for operation in APL's established world-wide service,

with mixed foreign commerce and domestic trade to Guam provided in accordance with the

Replacement Vessel's registry endorsement" and that, as result, the Administrator "found that

the Replacement Vessel will provide transportation in foreign commerce or in mixed foreign

commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C.

§ 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).  AR 196–

97.

## D.    Procedural History

On February 17, 2017, Matson filed an administrative appeal of MARAD's approval of

the replacement of the two vessels, AR 201–70, and on March 17, 2017 it amended its appeal,

AR 271–376.  The appeal focused principally on whether APL's service to Guam precluded

approval of the replacements because, in Matson's view, the statute only permits vessels engaged

exclusively in foreign or mixed foreign and domestic trade to participate in the MSP, and

because Guam is part of the United States, APL's service between Guam and the coastal United

States rendered the vessels ineligible.  *See* AR 272 ("The issue presented in this amended appeal

is whether assistance payments awarded to support U.S.-flag vessels operating in the

international trades under the Maritime Security Program . . . can be used to subsidize vessels

operating in Guam, a domestic trade.").   On April 7, 2017, MARAD rejected Matson's appeal.

AR 404–06.  MARAD determined that the company lacked standing to bring such an appeal

because it was not a contractor operating vessels under the MSP.  AR 404.  MARAD

nevertheless addressed the merits of Matson's appeal and concluded that the replacements were

proper under the statute.  AR 404–05.  MARAD wrote that "the relevant language of the MSA

could not be clearer regarding APL's ability to operate in the Guam trade:" the statute "provides

in relevant part that MSP vessels . . . 'shall be operated exclusively in foreign commerce or in

mixed commerce and domestic trade allowed under a registry of endorsement issued under

section 12111,'" *id.* (quoting 46 U.S.C. § 54105(a)(1)(A), and "Section 12111" provides that

"'[a] vessel for which a registry of endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef,'" *id.* (quoting 46 U.S.C. § 12111).  MARAD concluded that, "by incorporating Section 12111 into the MSA, Congress clearly and unambiguously established that trade with Guam under a registry endorsement, as provided in section 53102(a)(1)(A), is allowed under the MSP."  *Id.* at 405.

On June 2017, Matson sought review of (1) "MARAD's 2017 Appeal Decision, as well as its (2) 2015 and (3) 2016 Approval Orders" before the D.C. Circuit.  *See Matson Navigation Co. v. U.S. Dep't of Transp.*, 895 F.3d 799, 803 (D.C. Cir. 2018).  That court dismissed the entire case for lack of jurisdiction under the Hobbs Act, 28 U.S.C. § 2342(3)(A), but its reasoning differed for each of the three challenges.  *See Matson Navigation Co.*, 895 F.3d at 804–06.  With respect MARAD's 2017 Appeal Decision, the court held that Matson had forfeited any challenge to MARAD's determination that the company lacked administrative standing and, to the extent MARAD reached the merits, that the court lacked Hobbs Act jurisdiction over the agency's decision.  *Id*. at 806.  With respect to the 2015 approval, the D.C. Circuit rested its holding on Matson's failure to file a timely petition for review—"[i]ts petition for review was not filed until . . . long after the jurisdictional 60-day period in the Hobbs Act . . . had run."  *Id.* at 804–05.  Finally, with respect to MARAD's 2016 Approval Order, the D.C. Circuit held that the Order did "not trigger Hobbs Act jurisdiction" because, "[i]n contrast to the 2015 Approval Order, MARAD did not explicitly invoke section 50501" of title 46 "in reaching its eligibility determination," and it is that section that triggers Hobbs Act jurisdiction.  *Id.* at 805.

On November 27, 2018, Plaintiff filed its APA complaint against the Department of Transportation and the Maritime Administration before this Court.  Dkt. 1.  Plaintiff does not challenge "MARAD's decision denying Matson's administrative appeal."  Dkt. 20 at 36.

Instead, it challenges only the agency's approvals of the replacement vessel requests.  *Id.* at 44;

Dkt. 1 at 1 (Compl. ¶ 1) ("This action arises from MARAD's approval of two vessel replacement

requests.").  APL timely moved to intervene as a defendant, Dkt. 12, and the Court granted that

motion, Minute Order (Feb. 6, 2019).  Matson then moved for summary judgment, Dkt. 20; APL

cross-moved for summary judgment, Dkt. 21; and MARAD filed a partial motion to dismiss for

lack of jurisdiction and cross-motion for summary judgment, Dkt. 24.

On April 17, 2020, the Court ordered Plaintiff and MARAD to submit further briefing on

whether it had jurisdiction to review the 2015 eligibility determination concerning the APL

Guam.  Minute Order (Apr. 17, 2020).  It asked the parties to

> answer the following question: If the Court were to conclude that the 2015 order
> approving APL Guam as a replacement was issued pursuant to section 50501
> because of its explicit reliance on that section and was also issued pursuant to
> section 53105(f), do the courts of appeals have exclusive jurisdiction or
> concurrent jurisdiction with the district courts to review that order?

*Id.*  The parties then simultaneously exchanged briefs on the jurisdictional issue.  Dkt. 33; Dkt.

34.  The Court heard oral argument on the pending motions on May 21, 2020.  Minute Entry

(May 21, 2020).

## II.  LEGAL STANDARD

Courts must set aside agency actions that are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[A] reviewing

court must ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made.'"  *Cumberland Pharm. Inc. v. FDA*, 981 F. Supp. 2d 38, 48 (D.D.C. 2013) (quoting *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]gency

actions will [also] be set aside if they are contrary to law—if, in other words, they are not

'authorized by the statutory text.'" *Fisher v. Pension Benefit Guaranty Corp.*, 151 F. Supp. 3d

159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)).  The APA's

"requirement that agency action not be arbitrary and capricious includes a requirement that the

agency adequately explain its result." *Snohomish Cty., Wash. v. Surface Transp. Bd.*, 954 F.3d

290, 301 (D.C. Cir. 2020) (quoting *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir.

1999)).  This requires that the agency "articulate the reasoning behind its decision with sufficient

clarity to enable petitioners and th[e] court to understand the basis for its decision." *Id.* (quoting

*Jost*, 194 F.3d at 88).  An agency action is also arbitrary and capricious if it "entirely failed to

consider an important aspect of the problem" it contemplated. *State Farm*, 463 U.S. at 43.

Finally, under the *Chenery* doctrine, the Court

> must judge the propriety of [an agency] action solely [based on] the grounds
> invoked by the agency.  If those grounds are inadequate or improper, the court
> is powerless to affirm the administrative action by substituting what it considers
> to be a more adequate or proper basis.

*SEC v. Chenery*, 332 U.S. 194, 196 (1947); *see also Byers v. Comm'r of Internal Revenue Serv.*,

740 F.3d 668, 680 (D.C. Cir. 2014) (discussing *Chenery* doctrine).

## III.  ANALYSIS

### A.  Jurisdiction

The Court begins its analysis, as it must, with jurisdiction. *See Steel Co. v. Citizens for a

Better Envmt.*, 523 U.S. 83, 101–02 (1998).  The Court considers first whether Plaintiff has

Article III standing and second whether the Hobbs Act precludes this Court from considering

Plaintiff's challenge to the 2015 Approval Order.

#### 1.  *Article III Standing*

A plaintiff bears the burden of demonstrating that it has Article III standing.  This

requires demonstrating (1) that it has suffered an "injury in fact" that is "actual or imminent,"

and (2) "fairly . . . trace[able] to the challenged action of the defendant," and (3) that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotations omitted). Here, Matson asserts that it has competitor standing because the "Government [has] take[n] a step that benefits [its] rival and therefore injures [it] economically." Dkt. 20 at 41 (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)). It argues that it has "adduced substantial evidence that it competed directly with APL in the Guam and Saipan trade," and that APL's "unlawfully earned governmental benefit" under the MSP has "injured [it] economically." *Id.* Defendants do not challenge Plaintiff's Article III standing. Based on a review of the evidence Matson has proffered, AR 94; AR 300; Dkt. 20-1 at 3–4 (Def. SMF ¶¶ 6–14); Dkt. 20-2 at 2–3 (Wine Aff. ¶¶ 10–17), and the governing law, the Court agrees that Matson has Article III standing under the "doctrine of competitor standing." *Sherley*, 610 F.3d at 72.

2.     *Exclusive Jurisdiction in the Courts of Appeals under the Hobbs Act*

MARAD moves to dismiss in part for lack of statutory jurisdiction. The agency argues that the 2015 Approval Order was issued, at least in part, pursuant to 46 U.S.C. § 50501 and that the Hobbs Act, accordingly, provides for exclusive jurisdiction to review that Order in the courts of appeals. Dkt. 24-1 at 16–18; Dkt. 23 at 16–18. Matson responds that the 2015 Approval Order was not issued pursuant to § 50501 because that provision does not provide the Secretary with any authority to act; rather, § 50501 merely sets the requirements for U.S. citizenship. *See* Dkt. 34. The Court concludes that MARAD has the better argument and that this Court lacks statutory jurisdiction to review the 2015 Approval Order for the APL Guam.

"[U]nless a statute provides otherwise, [parties] seeking review of agency action go first to district court rather than to a court of appeals." *Int'l Bhd. Of Teamsters v. Peña*, 17 F.3d 1478, 1481 (D.C. Cir. 1994).  The Hobbs Act, however, provides that the courts of appeals have

> exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of . . . all rules, regulations, or final orders of . . . the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 313, or chapter 315 of title 49.

28 U.S.C. § 2342(3)(A).  "[P]etitions for review under the Hobbs Act," moreover, "must be filed 'within 60 days' of the 'entry' of the agency's final order." *Matson Navigation Co.*, 895 F.3d at 803 (quoting 28 U.S.C. § 2344).

Here, Matson seeks review of MARAD's 2015 Approval Order for the APL Guam.  The parties agree that the 2015 determination was made pursuant to 46 U.S.C. § 53105(f), which provides that "[a] contractor may replace a vessel under an operating agreement with another vessel that is eligible to be included in the Fleet under [§] 53102(b) . . . ."  But the cross-reference to § 53102(b)'s eligibility requirements may in some cases implicate a Hobbs Act triggering section—§ 50501—because one element of vessel eligibility is "meet[ing] the requirements of paragraphs (1), (2), (3), or (4) of subsection (c)," 46 U.S.C. § 53102(b)(1), and paragraph (c)(1) requires that the vessel is "owned and operated by one or more persons that are citizens of the United States under [§] 50501," *id.* § 53102(c)(1).  This is such a case.  "In its 2015 order approving APL G[uam] as a replacement, MARAD found the vessel was owned by a citizen of the United States 'within the meaning of 46 U.S.C. § 50501,' thus satisfying the owner's eligibility requirements in 46 U.S.C. § 35102(c)(2)." *Matson Navigation Co.*, 895 F.3d at 804 (quoting AR 83).  "Then, in view of all its findings, MARAD 'determined' that APL

Guam 'meets the requirements of 46 U.S.C. § 53105(f) regarding replacement vessels." *Id.* (quoting AR 84).

The Court must, accordingly, determine (1) whether MARAD's reliance on § 50501 in making the citizenship sub-determination of its overall eligibility determination means that the 2015 Approval Order was "issued pursuant to section 50501," 28 U.S.C. § 2342(3)(A), and, if so, (2) whether the courts of appeals have exclusive jurisdiction to review the entirety of MARAD's eligibility determination, even though § 50501 was just one statutory provision pursuant to which MARAD made that determination, or whether, instead, this Court has jurisdiction to review those questions posed by MARAD's determination that do not implicate § 50501.

a.   <u>Issuance of Eligibility Determination Pursuant to § 50501</u>

The D.C. Circuit has already hinted at the answer to the first question, and this Court will follow that lead.[1]   Although the court held that it lacked Hobbs Act jurisdiction to review the 2016 Approval Order because "MARAD never explicitly invoked section 50501 in reaching its eligibility determination in 2016," the court took care to "contrast" the 2016 and 2015 Approval Orders. *Matson Navigation Co.*, 895 F.3d at 805.  Unlike the 2016 Approval Order, MARAD did expressly rely on § 50501 in rendering the 2015 Approval Order. *Id*. at 804.  For this reason, the D.C. Circuit did not premise its decision declining to review the 2015 Approval Order on the same rationale that it applied to the 2016 Approval Order.  Instead, the court observed that

---

[1]  Since the D.C. Circuit held that it lacked jurisdiction and Matson refiled its challenge in this Court, the parties have swapped views regarding in which court, district or circuit, jurisdiction lies. *See Matson Navigation Co.*, 895 F.3d at 804 ("Matson contends, however, [the D.C. Circuit] has jurisdiction because MARAD's 'decisions involve regulations and programs that are "interrelated" with citizenship determinations' in 46 U.S.C. § 50501." (citing [Matson's] Br. 26–27)); Dkt. 25 at 11–12 (criticizing Defendant MARAD for abandoning its earlier "position that the challenge had to be brought in district court").

"MARAD's 'explicit reliance' on section 50501 [in the 2015 Approval Order] could provide [the] court with jurisdiction under the Hobbs Act over the 2015 approval." *Id.* To be sure, the court ultimately premised its decision on other grounds—Matson's appeal was, in any event, untimely under the Hobbs Act—but the court's reasoning suggests that the 2015 Approval Order was, in fact, subject to the Hobbs Act.

Significantly, the D.C. Circuit cited to *International Brotherhood of Teamsters v. Peña*, 17 F.3d 1478 (D.C. Cir. 1994) ("*IBT*"). 895 F.3d at 804. As *IBT* explained, where an agency decision "explicit[ly] reli[es]" on a both a statute for which the a court of appeals would have exclusive jurisdiction to review the decision and on a statute for which the default rule of district court review would apply, the court of appeals has jurisdiction over the entire petition for review. 17 F.3d at 1482. *Matson*'s contrasting of the 2015 Approval Order, which explicitly relied on § 50501, and the 2016 Approval Order, which did not, further supports this view. 895 F.3d at 806. "[I]mplicit[]" reliance on § 50501 alone "does not interpret [§] 50501 citizenship," and "[a]bsent explicit reference or its functional equivalent . . . to a statute listed in the Hobbs Act, the court [of appeals] would expand its exclusive jurisdiction beyond that which Congress intended." *Id.* But if an order, like the 2015 Approval Order, makes explicit reference to § 50501, that is enough to trigger Hobbs Act jurisdiction over the entire order.

Matson argues that *National Association of Manufacturers v. Department of Defense* ("*NAM*"), 138 S. Ct. 617 (2018) counsels a different result. Dkt. 25 at 12–14. In *NAM*, the plaintiffs challenged the Environmental Protection Agency's ("EPA") promulgation of a rule defining the phrase "waters of the United States." 138 S. Ct. at 624. The Supreme Court considered whether the rule was properly challenged in the courts of appeals, examining a "provision of the Clean Water Act, 33 U.S.C. § 1369(b)(1), that enumerated seven categories of

agency actions that must be challenged directly in the courts of appeals, including certain limitations issued under 33 U.S.C. § 1311." *Matson*, 895 F.3d at 804 (citing *NAM*, 138 S. Ct. at 626). The Supreme Court concluded that the courts of appeals did not have jurisdiction over the challenge in part because the rule was not "a limitation promulgated or approved 'under [§] 1311.'" *NAM*, 138 S. Ct. at 629–30 (quoting 22 U.S.C. § 1369(b)(1)(E)). In reaching this conclusion, the Court "acknowledged that the word 'under' is a 'chameleon' that 'must draw its meaning from its context.'" *Id.* at 630 (quoting *Kucana v. Holder*, 558 U.S. 233, 245 (2010)). But with respect to the provision at issue in that case—22 U.S.C. § 1369(b)(1)(E)—the Court was persuaded that "a limitation promulgated or approved *under* [§] 1311" was "most naturally read to mean that the effluent limitation or other limitation must be approved or promulgated 'pursuant to' or 'by reason of the authority of' § 1311." *Id.* (citations omitted) (emphasis added). The Court recognized that § 1311 "generally bans the discharge of pollutants into navigable waters absent a permit" but held that § 1311 did not "direct or authorize the EPA to define a statutory phrase"—"waters of the United States"—that appeared "elsewhere in the Act" and that, in any event, the EPA promulgated the rule under a different provision of the Act. *Id.*

Matson argues that, under the reasoning of the *NAM* decision, the 2015 Approval Order was made only "pursuant to" § 53101(f), which grants the Secretary authority to approve replacement vessels, and not "pursuant to § 50501, which sets forth the requirements for citizenship under the statute. Dkt. 25 at 12–14. The Court is unpersuaded. First, the Court notes that the term "pursuant to" is also a "'chameleon' that 'must draw its meaning from its context.'" *NAM*, 138 S. Ct. at 630 (quoting *Kucana*, 558 U.S. at 245). The Hobbs Act provides for exclusive appellate jurisdiction in cases challenging agency decisions made "pursuant to [§] 50501." 28 U.S.C. § 2342(3)(A). To give that statutory text meaning, as the Court must, *see*

*Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 188 (2010), there must exist *some*
agency decisions that are made "pursuant to" § 50501, which—as Matson observes—merely sets
forth the requirements for being "deemed to be" a "citizen of the United States" for purposes of
the merchant marines.  46 U.S.C. § 50501.  As a result, the Hobbs Act's reference to rules or
orders issued "pursuant to § 50501" can have meaning only if agency action taken "pursuant to §
50501" includes rules or orders that do not "direct," "authorize," or "approve[]" some action that
is compelled or authorized by § 50501 itself.  *NAM*, 138 S. Ct. at 630.  This understanding
comports with the definition of "pursuant to" as including "in conformity with" or "according
to."  "Pursuant to." *Merriam-Webster.com Dictionary*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/pursuant%20to, (last accessed May 29, 2020).
The 2015 approval decision was made "pursuant to" § 50501 in that it was explicitly made "in
conformity with" or "according to" the citizenship requirements set forth by that provision.
*See Matson Navigation Co.*, 895 F.3d at 802 (citing AR 83).

      b.     <u>Exclusivity of Court of Appeals' Jurisdiction</u>

      In this case, the 2105 Approval Order explicitly referenced § 50501 and other statutory
provisions not listed in the Hobbs Act.  This, then, raises the question whether the district courts
have concurrent jurisdiction to review those portions of a multiple-authority agency order that
turn on statutory provisions not listed in the Hobbs Act.  MARAD argues that D.C. Circuit
precedent, out-of-circuit precedent, and "underlying legal princip[les]" all support the conclusion
that "the courts of appeals have exclusive jurisdiction to review agency determinations made in
multiple-authority cases."  Dkt. 33 at 5, 12.  Matson, in turn, argues that because "this Court
indisputably has jurisdiction over the challenge to the 2016 [O]rder [pertaining to the APL
Saipan], it can and should resolve the substantially identical challenge to the 2015 [O]rder at the

same time." Dkt. 34 at 5.  The Court concludes that the courts of appeals have exclusive jurisdiction to review the entirety of this type of multiple-authority order and, accordingly, that it lacks jurisdiction to review MARAD's 2015 Approval Order authorizing the substitution of the APL Guam for the existing MSP vessel.

The D.C. Circuit has not expressly answered the question presented.  In *IBT*, for example, the court dealt with a multiple-authority order but did not have occasion to decide the question whether its "jurisdiction [was] concurrent [with the district court's] or exclusive" because the petitioner in that case brought its challenge in the court of appeals.  17 F.3d at 1482.  Several D.C. Circuit decisions, however, along with out-of-circuit precedents, support the conclusion that the courts of appeals have exclusive jurisdiction to review multiple-authority orders.  In *IBT*, the D.C. Circuit cited the Seventh Circuit's decision in *Suburban O'Hare Commission v. Dole*, 787 F.2d 186 (7th Cir.), with approval.  *IBT*, 17 F.3d at 1482.  In *Suburban O'Hare*, the Seventh Circuit considered whether it had exclusive jurisdiction over a challenge to a Federal Aviation Administration decision comprised of four distinct orders, three of which were issued pursuant to Chapter 20, which was subject to direct and exclusive appellate review.  787 F.2d at 192.  The fourth order was issued on the authority of Chapter 31, which was not subject to direct and exclusive appellate review.  *Id.*  The Seventh Circuit observed that

> [w]hen an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court. . . .  The separation of Chapter 20 claims from Chapter 31 claims in this case could only be effectuated through bifurcated proceedings.  But the purpose of having agency decisions reviewed by courts of appeals is to avoid duplicative factfinding.  If there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals we must resolve that ambiguity in favor of review by a court of appeals.  If a decision of an administrative agency is based, in substantial part, on a statutory provision providing for exclusive review by a court of appeals, then the entire proceeding must be reviewed by a court of appeals.

*Id.* at 192–93.  The Seventh Circuit noted that it "need not reach the question of what constitutes 'substantial part' where, as [t]here, three of the four orders in question were issued under" the provision that required exclusive appellate review.  *Id.* at 193.  In *Sutton v. U.S. Dep't of Transp.*, 38 F.3d 621 (2d Cir. 1994), the Second Circuit took a slightly different approach, concluding that the court of appeals had exclusive jurisdiction where the determination made based on the exclusive-appellate-jurisdiction triggering statute "was a necessary predicate" to the challenged decision.  *Id.* at 625.

In *Shell Oil Company v. Federal Energy Regulatory Commission*, 47 F.3d 1186 (D.C. Cir. 1995), decided the year after *IBT*, the D.C. Circuit considered "whether [it] should retain jurisdiction over" a petition for review that was initially (and properly) brought in the district court and then transferred to the D.C. Circuit "due its close relationship with" a separate petition then pending before that court and subject to its exclusive jurisdiction.  *Id.* at 1190–91, 1194. Although the cases "involve[d] separate petitioners seeking review of two distinct rulings in a single declaratory order," the D.C. Circuit applied *Suburban O'Hare*'s "principle" that "where an agency order arising from a common factual background and addressing a common question of law relies on two statutory bases that give rise to separate paths for judicial review, the entire order should be reviewed in a comprehensive and coherent fashion, and that review should take place in the court of appeals."  *Id.* at 1195.  In support of its decision to retain jurisdiction over the transferred petition, the D.C. Circuit noted that "a district court offers no advantages over a court of appeals with respect to on-the-record review of completed administrative proceedings, while a bifurcated approach might lead to confusion and unnecessary duplication."  *Id.*; *see also City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979) ("The policy behind having a special review procedure in the first place similarly disfavors bifurcating jurisdiction over

various substantive grounds between district court and the court of appeals."). Finally, in *Media Access Project v. FCC* the D.C. Circuit explained that "[g]enerally, when jurisdiction to review administrative determinations is vested in the courts of appeals these specific, exclusive jurisdiction provisions preempt district court jurisdiction over related issues under other statutes." 883 F.2d 1063, 1066–69 (D.C. Cir. 1989) (quoting *Connors v. Amax Coal Co.*, 858 F.2d 1226, 1231 (7th Cir. 1988)).

Because MARAD's citizenship determination under § 50501 was "a necessary predicate to" the challenged determination that the APL Guam was eligible to participate in the MSP as a replacement vessel, the courts of appeals have exclusive jurisdiction to review the entire determination. *Sutton*, 38 F.3d at 625. It is of no import that the parties do not dispute the citizenship determination that provides the foundation for Hobbs Act jurisdiction because "the exclusivity . . . of statutory review [does not] depend on the substantive infirmity alleged." *City of Rochester*, 603 F.2d at 936; *Creed v. Nat'l Transp. Safety Bd.*, 758 F. Supp. 2d 1, 5 (D.D.C. 2010) ("[T]he specific substantive ground alleged is irrelevant to the application of the special statutory review provision." (citing *City of Rochester*, 603 F.2d at 936–37). To bifurcate review and for this Court to assert jurisdiction over Matson's challenge to those aspects of the eligibility determination that do not implicate § 50501 would contravene the D.C. Circuit's guidance that "entire order[s]" resting on multiple authorities providing for direct review in distinct forums "should be reviewed in a comprehensive and coherent fashion[] and [that] that review should take place in the court of appeals." *Shell Oil*, 47 F.3d at 1195; *see also City of Rochester*, 603 F.2d 936 ("The policy behind having a special review procedure in the first place similarly disfavors bifurcating jurisdiction over various substantive grounds between district court and the court of appeals. The likelihood of duplication and inconsistency would exist in either case.").

The Hobbs Act provides that "[t]he court of appeals . . . has exclusive jurisdiction to . . . determine the validity of . . . all . . . final orders of . . . the Secretary of Transportation issued pursuant to section 50501." 28 U.S.C. § 2342(3)(A).  Giving the text is plain meaning, this grants the courts of appeals exclusive jurisdiction over the entirety of "final orders" and not merely those "portions of final orders" that implicate § 50501.  *See* Dkt. 33 at 7.  The Court therefore concludes that it lacks jurisdiction to consider Matson's challenge to MARAD's 2015 Approval Order authorizing the substitution of the APL Guam for the existing MSP vessel.[2]

Because all agree that the Court has jurisdiction to review MARAD's 2016 Approval Order respecting the APL Saipan, and because the Court agrees, the remainder of this opinion will consider whether that decision withstands APA scrutiny.

**B.      Statutory and Regulatory Regime Governing MSP Eligibility**

The heart of the dispute, as framed by the parties, comes down to "a discrete question of statutory interpretation—whether a vessel must be operated exclusively in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111 to be eligible for inclusion in the [MSP]." Dkt. 26 at 8.  Or, put differently, the question is whether the Secretary may authorize a contractor to replace an existing MSP vessel with a new vessel that operates in foreign trade (or in mixed foreign and domestic trade allowed under a registry endorsement) but does not do so "exclusively."  As explained below, the answer to this question is not obvious; it is not clear that MARAD answered it; and, if MARAD did, the answer it gave is too opaque to permit judicial review.  The

---

[2]  At oral argument, Matson chose not to address jurisdiction but, rather, focused entirely on the 2016 Approval Order, which all agree is subject to review in this Court.

Court must, accordingly, remand the matter to MARAD to answer the statutory question in the first instance and to set forth is reasoning.

Matson argues that MARAD's approval of the APL Saipan as a replacement vessel was contrary to law because the vessel was "ineligible to participate in the MSP because [it] operate[s] in trade between Saipan and the continental United States, which is domestic trade not conducted pursuant to a registry endorsement." Dkt. 20 at 24; *see also* AR 301, 371; AR 373. In Matson's view, the statute limits participation in the MSP Fleet to vessels that engage exclusively in foreign trade or in mixed foreign trade and domestic trade conducted pursuant to a registry endorsement and, accordingly, precludes the Secretary from approving any replacement vessel that operates—even in part—in domestic trade not permitted under a § 12111 registry endorsement. Dkt. 20 at 24. According to Matson, this construction of the statute is confirmed by the governing regulations, which require that replacement vessels operate in "foreign commerce" and then define "foreign commerce" to include "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. 12111." 46 C.F.R. § 296.2 (emphasis added); Dkt. 20 at 14. That rule makes sense, Matson continues, because MSP vessels receive what is, in essence, a subsidy, and a government subsidy to vessels engaged, even in part, in certain types of domestic trade would unfairly disadvantage other vessels engaged in that trade. Dkt. 20 at 12, 28.

This perspective differs markedly from the interpretation of the statute that MARAD and APL proffer in their briefs. They acknowledge that MSP operating agreements must require that MSP vessels operate "exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," 46 U.S.C. § 53105(a)(1)(A), but they assert that the Secretary is authorized to approve a replacement vessel so long as the new vessel

"is eligible to be included in the Fleet under section 53102(b)," *id.* at § 53105(f), and that

provision requires only that the vessel operate in "foreign trade," *id.* § 53102(b)(2), not that it do

so "exclusively." Dkt. 21-1 at 27–28. The contractual exclusivity requirement under the

operating agreement is given meaning, according to MARAD and APL, by the statutory

provisions that require the Secretary to terminate an operating agreement if the contractor (after

receiving notice of a material breach) "fails to achieve . . . compliance," *id.* § 53104(c), and that

reduce the contractor's right to payment on a pro rata basis "for each day less than 320 in a fiscal

year that the vessel is not operated in accordance with" the exclusive foreign trade requirement,

*id.* § 53106(d)(3). Dkt. 21-1 at 18; Dkt. 24-1 at 23. MARAD and APL further note that the

statute requires that a contractor merely certify that it has operated the vessel in accordance with

the exclusivity requirement "for at least 320 days in the fiscal year." Dkt. 21-1 at 32 (quoting 46

U.S.C. § 53105(b)) (emphasis omitted); Dkt. 24-1 at 37. Finally, APL—but not MARAD—

contends that the APL Saipan operates under a registry endorsement issued under 46 U.S.C. §

12111 and that a Coast Guard regulation interpreting that statute permits its service to Saipan.

Dkt. 21-1 at 29–40. MARAD, for its part, takes no position on this last argument. Hrg. Tr.

(Rough at 75–76).

The statutory text does clearly resolve the question. On the one hand, MARAD and APL

are correct that the specific provision at issue here, 46 U.S.C. § 53105(f), grants the Secretary

authority to allow a contractor to "replace a vessel under an operating agreement with another

vessel that is eligible to be included in the Fleet under section 53102(b)," and 46 U.S.C.

§ 53012(b) provides only that "the vessel is operated . . . in providing transportation in foreign

commerce"—not that it operate "exclusively in foreign commerce." But that reading of the

statute arguably ignores another statutory provision that directs the Secretary, "as a condition of

including any vessel in the Fleet," to require the contractor "enter into an operating agreement with the Secretary," *id.* § 53103(a), which, in turn, must require that the vessel "be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement under section 12111," *id*. § 53105(a)(1)(A).

Faced with the difficulty of explaining the statutory command that the operating agreement require that the vessel operate exclusively in foreign commerce (or in mixed foreign and domestic commerce under a § 12111 registry endorsement), MARAD and APL suggest that the requirement is not as categorical as it might seem.  In support of this argument, they note that the statute does not require the contractor to certify categorical compliance; it requires only a certification that the vessel has been and will be "operated in accordance with [the limitations on domestic trade in] section 53105(a)(1) for at least 320 days in the fiscal year."  Dkt. 21-1 at 32–33 (quoting 46 U.S.C. § 53106(b)) (emphasis omitted).  This means, according to MARAD and APL, that 46 U.S.C. § 53105(a)(1)(A) should be read to require that the contractor, in effect, commit only to operate the vessel in foreign commerce (or in mixed foreign and domestic commerce under a § 12111 registry endorsement) for at least 320 days a year.  Dkt. 21-1 at 32–33.  A failure to meet the contractual undertaking for more than 45 days of the year does not constitute a breach but, rather, merely results in a pro rata reduction in the MSP payment.  Dkt. 21-1 at 32–33 (citing 46 U.S.C. § 53106(d)(3)).  Unsurprisingly, Matson disagrees and notes that the 320-day provisions say nothing about domestic trade; rather, in Matson's view, the leeway is intended to cover circumstances such as when a vessel is in dock and not engaged in any kind of trade.  Dkt. 20 at 38 (noting that a vessel might call a domestic port "due to emergency, weather, exigent circumstances or some other reason not foreseen at the time of the operating agreement").

The parties' disagreement about the meaning of the governing MARAD regulations is equally confounding.  According to Matson, the regulations unambiguously support its position that a replacement vessel must operate exclusively in foreign commerce or in mixed foreign and domestic commerce covered by a registry endorsement.  Dkt. 20 at 14.  As Matson explains, the regulations provide that a vessel is eligible to be included in an MSP operating agreement if, among other things, the vessel is "operated . . . in foreign commerce."  *Id.* (quoting 46 C.F.R. § 296.11(a)(2).  The regulations then define "[f]oreign [c]ommerce" to mean "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111."[3]  *Id.* (quoting 46 C.F.R. § 296.2) (emphasis in brief).  In other words, according to Matson, the regulations provide that "a

---

[3]  This version of the regulation took effect on December 1, 2017.  82 Fed. Reg. 56895, 56897 (Dec. 1, 2017).  The regulatory definition of "[f]oreign [c]ommerce" effective during the period in which the challenged eligibility determination was made does not differ in material respects:

> (1)  For any vessel other than a liquid or a dry bulk carrier, a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under section 12105 of title 46, United States Code, where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries; and

> (2)  For liquid and dry bulk cargo carrying services, includes trading between ports in the United States and foreign ports or trading between foreign ports in accordance with normal commercial bulk shipping practices in such manner as will permit United States-documented vessels to freely compete with foreign-flag bulk carrying vessels in their operation or in competing for charters.

46 C.F.R. § 296.2 (2016 version) (emphasis added).  Section 12105, referenced in that definition, is now codified at 46 U.S.C. § 12111(b).

vessel is eligible" to participate in the MSP only if it operates exclusively in foreign commerce (or in mixed foreign and domestic commerce under a § 12111 registry endorsement).

To this, MARAD and APL respond that a regulation cannot change the meaning of a statute, and the statute defines "foreign commerce" to mean "commerce or trade between the United States, its territories or possessions, or the District of Columbia and a foreign country" and "commerce or trade between foreign countries." 46 U.S.C. § 53101(4); Dkt. 24-1 at 10, 26. They correctly note that the regulations define an "[e]ligible vessel" to mean "a vessel that meets the requirements of § 53102(b)," 46 C.F.R. § 296.2, that is, the statutory provision that lacks the express "exclusivity" requirement. Dkt. 24-1 at 26. MARAD further argues that Matson's reading of the regulations would render other regulatory text "nonsensical." Dkt. 28 at 22–25. In particular, if "eligible vessel" is read to mean a vessel operating exclusively in foreign commerce, the regulation governing MSP operating agreements would require that a "vessel operating exclusively in foreign commerce or in mixed foreign and domestic commerce under a" § 12111 registry endorsement must "[b]e operated exclusively in foreign commerce or in mixed foreign commerce and domestic trade under a" § 12111 registry endorsement. 46 C.F.R. 296.31(d).

APL adds a further twist to the analysis, as to which MARAD takes no position. In its view, the APL Saipan satisfies even the more demanding exclusivity requirement of 46 U.S.C. § 53105(a)(1)(A) because it operates exclusively "in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111." Dkt. 21-1 at 29–40. As APL acknowledges, Dkt. 21-1 at 20, 46 U.S.C. § 12111(b) authorizes trade "with Guam, American Samoa, Wake, Midway, or Kingman Reef" and does not mention Saipan. But, in APL's view, that is not a problem because a Coast Guard regulation, 46 C.F.R. § 67.17(a),

provides that "[a] registry endorsement entitles a vessel to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; and any other employment which a coastwise, or fishery endorsement is not required." Dkt. 21-1 at 42. "A coastwise endorsement," APL continues, "is only required for a vessel to engage in 'coastwise' trade within the meaning of Jones Act," 46 U.S.C. § 12112, which, APL asserts, the APL Saipan's service to Saipan is not. Dkt. 22-1 at 42. In Matson's view, in contrast, the Coast Guard regulation is inapposite, and all that matters is what the relevant statute says: it refers to a registry endorsement under § 12111, and § 12111 refers to Guam but not Saipan. Dkt. 25 at 36.

The problem with all of this back and forth is that bears no relation to anything contained in MARAD's 2016 Approval Order or its supporting memorandum. When a court reviews the decision of an administrative agency, it "must judge the propriety of such action solely by the grounds invoked by the agency." *Chenery Corp.*, 332 U.S. at 196. The Court cannot "supply [its] own justifications for an order nor uphold an order based on [the agency's] post hoc rationalization." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006). To be sure, the agency's reasoning need not be pellucid, *see Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) (quoting *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004)), and courts will uphold an agency's decision "[a]s long as 'the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)). Moreover, "[w]hen an agency relies on multiple grounds for its decision, some of which are invalid, [courts] may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" *Id.* (quoting *Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 434 (D.C. Cir. 1993) (internal quote quoting *Syracuse Peace Council v.*

*FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989)).  But where an "agency has entirely failed to consider

an important aspect of the problem," *State Farm*, 463 U.S. at 43, or has failed to explain its

decision with sufficient clarity to enable the parties and the "court to understand the basis for its

decision," *Snohomish Cnty., Washington*, 954 F.3d at 301 (quoting *Jost*, 194 F.3d at 88), the

decision runs afoul of the APA.

As counsel for MARAD acknowledged at oral argument, the need to address issues of

central importance to a decision applies even in a proceeding, like this one, in which the plaintiff

was not a full participant, the matter was decided by order as opposed to regulation, and the issue

raised in the litigation was not squarely presented to the agency.  Hrg. Tr. (Rough at 53)

(agreeing that Matson faced no exhaustion requirement because there was "not any formal

mechanism for participation by non[-]contracting parties in the process" and therefore "that

[Matson was] not obligated to raise the Saipan issue in the regulatory process").  Put differently,

administrative exhaustion is not required in a case, like this one, in which the plaintiff had no

right to participate in the administrative proceeding and did not have access to all relevant

administrative filings.

Measured against these standards, MARAD's 2016 Approval Order fails to satisfy basic

APA requirements.  To start, it is far from clear that the agency decided the matter on the

grounds that MARAD now presses.  Thus, while MARAD now argues that 46 U.S.C. § 53105(f)

merely requires that the replacement vessel operate in foreign commerce, as provided in 46

U.S.C. § 53102(b)(2)—and not that it operate "exclusively" in foreign commerce or mixed

foreign and domestic commerce under a registry endorsement, as specified in 46 U.S.C.

§ 53105(a)(1)(A)—the memorandum that supports the 2016 Approval Order posited that "46

U.S.C. § 53102(b)(2), [as] further clarified by 46 U.S.C. § 53105(a)(1)(A)[,] requires that an

eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111." AR 163. The memorandum then goes on to explain that the replacement vessel was eligible because it operated "with mixed foreign commerce and domestic trade to Guam provided in accordance with the . . . [v]essel's registry endorsement." *Id.* Following this same reasoning, the December 20, 2016 Approval Order explained that the replacement vessel would operate "with mixed foreign commerce and domestic commerce to Guam provided in according with the . . . [v]essel's registry endorsement" and that, accordingly, the "[v]essel will provide transportation in foreign commerce or in mixed foreign commerce and domestic trade allowed under registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A)." AR 196–97.

Nowhere in any of MARAD's exposition is there any suggestion that a replacement vessel need operate in foreign commerce only in part or that § 53105(f) can be read in isolation, without considering § 53105(a)(1)(A)'s exclusivity requirement. To the contrary, both the memorandum and Approval Order cite to § 53105(a)(1)(A); the memorandum posits that § 53015(a)(1)(A) "clarif[ies]" the meaning of § 53102(b); and both the memorandum and Approval Order expressly consider whether the vessel's registry endorsement under § 12111 is sufficient to permit the proposed trade with Guam. Yet, if MARAD's current reading of the statute was correct, that analysis would have been unnecessary; it would have been enough to conclude that the vessel was engaged—in part—in foreign commerce and to leave for another day whether some pro rata reduction in the statutory payment amount might be necessary, *see* 46 U.S.C. § 53106.

Likewise, the memorandum and Approval Order say nothing about the vessel's routes to and from Saipan.  Nor is obvious that the reasoning MARAD adopted with respect to the Guam routes answers this question.  APL now argues that essentially the same analysis applies, but neither the memorandum nor the Approval Order wrestled with that potentially dispositive question and, even to this day, MARAD has taken no position on that question.  Even under APL's theory, moreover, the analysis applicable to Saipan is not the same as the analysis the agency articulated with respect to Guam.  46 U.S.C. § 53105(a)(1)(A) permits vessels operating in mixed foreign commerce and domestic trade "allowed under a registry endorsement issued under section 12111" to participate in an MSP agreement, and 46 U.S.C. § 12111, in turn, applies to vessels engaged in "trade with Guam, American Samoa, Wake, Midway, or Kingman Reef."  APL adds Saipan to this list only by invoking a Coast Guard regulation.  Regardless of whether that position has any merit—and the Court expresses no view on that question— *Chenery* precludes the Court from upholding MARAD's Approval Order on this alternative theory, 332 U.S. at 196, which the agency neither considered nor even embraces today.

Ultimately, it appears that the agency did not address whether its Approval Order can be squared with the APL Saipan's trade with Saipan.  The existing record, moreover, does not disclose whether this was simply an oversight or whether MARAD had good reason for authorizing the replacement notwithstanding the vessel's trade with Saipan.  The question, though, was as central to the agency's conclusion as was the question whether the vessel's trade with Guam was disqualifying.  *See* AR 163 (Approval Order discussing the APL Saipan's service to Guam).  As things currently stand, the Court cannot "reasonably . . . discern[]" the basis, if any, for MARAD's approval of a replacement vessel that serves Saipan and the coastal United States.  *Bowman Transp., Inc.*, 419 U.S. at 285–86.

The parties' dispute, moreover, touches on issues of great importance to the MSP.  Their arguments pose the question whether an operating agreement to engage "exclusively" in foreign commerce (or mixed foreign commerce and domestic trade under a § 12111 registry endorsement) means what is says, or whether "exclusively" should be read, in light of other provisions of the statute, to mean at least 320 days a year.  *See* 46 U.S.C. § 53106.  Their arguments also raise the question whether the Secretary may approve the replacement of a vessel under 46 U.S.C. § 53105(f), even if the contractor is unable to execute or to perform under the required operating agreement.  And APL raises the question whether § 12111—as incorporated in § 53105(a)(1)(A)—should be read, in light of a Coast Guard regulation, to include trade with Saipan, even though § 12111 itself includes no reference to Saipan.

None of these important issues, however, is addressed in the agency's decision.  The Court, accordingly, can conclude only that MARAD (1) "fail[ed] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, (2) based its decision on different grounds than those now pressed by the agency and the intervenor, *Chenery*, 332 U.S. at 196, or (3) failed to "articulate the reasoning behind its decision with sufficient clarity to enable . . . this [C]ourt to understand the basis for its decision," *Snohomish Cty., Wash.*, 954 F.3d at 301 (quoting *Jost*, 194 F.3d at 88).  In any event, the decision cannot withstand APA scrutiny.

## C.  Vacatur upon Remand

This leaves the question of remedy.  Matson urges the Court to vacate the 2016 Approval Order.  Hrg. Tr. (Rough at 21–25).  Although they did not brief the issue, MARAD and APL urged the Court at oral argument to remand the matter without vacatur.  Hrg. Tr. (Rough at 56–58, 60–61).

32

"When a court concludes that agency action is unlawful, 'the practice of the court is ordinarily to vacate the rule.'" *Stewart v. Azar*, 313 F. Supp. 3d 237, 272 (D.D.C. 2018) (quoting *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997)). "[A]lthough vacatur is the normal remedy, [courts] sometimes decline to vacate an agency's action." *Id.* at 273 (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). "Whether a court should vacate an unreasonable agency action on remand, or not, depends on: (1) 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)' and (2) 'the disruptive consequences of an interim change that may itself be changed.'" *Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture*, 317 F. Supp. 3d 385, 390 (D.D.C. 2018) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Here, these factors are in dispute. MARAD and APL argue that remand will simply allow MARAD more clearly to explain the basis for its decision, and APL contends that the decision, in any event, it likely to be sustained based on its alternative theory. Matson disagrees, arguing that the 2016 Approval Order is unavoidably flawed and that the MSP has never countenanced the inclusion of vessels engaged in "domestic" trade not performed pursuant to a registry agreement; in their view the APL Saipan's service to Saipan is prohibited. APL represented at oral argument, moreover, that the APL Saipan is currently engaged in transporting goods for the Department of Defense and argued that vacatur could implicate military readiness. Hrg. Tr. (Rough at 60–61). Although counsel from MARAD did not dispute that factual assertion, he suggested that any military cargo might be transported on other vessels or that the APL Saipan might continue to operate without receiving payment under the MSP. *Id.* (Rough at 23, 84)

Although the Court is sympathetic to Matson's desire to bring this long-pending matter to a close, in light of the effect vacatur might have on military readiness, the Court will permit the parties to submit additional evidence and briefing on whether the Court should remand the matter with or without vacatur. MARAD and APL may submit any further evidence and briefing (not to exceed seven pages) on or before June 5, 2020, and Matson may file any responsive evidence and briefing (not to exceed seven pages) on or before June 12, 2020.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Plaintiff's motion for summary judgment; **DENY** Intervenor APL's and Defendant MARAD's cross-motions for summary judgment; and **GRANT** Defendant MARAD's motion to dismiss for lack of jurisdiction.

A separate order will issue.


<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge


Date:  May 30, 2020