UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATSON NAVIGATION COMPANY, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> APL MARINE SERVICES, LTD., *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No. 18-2751 (RDM) |

**MEMORANDUM OPINION**

In a prior opinion in this matter, the Court granted in part and denied in part Plaintiff Matson Navigation Company, Inc.'s ("Matson") motion for summary judgment, denied Defendants Department of Transportation and Maritime Administration's ("MARAD") (together "Federal Defendants") and Intervenor-Defendants APL Marine Services, Ltd. and APL Maritime, Ltd.'s (together "APL") cross-motions for summary judgment, and granted the Federal Defendants' motion to dismiss in part for lack of jurisdiction. Dkt. 44. Of relevance here, the Court concluded that it could not "discern the basis for MARAD's 2016 determination respecting the APL Saipan and, in particular, c[ould not] discern whether the agency (1) construed the statute to permit an MSP contractor to replace an MSP vessel with another vessel, so long as that vessel operates at least in part in foreign commerce; (2) failed to consider the fact that the APL Saipan might not operate exclusively in foreign or mixed foreign and domestic

trade due to its service to Saipan; or (3) concluded that the APL Saipan operates under a registry endorsement under 46 U.S.C. § 12111 that permits it to engage in trade between Saipan and the coastal United States." *Id.* at 2–3.  The Court, as a result, held (1) that "the agency either completely failed to explain its reasons for approving the replacement or entirely failed to consider an important aspect of the question before it and thus failed to comply with the APA" and (2) that the matter must be remanded to MARAD to "address in the first instance the important questions of statutory interpretation presented by this case." *Id.* at 3.

In light of the record as it then stood, the Court left one issue unresolved in its prior opinion: whether the remand should be with or without vacatur.  *Id.* at 32–34.  On June 5, 2020, the Federal Defendants and APL filed supplemental memoranda arguing in favor of remand without vacatur, Dkt. 42; Dkt. 43, and, on June 12, 2020, Matson submitted its memorandum urging vacatur, Dkt. 45.  APL subsequently filed a notice of supplemental authority addressing the D.C. Circuit's recent decision in *American Great Lakes Ports Ass'n v. Schultz*, No. 18-5154, 2020 WL 3240903 (June 16, 2020), Dkt. 46, and Matson responded to that notice, Dkt. 47.  With these additional filings before it, the Court now concludes that vacatur is warranted.

## ANALYSIS

The Administrative Procedure Act ("APA") directs that "[t]he reviewing court shall . . . hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (emphasis added).  "[A]lthough vacatur is the normal remedy," courts in this circuit "sometimes decline to vacate an agency's action." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The decision whether to vacate turns on the *Allied-Signal* factors, which consider (1) the "seriousness of the order's deficiencies," and (2) the likely "disruptive

consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted).

A.     **Seriousness of MARAD's Approval's Deficiencies**

The first *Allied-Signal* factor—"the seriousness of the order's deficiencies"—considers "the extent of doubt whether the agency chose correctly." *Id.* (citation omitted). As the D.C. Circuit has explained, "[t]here is a fine line between agency reasoning that is 'so crippled as to be unlawful' and action that is potentially lawful but insufficiently or inappropriately explained." *Radio-Television News Dirs. Ass'n*, 184 F.3d 872, 888 (D.C. Cir. 1999) (quoting *Checkosky v. SEC*, 23 F.3d 452, 464 (D.C. Cir. 1994) (separate op. of Silverman, J.)). "In the former circumstance, the court's practice is to vacate the agency's order, [and] in the later the court frequently remands for further explanation (including discussion of relevant factors and precedents) while withholding judgment on the lawfulness of the agency's proposed action." *Id.*

The Federal Defendants argue that this case falls into the latter category because it is at least "'conceivable' that MARAD could sustain the statutory interpretation it offered in its briefs on remand." Dkt. 42 at 3–4 (quoting *Allied-Signal*, 988 F.2d at 151). APL agrees and adds that, even if MARAD declines to adopt the statutory argument advocated by its counsel in this case, the agency is likely sustain its action based on the alternative theory APL pressed—that is, that service to Saipan is permitted under the vessel's registry endorsement. Dkt. 43 at 4. Matson, for its part, disagrees on both counts. It argues that MARAD's Approval Order was seriously deficient in several fatal respects, including—most notably—the agency's failure to address "an important aspect of the problem." Dkt. 45 at 5–6 (quoting *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017)).

The Court agrees with Matson that MARAD's approval order was seriously deficient and further concludes that there is considerable "doubt whether the agency chose correctly." *Allied Signal*, 988 F.2d at 150–51 (citation omitted).  As the Court has previously explained, the parties' arguments before this Court bore "no relation to anything contained in the MARAD's 2016 Approval Order or its supporting memorandum."  Dkt. 44 at 28.  "Thus, while [MARAD's counsel] . . . argue[d] that 46 U.S.C. § 53105(f) merely requires that the replacement vessel operate in foreign commerce . . . and not that it operate 'exclusively' in foreign commerce or mixed foreign and domestic commerce under a registry endorsement, . . . the memorandum that supports the [agency's] 2016 Approval Order posited that [the statute] 'requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111.'"  *Id*. at 29–30 (quoting AR 163).  Nor does the 2016 Approval Order say anything "about the vessel's routes to and from Saipan" or offer any analysis that would permit the Court to infer that the conclusion MARAD reached "with respect to the Guam routes answers" the question whether the Saipan routes fall within the statutory exception for registry endorsements under 46 U.S.C. § 12111.  *Id.* at 31.  To the contrary, "it appears that the agency did not address whether its Approval Order can be squared with the APL Saipan's trade with Saipan," *id.*, and the reasoning that the agency did apply is at odds with the argument that counsel made before the Court.

The errors in this case, accordingly, are fundamental, and the Court is left with substantial doubt that MARAD reached the correct decision.  To conclude on remand that the APL Saipan qualifies as a replacement vessel MARAD will need to do one of two things: either it will need to explain away its prior assertion that that the statute "requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic

trade allowed under a registry endorsement issued under section 12111," Dkt. 44 at 29–30 (quoting AR 163), or it will need to adopt APL's alternative argument, which neither MARAD nor its counsel has previously embraced, that a Coast Guard regulation permits vessels in mixed foreign commerce and domestic trade to provide service to Saipan under a registry endorsement issued under 46 U.S.C. § 12111, *see id.* at 24, 27–28, 31.  In seeking approval of the APL Saipan as a replacement vessel on remand, APL will, at best, start from a blank slate and, if unsuccessful in pressing its alternative theory, APL will need to convince MARAD that the above-quoted language included in its 2016 memorandum was mistaken.  Even if the error committed by MARAD was simply a failure to consider and to address an important aspect of the problem— the APL Saipan's service to Saipan—then the decision suffers from a "major shortcoming[]" that also counsels vacatur on remand.  *Stewart v. Azar*, 313 F. Supp. 3d 237, 273 (D.D.C. 2018) (quoting *Humane Soc'y v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017)) (alteration in original).

       The Court, accordingly, cannot conclude that this is a case in which the agency simply needs better to explain a "potentially lawful but insufficiently or appropriately explained" decision that it reached.  *Radio-Television News Dirs. Ass'n*, 184 F.3d at 88 (quoting *Checkosky*, 23 F.3d at 464).  Although MARAD might be able to reach the same bottom line on remand (and the Court, once again, expresses no view on that question), the decision that the agency did reach either wholly ignored an important aspect of the problem or employed reasoning that does not align with its conclusion.  Either way, the deficiencies in the decision are serious.

       The first *Allied Signal* factor, accordingly, weighs against remand without vacatur.

**B.**     **Disruptive Consequences of an Interim Change**

       The second *Allied Signal* factor requires the Court to evaluate the extent of the disruption that vacatur would cause.  MARAD relies on the declaration of William G. McDonald, Director

of the agency's Office of Sealift Support, to argue that vacatur might undermine military readiness. Dkt. 42-1 at 1 (McDonald Decl. ¶ 1). McDonald attests that "MSP vessels are available on a moment's notice to [the Department of Defense] to move equipment and supplies to support U.S. troops in the event of war or national emergency." Dkt, 42-1 at 1 (McDonald Decl. ¶ 3). He further attests that, if the Court were to vacate MARAD's approval of the APL Saipan, "the MSP fleet would be down one vessel, consisting of 59 vessels instead of the Congressionally-intended 60" because the APL Saipan "would no longer be subject to the MSP Operating Agreement, and would no longer be required to be maintained in active service, or under the U.S.-flag, nor would the vessel necessarily be subject to the obligation to be a part of the emergency preparedness program as set out under 46 U.S.C. § 53107." *Id.* at 1–2 (McDonald Decl. ¶¶ 4–5) (footnote omitted). According to the McDonald declaration, removal of the APL Saipan from the MSP fleet "would adversely affect national defense in terms of military readiness for anywhere from two to six months, and in terms of movement of military equipment and supplies to support U.S. troops should a contingency arise." *Id.* at 2 (McDonald Decl. ¶ 4). "MSP vessels are particularly important," in McDonald's view, "because they must be operated for at least 320 days a year in order for carriers to receive full MSP payments," which means that MARAD "can be assured that these vessels are generally operating and available." *Id.* at 3 (McDonald Decl. ¶ 5). McDonald also attests that the APL Saipan meets unique needs because it serves the Pacific and can "navigate and conduct cargo operations in smaller ports with shallower harbors." *Id.* at 5 (McDonald Decl. ¶ 9).

As the McDonald declaration explains, the extent of any disruption resulting from vacatur of the 2016 Approval Order depends in part upon whether "APL decide[s] that it cannot operate [the APL Saipan] under the U.S.-flag without the MSP payment and lay up the S[aipan],

or withdraw the vessel and propose a different vessel as a replacement." *Id.* at 2, 4 (McDonald Decl. ¶¶ 4, 7). McDonald asserts that, if APL chose to lay up the APL Saipan, "APL would also likely lay off the vessel's U.S.-citizen crew" and "the need to re-hire a U.S.-flag crew would further complicate making the vessel available to [the Department of Defense] in an emergency." *Id.* at 4 (McDonald Decl. ¶ 7). If, instead, APL were to withdraw the APL Saipan from consideration and offer another vessel in its stead, various required approval processes for that vessel "could take up to six months" and the same layoff and rehiring concerns would likely apply. *Id.* at 4–5 (McDonald Decl. ¶ 8).

APL, in turn, offers the declaration of Eric L. Mensing, its President and Chief Executive Officer. Dkt. 43-1 at 1 (Mensing Decl.). Mensing attests that, APL has received over $17 million in MSP subsidy payments to date for the APL Saipan and that "[d]iscontinuation of those payments . . . during a remand would . . . force APL to *potentially* suspend or discontinue its service" and to possibly withdraw the vessel "from its Emergency Preparedness Agreement with the Department of Defense . . . , leaving the military with reduced critical sealift capacity and support." *Id.* (Mensing Decl. ¶¶ 3–4) (emphasis added). He further asserts that "APL's service in the Guam-Pacific trade is only viable with MSP payments." *Id.* (Mensing Decl. ¶ 4). APL also offers three letters emphasizing the importance of MSP vessels and their service to Guam. Dkt. 43-2 at 2 (Ex. A) (letter from General Stephen R. Lyons of the U.S. Army, noting that "[a]ny potential disruptions in the ocean transportation system would increase [the Department of Defense's] risk to deploy and sustain forces globally."); Dkt. 43-3 at 2 (Ex. B) (letter from Representative Michael F.Q. San Nicolas of Guam in support of MSP service to Guam); *see also* Dkt. 43-4 at 2 (Ex. C) (December 2016 letter from Representative Gregorio Kilili Camacho Sablan to MARAD expressing support for APL Saipan's service to the Northern Mariana Islands

7

which would "expand the commercial and military opportunities for the benefit of our economy, safety, and security"). Finally, the company argues that vacatur would "create great legal uncertainty" concerning the payments already made to it under the MSP, Dkt. 43 at 7, and "undoubtedly lead to disputes over transactions that have long been settled," which would cause considerable disruption. Dkt. 46 at 2 (discussing *Am. Great Lakes Ports Assoc. v. Schultz*, No. 18-5145, 2020 WL 3240903, at *6–7 (D.C. Cir. June 16, 2020).

Matson responds that "there is ample capacity in the Pacific trade to carry U.S. government cargo to and from the island territories of Guam and Saipan, even without the APL S[aipan]." Dkt. 45 at 10. It represents that its own vessels are capable of filling any service gap left by the APL Saipan, including service requiring a vessel of the same size as the APL Saipan. *Id.* at 10–11 (citing Lauer Decl. ¶¶ 9–10). In particular, APL's Senior Vice President John P. Lauer attests that, as of July 1, 2020, the company will operate five vessels in the "'Guam Service,' which includes cargo shipped to or from Guam and Saipan;" that those vessels each "transship to Saipan . . . once a week;" that "[f]or approximately four years prior to the launch of APL's Guam and Saipan service, Matson carried 100% of the U.S. government's cargo to Guam and Saipan in its Guam Service;" and that the five vessels that Matson will operate in the Guam Service "have more than sufficient excess capacity to meet the shipping needs of the U.S. military that are currently being served by the APL Saipan." Dkt. 45-1 at 1 (Lauer Decl. ¶¶ 1–9).

Based on the parties' competing declarations, the Court is unpersuaded that the Federal Defendants and APL have carried their burden on showing that vacatur would result in significant disruption. To start, the Court finds that this is not a case in which vacatur would have consequences that would prove difficult to unscramble or would alter the status quo in a

manner that cannot readily be restored.  *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 269 (D.D.C. 2015).  Moreover, even beyond that, the MARAD and APL have failed to offer evidence, beyond conclusory assertions, that temporarily having 59—instead of 60—vessels in the MSP fleet would materially affect military readiness.  To the contrary, APL merely asserts that, if the Court vacates the 2016 Approval Order, the company would "*potentially* suspend or discontinue its service" and that it "*could* also be forced to withdraw the APL Saipan from its Emergency Preparedness Agreement with the Department of Defense. . . , leaving the military with reduced critical sealift capacity and support."  Dkt. 43-1 at1 (Mensing Decl. ¶ 4) (emphasis added).  The fact that APL, which is best placed to know how it would respond, can offer only a "maybe" casts significant doubt on whether anything other than a financial loss to APL would result from vacatur.  That conclusion is reinforced, moreover, by Matson's unqualified assurance that it has the capacity to pick up any slack left should APL choose to alter its service in the region due to vacatur of MARAD's Approval Order.  To be sure, that might have economic ramifications for the government and for APL, but economic ramifications of that sort do not rise to the level of disruption that would justify leaving a seriously flawed agency order in place.  *See Reed v. Salazar*, 744 F. Supp. 2d 98, 120 (D.D.C. 2010) ("The fact that there may be some costs . . . associated with [vacatur] does not mean that there should be an exception from the default rule that arbitrary and capricious agency action be set aside.").

      Accordingly, the second *Allied Signal* factor weighs against remand without vacatur.

## CONCLUSION

Because both *Allied Signal* factors weigh against remand without vacatur, and because vacatur is the norm, the Court will **VACATE** the agency's 2016 Approval Order and **REMAND** the matter to MARAD for further proceedings.

A separate order will issue.

      /s/ Randolph D. Moss
    RANDOLPH D. MOSS
    United States District Judge

Date: June 30, 2020